Arnold HOLLOWAY, Petitioner,

v.

Martin HORN, Commissioner, Pennsylvania Department of Corrections, and Donald Vaughn, Superintendent, State Correctional Institution at Graterford, Respondents.

No. CIV.A. 00–CV–1757.

United States District Court,
E.D. Pennsylvania.

Aug. 27, 2001.

Billy H. Nolas, Michael Wiseman, Matthew Lawry, Asst. Federal Defenders, Philadelphia, PA, for petitioner.

Thomas W. Dolgenos, Lawrence J. Goode, Asst. District Attorneys, Philadelphia, PA, for respondents.

## *OPINION AND ORDER*

VAN ANTWERPEN, District Judge.

## I. INTRODUCTION

This matter is before us pursuant to a Petition for a Writ of Habeas Corpus, filed by Arnold Holloway ("Petitioner"), a/k/a Nasir Kareem, a/k/a Arnold L. Walker, a/k/a/ Prince Lee Holloway, on April 3, 2000. Petitioner presents sixteen claims and numerous subclaims under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, in pursuit of relief from his state murder conviction and death sentence. Petitioner was arrested on May 30, 1985 and charged with possession of the instrument of a crime, criminal conspiracy and first degree murder arising from the death of Richard Caldwell on May 16, 1980. Richard H. Knox, Esq. was appointed by the state trial court to assist Petitioner in presenting his defense, but he withdrew upon the entry of appearance by the privately retained Barry Denker, Esq. ("trial counsel"). Petitioner was prosecuted by Assistant District Attorney Drew R. Barth ("the ADA" or "the prosecutor"). Petitioner was found guilty by a jury on all charges in the Court of Common Pleas, Philadelphia County, June Term, 1985, Nos. 1305–1308, Hon. Albert F. Sabo, presiding, on May 22, 1986. The same jury fixed the penalty at death the next day in a bifurcated proceeding. Mr. Denker filed post-verdict motions, but then sought to withdraw as counsel because of Petitioner's dissatisfaction with his performance and his own ill health, but Judge Sabo ordered that his firm continue to represent Petitioner. Thereafter Petitioner was represented at post-verdict proceedings by Mary Zell, Esq., an associate of Mr. Denker's, who refused to argue Mr. Denker's ineffectiveness. In an opinion dated September 21, 1987, Judge Sabo denied relief on all grounds raised in the motion. Petitioner filed a timely appeal to the Pennsylvania Supreme Court. He was represented on direct appeal by Richard R. Redmond, Esq. ("appellate counsel" or "direct appeal counsel"), who filed a brief on his behalf on November 2, 1988. The Pennsylvania Supreme Court denied relief on March 20, 1990. *Commonwealth v. Holloway* ("*Holloway I*"), 524 Pa. 342, 572 A.2d 687 (1990).

On May 3, 1991 Petitioner filed a *pro se* petition for collateral post-conviction relief under the Pennsylvania Post Conviction Relief Act ("PCRA"), 42 Pa. Cons.Stat. § 9541 *et seq.* On August 5, 1991, John P. Cotter, Esq. ("PCRA counsel") was appointed to represent Petitioner in his post-conviction proceedings. PCRA counsel filed an Amended Petition and Memorandum of Law on June 21, 1993. Several more counseled and pro se supplemental petitions and memoranda of law were filed. On July 19, 1995, Judge Sabo ordered that an evidentiary hearing be held in conjunction with Petitioner's claims for state post-conviction relief, and such hearing was held on February 10, 1997. Petitioner's post-conviction claims were denied in the Court of Common Pleas of Philadelphia County, Criminal Appeals/Post Trial Unit, on July 16, 1997. Petitioner then filed a timely appeal to the Pennsylvania Supreme Court, and briefs were filed by new counsel. The appeal was denied on October 1, 1999, and the decision of the Court of Common Pleas, Hon. Albert F. Sabo, was affirmed. *See Commonwealth v. Holloway* ("*Holloway II*"), 559 Pa. 258, 739 A.2d 1039 (1999).

This case comes before us under § 2254 of the AEDPA, which permits federal courts to grant, under certain circumstances, a writ of habeas corpus to prisoners convicted in state court. Petitioner filed his Petition for a Writ of Habeas Corpus ("Petition" or "Pet.") in this Court on April 3, 2000. His Petition was followed by a Memorandum of Law in Support of Petition for a Writ of Habeas Corpus ("Memorandum of Law" or "Pet. Mem. L.") and a Motion for Discovery on June 22 of that year.[1] We denied the Motion for Discovery on August 9, 2000. The Commonwealth submitted its Response to Petition for Writ of Habeas Corpus ("Comm. Resp.") on February 28, 2001. On March 23, 2001, we ordered that the Clerk of Quarter Sessions Court of Philadelphia County file with the Clerk of this Court all records of Petitioner's state court proceedings, and we received such records on April 20, 2001. Petitioner filed a Reply Memorandum in Support of Petition for a Writ of Habeas Corpus ("Pet. Reply Mem.") on May 10, 2001. After reviewing the entire record and the filings of the parties, we found that Petitioner had shown good cause for us to exercise our discretion and order limited discovery of evidence supporting the claim of racial discrimination in the selection of Petitioner's jury, which we ordered on July 5, 2001. The parties provided such discovery to each other and the Court by July 24, 2001. Oral arguments thereon were held on August 2, 2001, at which time Petitioner submitted a Motion for Summary Judgment on the *Batson* Claim. On August 6, 2001 we scheduled an evidentiary hearing to be held on August 16, 2001 as to direct appeal counsel's reasons for not raising the *Batson* claim. On August 14, 2001 the

Commonwealth filed a Response to Petitioner's Motion for Summary Judgment on the *Batson* Claim and a Motion for Reconsideration of Grant of Evidentiary Hearing. The evidentiary hearing was held on August 16, 2001, at which time we denied the Motion for Reconsideration. Both parties filed post-hearing letter-briefs on August 17, 2001. All papers, oral arguments, evidence from the hearing, and the expanded record have been considered herein, except as specifically noted. We have placed the burden of proof on Petitioner to establish by a preponderance of the evidence any or all of the sixteen claims and numerous subclaims included in his Petition, and find that he has satisfied this burden with respect to one of his subclaims. We therefore vacate Petitioner's death sentence and remand his case to the Pennsylvania courts with an order that there be a resentencing proceeding.

## II. FACTUAL BACKGROUND

The Commonwealth's evidence at trial consisted primarily of Petitioner's unsigned statement, the statement and testimony of Shirley "Bones" Baker (Baker), and the testimony of a medical examiner and several police officers.

On May 16, 1980, at approximately 1:45 a.m., police were summoned to the 300 block of West Sedgley Street in Philadelphia, where, lying in the street, was a dead body later identified as Richard Caldwell ("Caldwell" or "the victim").

Baker was arrested in January 1985 on bench warrants arising from her failure to appear for sentencing on several drug charges. While under arrest, she made a statement to the police regarding her

---

1. The Memorandum of Law appears to have been filed on that date, but due to a filing error, it was never docketed. We brought the discrepancy in the docket to the attention of Petitioner's counsel, and a Corrected Memorandum of Law in Support of the Petition was filed on June 24, 2001.

knowledge of the murder of Caldwell, implicating Petitioner and others. She testified at Petitioner's trial, and her testimony was consistent in most material aspects with her previous statement.

At trial, Baker described an operation in which she, Petitioner, Danny "Black" Freeman (Freeman), and Caldwell sold heroin for Leroy "Bubbles" Johnson (Johnson). Petitioner obtained heroin from Johnson and then distributed it to Baker, Freeman and Caldwell who sold it on the street. The money was split between the dealers who sold the heroin on the street and Petitioner, who then gave the money to Johnson. In May of 1980, Johnson grew impatient because Caldwell owed him money for drugs he sold. (N.T. 5/19/86 at 70–76, 85.) Petitioner revealed in his statement that Johnson was also angry at Caldwell because Caldwell owed money to a rival drug dealer with whom Johnson wanted to do business, and Caldwell's debt was interfering with his plans. (N.T. 5/19/86 at 164–165.)

Baker testified that around midnight on May 16, 1980 she was selling heroin at a bar at 7th and Allegheny Avenues in North Philadelphia. Johnson arrived and offered Baker some cocaine, so they left the bar and went to Baker's apartment. After snorting the cocaine, Petitioner and Freeman arrived, and Petitioner asked to borrow Johnson's van. Johnson informed them that Caldwell was in the van, and Petitioner replied, "I can take care of that now." Then, Petitioner and Freeman went upstairs, got a shotgun, and left the apartment. Petitioner and Freeman returned between a half hour and an hour later and whispered with Johnson about shooting and strangling Caldwell. Petitioner, Johnson, and Freeman then left the

apartment and Baker returned to the bar. (N.T. 5/19/86 at 79–83; 131.)

Petitioner's unsigned statement to police made after he was arrested in May 1985 presents a similar account with some significant differences. Petitioner stated that he, Johnson, Baker, and Freeman were all snorting cocaine in Petitioner's apartment, while Caldwell was passed out in Johnson's van.[2] Johnson instructed Petitioner to "Go, get on your job." Petitioner protested, wondering if he might simply hurt Caldwell instead of killing him. Johnson replied, "It's either you or him." According to the statement, Johnson had earlier told Petitioner: "When I get him set up take him out and shoot him." After getting the shotgun and leaving the apartment, Petitioner and Freeman tied Caldwell's hands together, and drove several blocks to 3rd and Sedgley Streets. They pushed Caldwell out of the van, strangled him, taking turns pulling at a belt around his neck, and each shot him once in the head. They then drove the van back to Seventh Street, and informed Johnson that the job was done. (N.T. 5/19/86 at 161–162.)

The medical examiner, Dr. Halbert Fillinger, testified that the cause of Caldwell's death was two shotgun blasts to the head and strangulation by ligature. He revealed that the shotgun wounds had been inflicted at contact range on the right side of the victim's head, and also testified that a 1.3 cm wide groove extended around the victim's neck, indicating strangulation. (N.T. 5/19/86 at 57–58, 60.)

Petitioner was tried for the first degree murder of Richard Caldwell, criminal conspiracy and possession of the instrument of a crime. He was convicted by a jury

---

2. Petitioner and Baker both had apartments in the same house. It is not clear from his statement whether he was referring to his apartment or the house as the place that they were snorting cocaine.

and sentenced to death. He has been denied relief from his conviction and sentence both on direct appeal and in state collateral proceedings under the PCRA. He now petitions this court for federal habeas corpus relief pursuant to § 2254 of the AEDPA.

## III. DISCUSSION

### A. Exhaustion and Procedural Default

■ Before filing a petition for habeas corpus relief under 28 U.S.C. § 2254, a petitioner must exhaust all available state court remedies. 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement is a rule of comity, not jurisdiction, *Castille v. Peoples*, 489 U.S. 346, 349, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989), and is designed to allow state courts the opportunity to correct a state's alleged violation of federal constitutional law before federal courts consider the matter. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). "An applicant shall not be deemed to have exhausted the remedies available in the courts of the State ... if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

■ Exhaustion requires that petitioner fairly present his claims to every level of state court, including offering each claim for discretionary review by a State's highest court, and afford each reviewing court a fair opportunity to act on those claims.[3] *O'Sullivan*, 526 U.S. at 845, 119 S.Ct. 1728; *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). To satisfy the "fair presentation" requirement, the state court pleadings must demonstrate that the legal theory and supporting facts asserted in the federal habeas petition are "substantially equivalent" to those presented to the state courts, *see Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996), and the method of legal analysis to be applied in federal court was available to the state courts, *see McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir.1999).[4]

■ The petitioner bears the burden of proving that he has exhausted available state remedies. *See Landano v. Rafferty*, 897 F.2d 661, 668 (3d Cir.1990); *Santana v. Fenton*, 685 F.2d 71, 73 (3d Cir.1982). The petitioner is not, however, required to revisit claims raised on direct appeal in state collateral proceedings, *see O'Sullivan*, 526 U.S. at 844, 119 S.Ct. 1728 (citing *Brown v. Allen*, 344 U.S. 443, 447, 73 S.Ct. 397, 97 L.Ed. 469 (1953)), or seek alternatives to state habeas such as "a suit for injunction, a writ of prohibition, or mandamus or a declaratory judgment in the state

3. This requirement is currently being questioned in Pennsylvania with regard to non-capital cases. *See Mattis v. Vaughn*, 128 F.Supp.2d 249, 259 (E.D.Pa.2001) (upholding an order by the Pennsylvania Supreme Court making discretionary review by that court "unavailable" for purposes of federal habeas review). The Pennsylvania Supreme Court, however, exercises mandatory review of all death sentences, thereby making the order addressed in *Mattis* inapplicable here.

4. The Third Circuit has interpreted this standard and established four criteria to determine whether a federal claim is fairly presented when state court pleadings do not refer to specific, appropriate portions of the Constitution:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir.1999) (quoting *Evans v. Court of Common Pleas, Del. County, Pa.*, 959 F.2d 1227, 1232 (3d Cir.1992)).

courts." *Id.* (citing *Wilwording v. Swenson*, 404 U.S. 249, 249–50, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (per curiam)). If the petitioner is unable to prove that all claims in his petition satisfy the statutory exhaustion requirements, his entire petition must be dismissed without prejudice and returned to the state courts for consideration of the unexhausted claims. *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Lines v. Larkins,* 208 F.3d 153, 159–60 (3d Cir.2000). In the clear absence of any colorable federal claim, unexhausted claims may be dismissed on their merits. *See Lambert v. Blackwell,* 134 F.3d 506, 515 (3d Cir.1997) (interpreting 28 U.S.C. § 2254(b)(2): "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

If, however, state procedural rules bar a petitioner from seeking further relief in state courts, "the exhaustion requirement is satisfied because there is 'an absence of available State corrective process.'" *McCandless v. Vaughn,* 172 F.3d at 260 (citing 28 U.S.C. § 2254(b)); *see also Gray v. Netherland,* 518 U.S. 152, 161–62, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) ("Because [the exhaustion] 'requirement ... refers only to remedies still available at the time of the federal petition,' it is satisfied 'if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law.'" (citations omitted)); *Coleman v. Thompson,* 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him.").

A federal court may not, however, proceed to the merits of a claim simply because that claim satisfies the exhaustion requirement of 28 U.S.C. § 2254(b)(1)(A) and § 2254(c) because of a lack of available state process. Rather, "[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *see also Lines v. Larkins,* 208 F.3d at 160 (quoting *McCandless v. Vaughn,* 172 F.3d at 260).

Like exhaustion, the procedural default doctrine is based on principles of comity, and is intended to "reduce[ ] friction between the state and federal court systems by avoiding the 'unseem[liness]' of a federal district court's overturning a state court conviction without the state courts having had an opportunity to correct the constitutional violation in the first instance." *O'Sullivan,* 526 U.S. at 844–45, 119 S.Ct. 1728. A claim is procedurally defaulted if the state court of last resort refuses to consider its merits. *See Ylst v. Nunnemaker,* 501 U.S. 797, 801, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) ("If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available."); *County Court v. Allen,* 442 U.S. 140, 152–53, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979) (finding that, because the trial court "ruled on the merits" rather than on some state procedural ground, that the court "implicitly decided that there was no procedural default").

The Commonwealth argues that a number of Petitioner's claims or subclaims were not fairly presented, because Petitioner either never raised them at all, or did not analyze them in sufficient depth to put the Pennsylvania Supreme Court on notice that a federal claim was being raised. The Commonwealth further ar-

gues that such claims or subclaims would not be reviewable now in state court, because 42 Pa. Cons.Stat. § 9545(b), the timing requirement of PCRA, would bar a subsequent petition by Petitioner, and therefore the exhaustion requirement as to these subclaims is satisfied by procedural default "because there is 'an absence of available State corrective process.'" *McCandless v. Vaughn,* 172 F.3d at 260 (citing 28 U.S.C. § 2254(b)).

 We agree with the Commonwealth that any claims not fairly presented by Petitioner could not be raised in state court now because of the operation of § 9545(b). *See Holland v. Horn,* 150 F.Supp.2d 706, 721–26 (E.D.Pa. 2001). Petitioner had already amended his PCRA petition several times, but he could have amended it again during the sixty-day window of opportunity from November 17, 1995, when § 9545(b) was enacted, until it took effect on January 16, 1996, to include any omitted claims, without running afoul of the statute's one year time limit. Not only does § 9545 bar Petitioner from raising any omitted claims in a subsequent PCRA petition; it also causes such claims before us to be procedurally defaulted. Section 9545 is an independent and adequate state ground barring our review of such claims absent a showing of cause and prejudice. *See Holland,* 150 F.Supp.2d at 730–40; *see also* Part III. B. 2, *infra.*

Nearly all of the claims and subclaims explicitly raised by Petitioner are exhausted under 28 U.S.C. § 2254 by virtue of their having been fairly presented in state court. Upon reviewing the state court pleadings and the claims before us, we find that most of the legal theories and supporting facts asserted in the federal habeas petition are "substantially equivalent" to those presented to the Pennsylvania Supreme Court and Pennsylvania trial courts, *see Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996), and the method of legal analysis to be applied by us was available to the state courts, *see McCandless v. Vaughn,* 172 F.3d at 261. Therefore, the vast majority of claims and subclaims explicitly raised are exhausted by virtue of having been fairly presented to the Pennsylvania Supreme Court and trial-level state courts, and the few that were not fairly presented are exhausted by application of the time bar of § 9545(b).

## B. Standards of Review

### 1. Review under the AEDPA

 Under the Anti–Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, a petitioner may not be granted federal habeas relief if his claims were adjudicated on the merits in state court,[5] unless the state court decision was

---

5. If a court relied on procedural grounds to decline to decide a federal claim, or if it examined the merits of a claim only in the course of deciding a different claim, it has not adjudicated the claim on the merits. *See Sistrunk v. Vaughn,* 96 F.3d 666, 675 (3d Cir. 1996) (citing *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)). Otherwise, if the court cites to the controlling Supreme Court precedent or if it cites to state precedent or if it cites to state precedent or the progeny of state precedent that relies on the Supreme Court precedent, or even if no law is cited, and the decision is neither contrary to nor an unreasonable application of the relevant Supreme Court pre-

cedent, the state court will be deemed to have decided the federal claim on the merits. *See Werts v. Vaughn,* 228 F.3d 178, 202–05 (3d Cir.2000). In rare cases, the state court cites to and applies Supreme Court precedent that is not actually controlling with respect to the federal claim that the state court is attempting to adjudicate. In such cases the state court has not adjudicated the federal claim on the merits. *See Appel v. Horn,* 250 F.3d 203, 210 (3d Cir.2001) (finding that the state court should have analyzed a claim of right to counsel under *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), but instead analyzed the claim as one of inef-

(1) ... contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) ... based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Factual issues decided by the state court "shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).[6]

■ The "threshold question under AEDPA is whether [petitioner] seeks to apply a rule of law that was clearly established at the time his state court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). An existing federal law is "clearly established" unless it either "breaks new ground or imposes a new obligation on the States," *id.* at 391, 120 S.Ct. 1495, or was not "dictated" by precedent existing when the petitioner's conviction became final. *Id.; see also Teague v. Lane*, 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). The fact that a federal standard "of necessity requires a case-by-case examination of the evidence, obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established' by this Court." *Williams*, 529 U.S. at 391, 120 S.Ct. 1495 (citation omitted) (finding the *Strickland* standard for ineffective assistance of counsel to be clearly established).

■ A state court decision is contrary to federal law as determined by the Supreme Court "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495. "[I]t is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir.1999). It is likewise not necessary for a petitioner to cite factually identical Supreme Court precedent. He may instead rely on a Supreme Court rule that, by virtue of its factual similarity or intention to apply to variant factual situations, "can fairly be said to require a particular result in a particular case." *Id.* at 888–89.

■ A state court adjudication is an "unreasonable application" of clearly established federal law if the court "identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of

---

fective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); *Hameen v. State of Delaware*, 212 F.3d 226, 248 (3d Cir.2000) (finding that the state court should not have relied on *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), because it did not control the claim before it).

6. If no state court record exists with respect to a petitioner's claims, and Petitioner has "failed to develop the factual basis of the claim in state court," a federal evidentiary hearing may be held on the matter only if the petitioner satisfies two narrow criteria. First, he must show that his claim relies on either a new, retroactive constitutional law that was previously unavailable, or a factual predicate that could not, with the exercise of due diligence, have been previously discovered. Second, the petitioner must establish that the facts supporting his claim are sufficient to establish, by clear and convincing evidence, that but for constitutional error no reasonable fact-finder would have found him guilty of the underlying offense. 28 U.S.C. § 2254(e)(2).

the prisoner's case." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively unreasonable.*" *Id.* at 409, 120 S.Ct. 1495 (emphasis added). Although the term "unreasonable" is often difficult to define, the most important distinction is that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410, 120 S.Ct. 1495 (emphasis in original). A state court decision cannot be found unreasonable unless, "evaluated objectively and on the merits, [it] resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Matteo,* 171 F.3d at 890. The Third Circuit is of the view that in evaluating reasonableness, federal habeas courts are not precluded from considering the decisions of lower courts. *Matteo,* 171 F.3d at 890 (citing *O'Brien v. Dubois,* 145 F.3d 16, 25 (1st Cir.1998)). In fact, such lower court decisions may serve as "helpful amplifications" of Supreme Court precedent. *Id.*

## 2. Procedurally Defaulted Claims

■ A federal claim is procedurally defaulted and federal habeas review of the claim is barred if the state court of last resort refuses to consider its merits, *see Ylst v. Nunnemaker,* 501 U.S. 797, 801, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), if such refusal is "pursuant to an independent and adequate state procedural rule," *see Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see also Lines v. Larkins,* 208 F.3d 153, 160 (3d Cir.2000).

■ In its decision on Petitioner's PCRA appeal, the Pennsylvania Supreme Court relied on two procedural grounds to refuse to adjudicate the merits of a number of Petitioner's federal claims. *See Holloway II,* 559 Pa. 258, 739 A.2d 1039, 1044 (1999). First, it relied on its long-established rule that the failure of trial counsel to contemporaneously object to errors occurring at trial, and thus preserve these issues for appeal, results in a waiver of these issues. *See id.* (citing *Commonwealth v. Williams,* 541 Pa. 85, 660 A.2d 1316 (1995)). Such issues may only be considered on their merits if trial counsel is first shown to be constitutionally ineffective for failing to preserve the issues for appeal, and thus the Pennsylvania Supreme Court considered all such claims raised by Petitioner as claims of trial counsel's ineffectiveness. *See id.* (citing *Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693 (1998)). The court also relied on the interplay between two provisions of the PCRA, 42 Pa. Cons.Stat. § 9543(a)(3), which bars the Pennsylvania Supreme Court from hearing any claim that was previously litigated on direct appeal or was waived, and § 9544(b), under which "an issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, ... on appeal or in a prior state postconviction proceeding," to find that any claim not raised at trial, on direct appeal, before the PCRA trial court, or any combination thereof, was waived. *Holloway II,* 739 A.2d at 1044. Again, however, such waiver could be overcome if counsel were shown to be constitutionally ineffective for failing to raise such claims at the proper time, and thus all such claims were considered to be, and adjudicated as, claims of ineffectiveness of counsel for failure to timely raise the claims. *Id.* If either of these grounds are independent and adequate state procedural rules, we would be barred from examining

the underlying claims on the merits.[7]

A state procedural rule is considered independent if it does not rely on the merits of a federal claim or "rest[ ] its decision primarily on federal law."[8] *Harris v. Reed*, 489 U.S. 255, 260–61, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *see also Ford v. Stepanik*, 1998 WL 297626, at *3 (E.D.Pa. June 2, 1998). Such a rule is adequate under the procedural default doctrine if it is "firmly established and regularly followed" within the state. *James v. Kentucky*, 466 U.S. 341, 348, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984); *see also Ford v. Georgia*, 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (stating that a state procedural rule may not be adequate if "the defendant ... could not be 'deemed to have been apprised of its existence' "); *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) ("[A] state procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed.' "); *Barr v. City of Columbia*, 378 U.S. 146, 149, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964). *But see Jamison v. Collins*, 100 F.Supp.2d 521, 559 (S.D.Ohio 1998) ("A state procedural rule that was not firmly established at the time it should have been complied with by the petitioner, and therefore is applied retroactively, is not an adequate state ground that bars federal habeas review."). The phrase "firmly established and regularly followed" requires that a petitioner have some sort of notice, at the time of his state court procedural default, of a state procedural rule's potential impact on his case before that rule can be considered adequate. *See Ford v. Georgia*, 498 U.S. at 423–24, 111 S.Ct. 850; *N.A.A.C.P. v. Alabama*, 357 U.S. 449, 457, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) ("[A] local procedural rule, although it may now appear in retrospect to form part of a consistent pattern of procedures ... cannot avail the State here, because petitioner could not fairly be deemed to have been apprised of its existence. Novelty in procedural requirements cannot be permitted to thwart review in this Court...."); *Cabrera v. Barbo*, 175 F.3d 307, 313 (3d Cir.1999) ("The reason for these requirements is that a petitioner should be on notice of how to present his claims in the state courts if his failure to present them is to bar him from advancing them in a federal court."). The Third Circuit found this notice requirement satisfied when a presiding judge in a collateral proceeding specifically asked a petitioner if he had anything else to present. *Cabrera*, 175 F.3d at 313 (finding that petitioner had "ample opportunity" to present his defaulted claims in state court because "the judge at the hearing repeatedly gave Cabrera, who was present at the hearing, an opportunity to say 'anything' ").

Petitioner asserts that the §§ 9544(b) and 9543(a)(3) rules are not adequate, because the "relaxed waiver" doctrine makes such rules not "firmly established and regularly followed." Under the "relaxed waiver" doctrine, the Pennsylvania Supreme Court reserved its discretion "to address all issues arising in a death penalty case, irrespective of a find-

---

7. On PCRA appeal, the Pennsylvania Supreme Court also ruled that it could not examine several claims that it had addressed on direct appeal, because they fell within the "previously litigated" bar of 42 Pa. Cons.Stat. § 9543(a)(3). We need not decide whether this bar is also bars us from examining such claims on the merits; we simply review any claims that were adjudicated on direct appeal under the AEDPA standard. If such claims were not actually adjudicated, however, we will examine them under the standard outlined in Part III. B. 3., *infra*.

8. There is no dispute that such procedural rules are independent.

ing of waiver." *Commonwealth v. Travaglia,* 541 Pa. 108, 661 A.2d 352, 356 n. 6 (1995). Petitioner suggests that the doctrine's existence led him to believe that his state collateral claims would be preserved despite his violation of §§ 9544(b) and 9543(a)(3), and that he therefore was without proper notice of the statute's potentially preclusive effect.

We believe that these PCRA rules are adequate state grounds barring our review of the underlying claims on the merits. Petitioner is correct in citing the existence of such a doctrine, at least prior to the PCRA amendments of November 17, 1995, at which time the doctrine appears to have been eradicated by the language of those amendments, which state that "[e]xcept as specifically provided otherwise, all provisions of this subchapter shall apply to *capital* and noncapital cases." 42 Pa. Cons. Stat. § 9542 (emphasis added). The Pennsylvania Supreme Court verified this interpretation in *Commonwealth v. Peterkin,* 554 Pa. 547, 722 A.2d 638 (1998), in which it upheld the constitutionality of the 1995 PCRA amendments against challenges that they could not, in conjunction with the relaxed waiver doctrine, provide reliable notice of the availability of state collateral review. The clear language of the 1995 amendments, in conjunction with the Pennsylvania Supreme Court's ruling that the relaxed waiver doctrine could not trump the statute's authority, leads us to conclude that Petitioner could not have justifiably relied on the relaxed waiver doctrine as grounds for failing to timely raise his claims. *See Holland v. Horn,* 150 F.Supp.2d at 722 n. 11 (E.D.Pa. 2001) (finding that to the extent relaxed waiver existed, it ended with the enactment of the 1995 PCRA amendments).

Furthermore, the relaxed waiver doctrine was never as broad or as widespread as Petitioner asserts. *See Commonwealth v. Williams,* 541 Pa. 85, 660 A.2d 1316, 1319–1320 (1995) ("While we have recognized that waiver rules are often relaxed in capital cases, ... we have held in other capital cases that issues not raised before the trial court were waived.... This Court does not countenance trial counsel intentionally sitting by silently at trial only later to complain of trial errors on appeal after an unfavorable verdict. That a matter is a death penalty case in no way relieves trial counsel of the duty to raise appropriate contemporaneous objections at trial to allow the trial court to cure any alleged error as well as preserve issues for appellate review.") (citing *Commonwealth v. Goins,* 508 Pa. 270, 495 A.2d 527, 530 (1985) (plurality) (appellant's claims of prosecutorial misconduct are waived for trial counsel's failure to object); *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987) (even though issue of whether exclusion of prospective jurors was of constitutional dimension, the issue was waived because defense counsel indicated he had no objection to the challenges for cause of the two jurors); *Commonwealth v. Szuchon,* 506 Pa. 228, 484 A.2d 1365 (1984) (whether prospective jurors were improperly excluded is waived and cannot be addressed for the first time on appeal because trial counsel failed to object to the challenge of prospective jurors or to rehabilitate them through further questioning)). Clearly, relaxed waiver was not so widespread that Petitioner could have justifiably relied on it to believe that the PCRA waiver rules regarding the requirement of raising claims at the earliest opportunity were not "firmly established and regularly followed." *James v. Kentucky,* 466 U.S. 341, 348, 104 S.Ct. 1830, 80 L.Ed.2d 346 (1984). The phrase "firmly established and regularly followed" requires that a petitioner have some sort of notice, at the time of his

state court procedural default, of a state procedural rule's potential impact on his case before that rule can be considered adequate. *See Ford v. Georgia,* 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991). Nor could Petitioner be deemed not " 'to have been apprised of [the] existence' " of such rules. *Id.* (quoting *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 457, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)). Because the relaxed waiver doctrine was not so broadly or frequently applied as to justify reliance on it or justify a belief that the PCRA rules at issue were not "firmly established and regularly followed," we find such rules to be "adequate" so as to bar our direct review of the underlying claims.

Even if the relaxed waiver doctrine were sufficiently widespread such that Petitioner could have believed that any claim not raised on direct appeal could be raised on the merits in his PCRA petition without a showing that direct appeal counsel was ineffective for failing to assert the claim, Petitioner would still be faced, as to many claims, with the waiver that occurred when trial counsel failed to preserve such issues for appeal. Such waiver rests not only on

the PCRA rules, but on the longstanding independent rule that any issues not preserved by trial counsel's contemporaneous objection could only be reviewed as claims of trial counsel's ineffectiveness for failing to raise them. The "relaxed waiver" doctrine never, or at least rarely, applied to such waivers, *see Commonwealth v. Williams,* 660 A.2d at 1316, and cases cited therein, and therefore the contemporaneous objection rule must also be considered "adequate" so as to bar our direct review of the underlying trial errors.

■ Federal review of defaulted claims is prohibited, unless Petitioner is able to "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." [9] *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546. The Supreme Court has identified three circumstances in which procedural default may be excused for cause: (1) if the "factual or legal basis for a claim was not reasonably available to counsel," (2) "if some interference by officials made compliance [with state procedural rules] impracticable," [10] or (3) "if the procedural

---

9. Another exception to the procedural default doctrine is recognized in cases where preclusion of federal review would result in a "fundamental miscarriage of justice." *Murray,* 477 U.S. at 495, 106 S.Ct. 2639. This is a particularly rare exception, applicable only in cases "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496, 106 S.Ct. 2639. Actual innocence alone, however, is not a cognizable claim for habeas relief; petitioner must instead *"supplement[ ]* his constitutional claim with a colorable showing of factual innocence." *Herrera v. Collins,* 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (emphasis in original). To establish actual innocence due to errors at trial, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo,* 513 U.S. 298, 327,

115 S.Ct. 851, 130 L.Ed.2d 808 (1995). This represents a "stronger showing than that needed to establish prejudice." *Id.* In order to demonstrate actual innocence as a result of errors committed at sentencing, "one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under the applicable state law." *Sawyer v. Whitley,* 505 U.S. 333, 336, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). Petitioner does claim generally that the many errors in his case resulted in a colorable showing of factual innocence, but we find that none of the underlying claims that go to innocence have merit, so no miscarriage of justice existed with respect to any of those claims.

10. Petitioner argues that Commonwealth should be estopped from arguing that certain claims were defaulted because of the statement of ADA Ronald Eisenberg to the Penn-

default is the result of ineffective assistance of counsel." [11] *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). If cause is established, a petitioner must then also demonstrate actual prejudice as a result of the procedural default. Actual prejudice requires that the petitioner "shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original). Petitioner does not contend that either of the first two circumstances demonstrating cause are relevant to his claims, except as we have explained in note 10, and we agree and so find. Although Petitioner argues that none of his claims are defaulted, he argues that if we were to find such a default, his trial and appellate coun-

sylvania Supreme Court in response to Petitioner's attempts to file pro se briefs on direct appeal while represented: "[Should he] later be dissatisfied with the outcome of his direct appeal, he may then pursue any additional claims through state collateral review." (Pet. Reply Mem. App. A.) This argument has no merit. On the original record, we cannot even determine which claims would fall within the scope of this argument, because the pro se direct appeal filing is not in the record. The record includes Petitioner's pro se PCRA petition and Petitioner alleges that the direct appeal filing had the same claims as those in the pro se PCRA petition, but there is no evidence that such is the case. During the evidentiary hearing that we held for the sole and limited purpose of establishing direct appeal counsel's reasons for not raising the *Batson* claim, in order to determine whether cause was shown for the procedural default that arose from the failure to raise the claim on direct appeal, Petitioner submitted as Petitioner's Exhibit 1 the missing pro se filing. However, as we explain *infra* at n. 56, we may only consider such evidence for the purpose of determining whether cause exists. Furthermore, we find that the letter is ambiguous. ADA Eisenberg's statement can as easily understood to mean that Petitioner could pursue claims directly on the merits in collateral proceedings as to mean that in collateral proceedings Petitioner could allege that direct appeal counsel was ineffective for not raising the omitted claims.

Finally, the letter refers to Petitioner as being represented. The Pennsylvania Supreme Court is not required to accept and consider pro se filings from a represented appellant, but may do so in its discretion. *See Commonwealth v. Ellis,* 534 Pa. 176, 626 A.2d 1137, 1139 (1993) ("[T]here is no constitutional right to hybrid representation either at trial or on appeal ... and no statute mandates hybrid representation on appeal.") (citing *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811, 821 (1985)) (no right to hybrid representation at trial); *id.* at 1140 ("[I]f appellate counsel's arguments do not prevail and the appellant is convinced that his own unheeded arguments should have been presented, he need only file a petition pursuant to the Post Conviction Relief Act, claiming appellate counsel's ineffectiveness."); *see also, e.g., Commonwealth v. Henry,* 341 Pa.Super. 146, 491 A.2d 193, n. 2 (1985); *Commonwealth v. Kibler,* 294 Pa.Super. 30, 439 A.2d 734 (1982). Even when the Pennsylvania Supreme Court does consider such briefs, it often merely dismisses the claims therein as being without merit with little or no discussion.

Each of these three reasons is sufficient for us to find that the Commonwealth should not be estopped because of the Eisenberg letter from arguing procedural default of claims not raised in the counseled direct appeal brief, and we so find.

11. The AEDPA has, in some circumstances, eliminated the cause and prejudice exception to procedural default in lieu of a more deferential standard of review for all capital habeas claims arising under § 2254. *See* 28 U.S.C. § 2264. This standard only applies, however, to convictions in states that satisfy the criteria set forth in 28 U.S.C. § 2261. Since Pennsylvania does not satisfy these criteria, we therefore continue to apply the traditional cause and prejudice analysis in Petitioner's case. *See Death Row Prisoners of Pennsylvania v. Ridge,* 106 F.3d 35, 36 (3d Cir.1997).

sel were constitutionally ineffective in not raising his defaulted claims. We will therefore limit our analysis of Petitioner's defaulted claims to the adequacy of his legal representation.[12]

 Ineffective assistance of counsel is a violation of the Sixth Amendment, which guarantees every defendant "[i]n all criminal prosecutions...the Assistance of Counsel for his defense." A showing of ineffective assistance requires satisfaction of two components. First, counsel must have been so deficient that his "representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, a petitioner must show that counsel's "deficient perfor-

mance prejudiced the defense." *Id.* In determining whether counsel acted reasonably, there remains a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052; *Diggs v. Owens*, 833 F.2d 439, 444–45 (3d Cir. 1987). Counsel's actions are evaluated " 'on the facts of the particular case, viewed as of the time of counsel's conduct.' " *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052). A lack of success is not proof of unreasonableness, *see Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, and strategic and tactical decisions are not grounds for an ineffective assistance claim unless

---

**12.** As mentioned above, Petitioner fairly presented claims of ineffective assistance of trial and appellate counsel in the state courts. The Pennsylvania Supreme Court determined that his constitutional right to counsel had not been violated. *Holloway I*, 572 A.2d at 691–94; *Holloway II*, 739 A.2d at 1044–48. Therefore, he may now argue that his deficient representation amounts to an appropriate ground for finding cause. *See Edwards v. Carpenter*, 529 U.S. 446, 452, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000) (" '[A] claim of ineffective assistance' generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.' ") (quoting *Murray v. Carrier*, 477 U.S. 478, 489, 106 S.Ct. 2639 (1986)); *Holloway II*, 559 Pa. 258, 739 A.2d 1039, 1044 (1999) (acknowledging that Petitioner alleges "that all his prior counsel were ineffective").

28 U.S.C. § 2254(d) empowers federal courts to grant a writ of habeas corpus pursuant to "any claim that was adjudicated on the merits in State court proceedings" if the federal court finds that the state adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law." Recent decisions have refrained from applying this highly deferential standard in cases involving claims of cause and prejudice to excuse state procedural default. *See Edwards*, 529 U.S. at 452–54, 120 S.Ct. 1587.

In *Edwards*, the Supreme Court required that claims of cause on the grounds of ineffectiveness of counsel had to be exhausted in state court. *Id.* The Court did not address whether, in reviewing exhausted claims of ineffectiveness of counsel, we should now apply the standard set forth in 28 U.S.C. § 2254(d), as opposed to that established by *Murray v. Carrier*. *Id. See also Holland v. Horn*, 150 F.Supp.2d at 745–48 (E.D.Pa. 2001). We believe that the procedural default doctrine addressed by the Supreme Court in *Murray v. Carrier* is controlling and unchanged by 28 U.S.C. § 2254(d). *Id.*

The standard set forth in 28 U.S.C. § 2254(d) applies to a federal court's review of "any claim." When a petitioner, in trying to establish "cause" for his procedural default, contends that his counsel was ineffective, he is not seeking review of a state court's determination of ineffectiveness of counsel; i.e. he is not seeking review of the state court's decision as a ground for habeas relief. Rather, he is using his ineffectiveness of counsel allegation to excuse his failure to present claims to the state court. Cause and prejudice are merely an excuse to overcome a procedural default; they are not a claim in themselves. Therefore, our review of an allegation of ineffectiveness as an excuse is independent of our review of the Pennsylvania Supreme Court's adjudication of an ineffectiveness claim.

counsel displayed "ineptitude, inexperience, lack of preparation or unfamiliarity with basic legal principles." *Commonwealth of the Virgin Islands v. Weatherwax ("Weatherwax I")*, 20 F.3d 572, 579 (3d Cir.1994), *rev'd on other grounds, Commonwealth of the* Virgin Islands v. Weatherwax (*"Weatherwax II "*), 77 F.3d 1425, 1435 (3d Cir.1996).

Prejudice exists if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also United States v. DeRewal,* 10 F.3d 100, 104 (3d Cir.1993) (defining prejudice as deprivation of "a trial whose result is reliable"). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. In assessing the likelihood that the result would have been different, courts "must consider the totality of the evidence before the judge or jury." *Id.* at 695, 104 S.Ct. 2052. This standard of prejudice applies when counsel's deficiencies deprive his client of a substantive or procedural right. *See Williams v. Taylor,* 529 U.S. 362, 391–93, 120 S.Ct. 1495, 146 L.Ed.2d 389.

In a limited number of cases, when counsel's deficiencies do *not* deprive his client of another substantive or procedural right, the *Strickland* prejudice analysis is insufficient to determine whether a petitioner has been deprived of his right to assistance of counsel, and the focus is instead on fundamental fairness. *Williams,* 529 U.S. at 391–93, 120 S.Ct. 1495 (citing *Lockhart,* 506 U.S. at 369, 113 S.Ct. 838; *Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986) ("[T]he 'benchmark' of an ineffective assistance claim is the fairness of the adversary proceeding.")). In order to establish prejudice as a result of deficient representation in such cases, a defendant must demonstrate that "counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Lockhart,* 506 U.S. at 369, 113 S.Ct. 838 (citing *Kimmelman v. Morrison,* 477 U.S. 365, 374, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)). When counsel's deficiency *does* result in the deprivation of a right that his client is entitled to, however, "[c]ases such as [*Nix* and *Lockhart* ] do not justify a departure from a straightforward application of *Strickland.*" *Williams,* 529 U.S. at 393, 120 S.Ct. 1495.

The prejudice standard applied in the ineffective assistance context is nearly identical to the actual prejudice standard for excusing a procedural default articulated in *Coleman.* As a result, we may rely on any findings of prejudice within our ineffectiveness inquiry to satisfy any claims of actual prejudice to Petitioner. Furthermore, the standard used to determine ineffective assistance as grounds for cause is identical to that applied with respect to substantive claims for relief under the Sixth Amendment. As a result, we rely on our above explanation of the *Strickland* standard in all our ineffective assistance inquiries.

If we find sufficient cause and prejudice under *Coleman* to excuse the procedural default caused by the failure of trial counsel to contemporaneously object, or caused by direct appeal counsel for failure to raise a claim, or both, as would be necessary in some cases, we believe we would then exercise plenary review the of the merits of the underlying claim. *See, e.g., Appel v. Horn,* 250 F.3d 203, 210 (3d Cir.2001) ("It follows that when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal

habeas court, the deferential standards provided by AEDPA and explained in *Williams* do not apply ... [and] the federal habeas court must conduct a de novo review over pure legal questions and mixed questions of law and fact, as a court would have done prior to the enactment of AEDPA."); *Hameen v. State of Delaware*, 212 F.3d 226, 248 (3d Cir.2000) ("[U]nder the AEDPA the limitation on the granting of an application for a writ of habeas corpus is only 'with respect to any claim that was adjudicated on the merits in state court proceedings.' Hence we exercise pre-AEDPA independent judgment. . . ."); *Smallwood v. Gibson*, 191 F.3d 1257, 1264 (10th Cir.1999) (finding that under AEDPA "we are generally subject to two different frameworks of review, depending upon whether the state courts addressed the merits of the claim for relief. If the state courts have not heard the claim on its merits, we review the district court's legal conclusions de novo"). Even if the Pennsylvania Supreme Court determined, in the course of adjudicating a claim of ineffectiveness, that the underlying, procedurally defaulted claim had no merit, we would not be bound by this purported determination of the merits of that claim. *See Sistrunk v. Vaughn*, 96 F.3d 666, 673 (3d Cir.1996).

■ We also note that in *Sistrunk*, the Third Circuit explained that the doctrine that an independent and adequate state ground bars federal relief "applies whenever the state court relies upon such an adequate and independent state ground, even when it goes on to address the federal claim in an alternative holding." *Id.* (citing *Harris v. Reed*, 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)). The Third Circuit further reasoned that "[i]f federal review of a federal claim is foreclosed when the state court addresses the merits of the federal claim in an alternative holding directed to that claim, surely federal review must also be foreclosed when the state court addresses the merits of the federal claim only in the course of resolving another, independent claim." *Id.* at 675. Thus, if the Pennsylvania Supreme Court relied upon an independent and adequate state ground with respect to any subclaim and we find the procedural default to be excused, we may examine the underlying claim and apply de novo review to it rather than the AEDPA standard. *See Appel v. Horn*, 250 F.3d at 210; *Hameen v. State of Delaware*, 212 F.3d at 248. We would still presume that any state court's factual determinations are correct, rebuttable only on a showing of clear and convincing evidence. *See Appel*, 250 F.3d at 210 (citing 28 U.S.C. § 2254(e)(1)); *see also Smallwood*, 191 F.3d at 1264 (state court factual findings are reviewed for clear error).

### 3. Fairly Presented Claims That Were Neither Adjudicated on the Merits, nor Procedurally Defaulted

■ As with claims for which a procedural default was overcome by a showing of cause and prejudice, we would also review de novo any claim that was not adjudicated on the merits by the Pennsylvania Supreme Court due to the erroneous application of the "previously litigated" bar of 42 Pa. Cons.Stat. § 9543(a)(3) and § 9544(a), because such a bar would not be "adequate" to prevent our review. In the course of deciding Petitioner's PCRA appeal, the Pennsylvania Supreme Court invoked the "previously litigated" bar to decline to review a number of claims, asserting that it had addressed such claims on direct appeal. *Holloway II*, 739 A.2d at 1044. We respectfully find that, in several instances, some of these claims or subclaims were not actually addressed by the Pennsylvania Supreme Court, even if its decision in *Holloway I* is read broadly. Even though the Pennsylvania Supreme

Court could have properly found such claims to be waived for failure to raise them on direct appeal, it did not rely on that procedural bar, and we are therefore not bound by the existence of such a bar, even though we would be bound by it had the court asserted it. Because such claims are therefore not procedurally defaulted, and were not, in fact, adjudicated on the merits, but were fairly presented, we review them de novo. *See Appel v. Horn*, 250 F.3d at 210; *Hameen v. State of Delaware*, 212 F.3d at 248.

## C. Petitioner's Substantive Claims

### 1. Claim I–Exclusion of Evidence of Alleged Accomplice's Acquittal

██ Petitioner claims that the exclusion of his knowledge and the knowledge of Detective Gilbert, who interrogated him, of the acquittal of Freeman, offered for the purpose of showing Petitioner's state of mind and the detective's motive to fabricate Petitioner's alleged confession, was a violation of Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights to due process, present a defense, and to a fair trial. He also claims that all prior

counsel were ineffective to the extent that they failed to fully, timely, and properly raise this issue. Petitioner argues that because he knew that his alleged accomplice, Freeman, had been acquitted, he had a strong motive not to make any statement. According to Petitioner, the only evidence against either Freeman or him was the statement of Shirley Baker, and Freeman was acquitted on that evidence, so Petitioner allegedly reasoned that he would likewise be acquitted, and therefore he never would have made the statement. Petitioner further argues that because the detective also knew of both Freeman's acquittal and Baker's testimony, the detective concocted Petitioner's alleged confession using Baker's testimony, so that at least someone would be convicted for the Caldwell murder.

Petitioner raised these issues both in his amended PCRA Petition to the PCRA hearing court and in his initial PCRA brief before the Pennsylvania Supreme Court.[13] Because the Pennsylvania Supreme Court found that these issues were not raised on direct appeal or before the PCRA trial court, however, the Pennsylvania Supreme Court deemed them to be waived.[14] *Com-*

**13.** The Commonwealth takes issue with Petitioner's allegation that his previous claim rested on all of these amendments, arguing that some were not raised. Petitioner did claim, however, that his rights to due process and a fair trial were violated, so we find that he did raise claims under the Fifth, Sixth, and Fourteenth Amendments. We understand Petitioner to be arguing that he was deprived of "a meaningful opportunity to present a complete defense," which could be brought as either a due process or fair trial claim. *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *see also Strickland v. Washington*, 466 U.S. 668, 684–85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment."). Because substantially the same facts

and legal theories were available to the Pennsylvania Supreme Court, and, notwithstanding the Pennsylvania Supreme Court's assertion to the contrary, also to the PCRA hearing court, we find that Petitioner's Fifth, Sixth, and Fourteenth Amendment claims were fairly presented. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996). Petitioner has made no argument to us regarding the alleged Eighth Amendment violation, and therefore we deem such a claim to be waived.

**14.** Although Petitioner's trial counsel did not use the magic word "objection," when Judge Sabo ruled at the suppression hearing that Freeman's acquittal may not be referred to at trial, trial counsel strenuously argued that such information was crucial to Petitioner's defense. (N.T. 5/13/86, at 89–93.) The Su-

monwealth v. Holloway (Holloway II), 559 Pa. 258, 739 A.2d 1039, 1044–45 (Pa. 1999). Because Petitioner alleged ineffectiveness of all prior counsel, however, the court adjudicated the claims from the standpoint of a ineffectiveness claim. See id. We must therefore do so as well, applying the AEDPA standard.

In deciding the ineffectiveness claim, the Pennsylvania Supreme Court noted that Petitioner's underlying federal claim was based on a due process theory, explained the claim, and then decided that the claim had no merit. See Holloway II, 739 A.2d at 1044–45. The court then proceeded to examine Petitioner's state law claim as to the exclusion of this evidence. Petitioner argues that because the case relied upon by the Pennsylvania Supreme Court in this latter discussion, Commonwealth v. Meredith, 493 Pa. 1, 425 A.2d 334 (1981), was simply a state law case, and neither it nor any case it cited to discussed due process issues, the court never decided the federal claim. We find that the court did not adjudicate the federal claim within the meaning of the AEDPA, 28 U.S.C. § 2254(d), but that it adjudicated the claim of ineffectiveness of counsel for failure to raise this evidentiary issue previously on the basis that neither the federal claim nor the state claim had merit. See Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (counsel cannot be ineffective for failing to raise a meritless claim). The court's brief description of Petitioner's due process claim and the decision that the claim has no merit would suffice for us to conclude that it considered and decided the federal claim so as to be "adjudicated on the merits" for the purpose of applying AEDPA, were the claim in such a procedural posture that the court was examining the claim directly, see Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir.2000), therefore they suffice for us to conclude that it decided the issue as an underlying basis for the claim of ineffective assistance of counsel.[15] It appears that the court simply moved on to examine the state-law issue without using a transition sentence.

We have reviewed the court's ineffectiveness adjudication under the AEDPA standard, and we find that it is neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. In the process of our review, we also find that we agree with the Pennsylvania Supreme Court that the underlying claim has no merit. Therefore, not only do we find that the Pennsylvania Supreme Court's decision must be upheld under the AEDPA and thus deny relief; if we were to examine the underlying claim de novo, either by concluding that it had been fairly presented but not adjudicated on the merits, or after a showing of cause and prejudice, we would likewise deny re-

preme Court of Pennsylvania, however, appears to have treated this claim as waived both for a failure to contemporaneously object at trial and for failure to raise on direct appeal as required by 42 Pa. Cons.Stat. §§ 9543(a)(3) and 9544(b). We will assume that both of these bases for the waiver are independent and adequate state grounds barring our review of the underlying substantive claim, and that each were properly applied by the Pennsylvania Supreme Court as to this claim. Therefore, to review this claim on the

merits, we would be required to find cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default. See Part III. B. 2, supra.

15. We conclude that the court decided the ineffectiveness claim based not only upon the underlying due process claim, but also upon the underlying claims based on the rights to present a defense and to a fair trial. See n. 13, supra.

lief.[16]

■ Petitioner argues that under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), and *Crane v. Kentucky*, 476 U.S. 683, 689–90, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986),[17] his rights to due process, to present a defense and to a fair trial were violated. He argues that he should have been permitted to offer evidence of his and Detective Gilbert's knowledge of Freeman's acquittal solely for the purpose of showing that Petitioner had no motive to make the statement and thus never would have, and that Detective Gilbert had a motive to create the statement.

■ The Supreme Court has traditionally been reluctant to "impose constitutional constraints on ordinary evidentiary rulings by state trial courts." *Crane*, 476 U.S. at 689, 106 S.Ct. 2142. The Constitution gives trial judges "wide latitude" to exclude evidence that is "repetitive," "only marginally relevant," or that poses an undue risk of "harassment, prejudice, or confusion of the issues." *See Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Further, the Court has "never questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability-even if the defendant would prefer to see the evidence admitted." *Crane*, 476 U.S. at 690, 106 S.Ct. 2142 (citing *Cham-*

*bers*, 410 U.S. at 302, 93 S.Ct. 1038.). Nevertheless, the Court has held in a few limited cases that state court evidentiary rulings violated the defendant's Fifth or Sixth Amendment rights.

In *Chambers*, the Court held that under the facts of that case, the defendant's right to due process was violated. 410 U.S. at 286, 93 S.Ct. 1038. The trial court had excluded evidence that a third person on separate occasions orally confessed to three different friends to the murder for which Chambers was convicted, under circumstances that bore substantial assurances of trustworthiness, as well as evidence that this person made, but later repudiated, a sworn written confession. *Id.* at 287–90, 93 S.Ct. 1038. The testimony of the three persons to whom the oral confessions were made, as well as the repudiated written statement were excluded as hearsay, because Mississippi recognized no exception for admissions against penal interest. Further, because of Mississippi's common-law voucher rule, the trial court prevented Chambers from cross-examining this third person when he called him as a witness. The Court held that, due to this combination of evidentiary rulings, Chambers was deprived of his right to due process. The Court emphasized that it was establishing no new principles of constitutional law and *limited* its holding to the facts and circumstances of the case before it. *Id.* at 302–303, 93 S.Ct. 1038. There-

---

**16.** Because we have come to this conclusion, we need not examine whether Petitioner's procedural default for failing to timely raise the claim can be excused by a showing of cause and prejudice or fundamental miscarriage of justice. Indeed, we need not even decide whether the claim really was defaulted. In addition to arguing that the PCRA and contemporaneous objection rules are either not independent and adequate state procedural grounds barring our review of the merits, or that they were erroneously applied to Peti-

tioner, or both, Petitioner argues that Commonwealth should be estopped from arguing that the claim was defaulted. *See* n. 10, *supra*. These issues are moot.

**17.** *Crane* was decided after Petitioner's trial but before his direct appeal was final. Therefore Petitioner may use it as a basis for seeking the writ. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

fore *Chambers* provides little support for Petitioner.

*Crane*, which dealt with the exclusion of evidence of the circumstances surrounding a confession, is somewhat more helpful to Petitioner and is the standard by which we determine whether the Pennsylvania Supreme Court's decision that the exclusion of the evidence at issue did not violate Petitioner's right to due process (and to a fair trial) was an unreasonable application of, or contrary to, federal law. In *Crane*, the trial court excluded testimony concerning the circumstances of defendant's confession because it pertained to the issue of voluntariness, which had been resolved against the defendant in a pretrial ruling.[18] 476 U.S. at 684–85, 106 S.Ct. 2142. The defendant, however, offered the testimony to show that the statement was not credible. The Court held that the exclusion of the testimony deprived the defendant of a fair trial.

In *Crane*, the Court held that even though a trial court may have ruled on the issue of the voluntariness of a confession, a defendant may offer proof on the circumstances of the confession that go to voluntariness, not because voluntariness may be relitigated, but because those very same circumstances go to the credibility of the confession, i.e. whether the contents are true, and because such information is particularly relevant where there is no physical evidence linking the defendant to the crime and the entire defense is that, for a variety of reasons, the defendant's earlier admission of guilt should not be believed. Here, Petitioner wants to offer the circumstance of his state of mind, i.e. of the knowledge that he had, to show that he

never would have made the statement he is alleged to have made, and therefore did not make it. *Chambers* deals with the credibility of the confession; the instant case deals with the credibility of the defendant on the stand denying that he made the statement; both are jury issues. The narrow language of *Crane* covers the circumstances in which the confession occurred, i.e. the physical and psychological environment that yielded the confession. *Id.* at 688–89, 106 S.Ct. 2142. Under such a reading, *Crane* would not provide an avenue for relief for a defendant who claims that he never even made the statement.

■ One could also read *Crane* as standing for the proposition that a defendant must be allowed to offer evidence that goes to credibility even though that evidence would be excluded if offered for a different reason, such as a pretrial issue that may not be relitigated or an issue that is otherwise irrelevant. *Crane* instructs that a defendant must have "a meaningful opportunity to present a complete defense" including "an opportunity to be heard." *Id.* at 690, 106 S.Ct. 2142 (citing *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948)). Such opportunity requires that a defendant be allowed to present "competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." *Crane* at 690, 106 S.Ct. 2142. "[E]xclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecution's case encounter and 'survive the crucible of meaningful adversarial testing.'" *Id.* at 690–91, 106 S.Ct. 2142 (quoting *United*

---

**18.** The sixteen-year-old defendant asserted that he "had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied permission to telephone his mother, and that he had been badgered into making a false confession." *Crane*, 476 U.S. at 685, 106 S.Ct. 2142.

*States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). Even under this broader reading of *Crane* Petitioner is not entitled to relief.

Here, the claim that the confession was fabricated was central to Petitioner's claim of innocence, and the evidence of Freeman's acquittal and Petitioner's knowledge thereof was central to Petitioner's claim that he had no motive to make such a statement, but rather had motive not to make it. For this case to fall within the teaching of *Crane,* there must be "competent, reliable evidence" that Petitioner knew of Freeman's acquittal. The only evidence is Petitioner's statement at the suppression hearing that he knew of the acquittal, as well as Petitioner and his wife's blurting out at trial that Petitioner knew that Freeman had been acquitted. Such uncorroborated self-serving statements by Petitioner are inherently biased and therefore cannot be said to be competent and reliable. The statement by Petitioner's wife would seem to be based upon a hearsay statement by Petitioner.[19]

Petitioner's argument also rests on the assumption that because he knew of Freeman's acquittal, he would have had no motive to confess. This is a faulty assumption. People confess to crimes for a variety of reasons, even when it is not in their interest to do so. Here, there are several obvious reasons Petitioner could have confessed and tried to obtain leniency by implicating Johnson in the murder. First, as the Commonwealth argued at trial, he knew that Baker had implicated him in the murder and was willing to testify at his trial. Second, if he knew of Freeman's acquittal, he could be concerned that Freeman, his alleged co-con-

spirator, could make a statement or testify against Petitioner, implicating him in the murder. Freeman could not be retried, even if he implicated himself while implicating Petitioner. Therefore, what may have been the strongest reason for Freeman to refrain from making a statement about Petitioner's involvement no longer existed. Third, because Freeman had been acquitted, there was a higher likelihood that one of the other suspects in the case, of which Petitioner was one, was the murderer. Any of these motives, alone or in combination, could suffice for Petitioner to confess while attempting to deflect the blame for the murder from himself as much as possible.

Petitioner's argument also rests on the deduction that he would be acquitted because Freeman had been acquitted on the same evidence. This reasoning is also faulty because there were separate trials and juries, and it also assumes that all of the evidence against each defendant would be the same, and it ignores credibility issues. There is no reason to believe that Petitioner and Freeman were equally credible, or even that each jury would find that the respective defendant was more credible than Baker. Further, the assumption requires that Baker's statement or testimony implicate both Petitioner and Freeman equally, and that the juries understand that to be the case. Baker's statement and testimony at the two trials show that it was Petitioner who did most, if not all, of the talking to Johnson, with Baker present, about the murder of Caldwell. Further, Baker testified and stated that Johnson either ordered Petitioner to commit the murder or alerted him to the opportunity to commit the murder. John-

---

**19.** The common law evidence rule in effect in Pennsylvania at the time of the trial did not favor the admission of self-serving statements on behalf of the person making them. *Em-*

*mons v. McCreery,* 307 Pa. 62, 66–67, 160 A. 722 (Pa.1932); Brown, *Pennsylvania Evidence* at 132, *VI Admissions.*

son did not direct these comments at Freeman. Rather, it was Petitioner who ordered Freeman to accompany him. With such facts, it would be incorrect to deduce that because Freeman was acquitted, Petitioner would also be acquitted.

■■■ Finally, we must note that the reason for which Petitioner sought to introduce the evidence was very close to the reason for which it may not be offered. Evidence of an alleged co-conspirator's acquittal may not be introduced to persuade the jury that the defendant should likewise be acquitted. *See, e.g., United States v. Sanders,* 95 F.3d 449, 454 (6th Cir.1996); *United States v. Fernandez–Roque,* 703 F.2d 808, 813 (5th Cir.1983); *Commonwealth v. Meredith,* 493 Pa. 1, 425 A.2d 334, 337 (1981); *Commonwealth v. Quaranta,* 295 Pa. 264, 145 A. 89, 91–92 (1928); *cf. United States v. Gambino,* 818 F.Supp. 536, 539 (E.D.N.Y.1993), *aff'd* 59 F.3d 353, 367 (2d Cir.1995) (evidence of defendant's own prior acquittal is not admissible for purpose of demonstrating government's motive to fabricate prosecution, based on alleged frustration with its inability to obtain conviction). Petitioner wanted to tell the jury that he himself made that deduction, and therefore he never would have made the statement. Such an offer of proof is tantamount to offering the acquittal for the purpose of enticing the jury to make the same deduction that the Petitioner allegedly made. Although Judge Sabo could have instructed the jury to limit the use of the evidence of the acquittal, it is doubtful that any instruction would have effectively prevented the jury from using it in just the way defendant claims he did. Therefore, under facts such as these where the impermissible use is inextricably intertwined with the use for which the defendant proffers the evidence, and where the impermissible use is highly likely to confuse the issues and prejudice the jury, the evidence may properly be excluded. Even for the limited reason for which the evidence was proffered, it posed an undue risk of causing confusion of the issues and prejudice against the Commonwealth.

Therefore, we must conclude that the exclusion of this evidence did not violate *Crane.* Thus the decision of the Pennsylvania Supreme Court that the exclusion of this evidence did not deny Petitioner due process of law was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court in *Crane,* and therefore its decision that counsel was not ineffective was not contrary to, or and unreasonable application of, *Strickland v. Washington.* Further, because in the process of reviewing the reasonableness of this decision we were forced to consider the merits of the underlying claim ourselves, and concluded that *Crane* was not violated, we need not consider this issue further.

## 2. Claim II–Improper Closing Arguments by the Prosecutor

■ In his second claim, Petitioner argues that he is entitled to habeas corpus relief because the prosecutor's closing arguments were "egregiously improper and violated petitioner's rights to due process and a fair trial." (Pet. Mem. L. at 19.) Specifically, Petitioner makes four separate subclaims in support of his larger claim, objecting to various points in the prosecutor's closing argument that he feels deprived him of his rights. Petitioner alleges that:

1) The prosecutor claimed that Petitioner's alleged co-conspirator had been convicted, when in fact he had been found not guilty;

2) The prosecutor repeatedly stated his personal belief that Petitioner was guilty;

3) The prosecutor repeatedly stated his personal belief that Petitioner was lying; and

4) The prosecutor stated his belief that Petitioner was a threat to witness Shirley Baker, and she was afraid for her life, although there was no evidence in the record to support either assertion.

Before considering the claims themselves, we must determine whether they are properly before us. *See* 28 U.S.C. § 2254(c). Petitioner's first three subclaims were presented both on the merits and as part of claims of ineffective assistance of counsel to the PCRA hearing court in the Supplemental Amended Petition under PCRA and then to the Pennsylvania Supreme Court on PCRA review. Petitioner's fourth subclaim, that the prosecutor improperly stated his belief that Baker feared Petitioner would kill her, was presented on direct appeal. The Commonwealth argues that this claim was not fairly presented to the Pennsylvania Supreme Court because it was presented in a substantially different form. The Commonwealth offers no explanation for this argument, and the record discloses that the Pennsylvania Supreme Court both heard and ruled on an argument substantially similar to the one presented to this Court. *Holloway I*, 572 A.2d at 690. We therefore find that all four of these subclaims were fairly presented to the PCRA hearing court and the Pennsylvania Supreme Court on their merits, and the first three were also fairly presented as underlying claims of trial counsel's ineffectiveness for failing to object to the prosecutor's statements. Consequently, we also find that all of these subclaims, and the ineffectiveness claims as to the first three, are exhausted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996).

The Supreme Court of Pennsylvania treated the first three subclaims as waived on their merits both for the failure of trial counsel to contemporaneously object to the prosecutor's alleged misconduct, and for the failure of appellate counsel to raise them on direct appeal as required by 42 Pa. Cons.Stat. §§ 9543(a)(3) and 9544(b). *Commonwealth v. Holloway* (*Holloway II*), 559 Pa. 258, 739 A.2d 1039, 1044–45 (Pa.1999). Because Petitioner alleged ineffectiveness of all prior counsel, however, the court adjudicated these subclaims from the standpoint of ineffectiveness claims. *See id.* We will assume that both of these bases for the waiver are independent and adequate state grounds barring our review of the underlying substantive claims, and that each were properly applied by the Pennsylvania Supreme Court as to these subclaims. Therefore, we will examine the ineffectiveness claims under the AEDPA standard, but we may only examine the underlying claims on the merits if cause and prejudice or a fundamental miscarriage of justice are shown to excuse Petitioner's procedural default. *See* Part III. B. 2, *supra.* The fourth subclaim will be examined simply as a prosecutorial misconduct claim, reviewed under the AEDPA, because it was raised on direct appeal.

### a. Legal Background

There have been numerous cases before the U.S. Supreme Court regarding prosecutorial misconduct, and the Court has long attempted to define and discourage such actions. Given the wide range of error possible at trial, few prosecutorial misconduct cases have similar fact patterns, but the Supreme Court's guiding principles are nevertheless controlling. The Supreme Court has maintained stringent conduct requirements for prosecutors since the landmark case *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed.

1314 (1935), in which the Court held that the prosecutor carries with him the force and credibility of the government, and thus must act appropriately, with the ultimate goal not simply a conviction, but justice.

The Court has continued to refine these principles. Regarding claims similar to those that Petitioner raises here, the Court has observed that:

> Prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

*United States v. Young,* 470 U.S. 1, 18, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985).

 Under current federal law as determined by the Supreme Court, a federal court reviewing a claim of prosecutorial misconduct must examine the comments of the prosecutor in the context of the trial as a whole. *Id.; Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). If the alleged misconduct was indeed error, the court must determine if the error so infected the trial as to make the resulting conviction a denial of due process. *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d

618 (1987). Thus, the ultimate issue under review is the effect of the error on the fairness of the trial itself, rather than the culpability of the prosecutor for committing error. *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

### b. Subclaims I–III: Ineffective Assistance of Counsel Claims

Petitioner raised these claims both on the merits and as ineffective assistance of counsel claims to the Pennsylvania Supreme Court on PCRA appeal. That court deemed the substantive claims to be waived, therefore it only considered the ineffectiveness claims, holding that counsel could not have been ineffective because the underlying claims were without merit. We must review these ineffectiveness claims under the AEDPA. Doing so, we hold that the Pennsylvania Supreme Court's decision was not an unreasonable application of, or contrary to, U.S. Supreme Court precedent.[20]

In his first subclaim, Petitioner maintains that he is entitled to habeas relief because the prosecutor improperly implied that Danny Freeman, an alleged accomplice of Petitioner's, was convicted, when in fact a jury had found Freeman not guilty. We hold that the Pennsylvania Supreme Court's denial of relief to Petitioner on this subclaim does not violate the strict standard of the AEDPA, and therefore we deny relief for this claim.

In his closing argument, the prosecutor stated:

> You took an oath, ladies and gentlemen of the jury, to decide this case based on

---

**20.** We further hold that as to these three subclaims, the Pennsylvania Supreme Court correctly applied *Greer;* that is, we would reach the same conclusion were we to exercise plenary review after a showing of cause and prejudice or fundamental miscarriage of justice. Therefore, because we find these claims to be without merit, we need not decide whether the Pennsylvania Supreme Court was correct in deeming such claims to be waived.

this evidence presented from that witness stand. You didn't hear anything about Danny Freeman's case other than from the defendant and the defendant's wife. Take that testimony. Take it as you take the rest of the things that came out of both their mouths. Let the defendant' wife, not recalling anything, that the detective said last week, but yet she can tell you in detail what the detective said on the phone this week. Take that testimony from the defendant and put it right next to everything else he told you. See if it has the ring of truth to it. You don't know what happened to Danny Freeman, and I can't tell you. The law won't let me. If you base your verdict in this case, one way or the other, on what you think happened to Danny Freeman after never having the opportunity to hear the case against Danny Freeman, after not knowing what the verdict is against Danny Freeman, you're going to violate your oaths. And if you ever do find out, you might be surprised of what the verdict was.

(N.T. 5/21/86 at 48.)

Petitioner argues that this subclaim should be considered under a different standard than that of *Greer*. Petitioner contends that the prosecutor's statements were the equivalent of false testimony and, citing *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), argues that the conduct should be examined under a stricter standard than that of *Greer*. Indeed, Petitioner seems to advocate overturning Petitioner's conviction for Fourteenth Amendment violations regardless of the substantive effect of the prosecutor's statement on the trial.

Petitioner is incorrect. The prosecutor's statements, made in closing arguments, are not evidence and clearly fall under a different standard than that applied in *Agurs* to false testimony knowingly submitted to the court.[21] The claim, along with the other three, should be examined as one of general prosecutorial misconduct, in which we must place the alleged error in the context of the trial as a whole, and determine if the error was sufficient to cause the denial of due process. *Greer*, 483 U.S. at 765, 107 S.Ct. 3102.

The Pennsylvania Supreme Court dismissed Petitioner's first subclaim, simply noting, "We find nothing prejudicial about these remarks." Under the AEDPA, we must defer to this holding, unless we find it to be contrary to, or an unreasonable application of clearly established law. Petitioner has not convinced us that the ruling was contrary to federal law, as his *Agurs* argument is untenable. While unclear, it is certainly possible that the Court viewed the prosecutor's argument, and particularly his use of the word "surprise" as a benign statement meant to reinforce to the jury its obligation to not consider the Freeman verdict. We cannot say that this interpretation is unreasonable. Thus the Pennsylvania Supreme Court's decision did not violate the strict standard of the AEDPA, and we deny relief for this subclaim.[22]

In his second subclaim, Petitioner maintains that the prosecutor improperly stated his personal belief that petitioner was guilty, thus denying Petitioner his right to due process and a fair trial. The Pennsylvania Supreme Court's denial of relief to Petitioner on this subclaim was not con-

---

21. At trial, Judge Sabo specifically instructed the jury that, "the speeches of counsel are not part of the evidence and you should not consider them as such." (N.T. 5/21/86 at 105.)

22. We would also find the claim to be meritless under the *Greer* standard, so Petitioner would be unable to overcome his procedural default of the substantive claim.

trary to, or an unreasonable application of federal law, and therefore we deny relief for this claim.

The Petitioner specifically objects to the prosecutor's statement analyzing a possible risk to Shirley Baker's life because she gave testimony against the Petitioner, "For coming in here and testifying against the guys that did it, what do you think they would like to do to her?" (N.T. 5/21/86 at 59.) The Petitioner objects to the prosecutor's characterization that he was one of "the guys that did it," and maintains it deprived him of his rights to due process and a fair trial by prejudicing the jury.

The Pennsylvania Supreme Court dismissed this claim, examining the prosecutor's statement in the context of his larger argument about the differing motives behind the testimony of Shirley Baker and Petitioner.[23] The court held that within the context of this argument, the prosecutor's statement was allowable because the defense had previously questioned Baker's motives for testifying. While this Court might not have adopted this interpretation, we cannot say that it is unreasonable or contrary to clearly established federal law, and we thus deny Petitioner's claim for relief under the AEDPA.

In this subclaim Petitioner objects to the prosecutor's specific characterization of him as one of "the guys that did it." The Pennsylvania Supreme Court, rather than addressing this issue directly, examined the claim in the context of the prosecutor's entire analysis of the varying motives for testifying. We could examine this statement apart from the prosecutor's overall argument contrasting the varying motivations of each witnesses. Using this analy-

sis, we could find that the prosecutor's statement was in error, but even if this were the case, this error did not so infect the trial as to deny the defendant a fair trial. *See Greer,* 483 U.S. at 765, 107 S.Ct. 3102. Therefore, Petitioner would not be able to overcome his procedural default, because the substantive claim is without merit.

In his third subclaim, Petitioner maintains that the prosecutor improperly implied that Petitioner was lying, and thus deprived Petitioner of a fair trial and due process. We hold that the Pennsylvania Supreme Court's denial of relief to Petitioner on this subclaim does not violate this strict standard, and therefore we also deny relief for this claim.

Petitioner objects to the prosecutor's questioning of Petitioner's motives for testifying in his own defense during closing arguments. The prosecutor stated:

> [The] defendant comes in here with his witnesses and he has a motive. This is a capital case, and he knows it. He's on trial ... [h]e's on trial for his life. What in the world could be a stronger motivation to lie? What in the world would be a stronger motivation to bring in other people to lie for you?

N.T. 5/21/86 at 58–59.

■ Petitioner argues, citing *Caldwell v. Russell,* 181 F.3d 731 (6th Cir.1999), and *United States v. Rodrigues,* 159 F.3d 439 (9th Cir.1998), among others, that the prosecutorial attacks on the integrity and credibility of the defense are error sufficient to overturn conviction. Under the AEDPA and *Tyler v. Cain,* —— U.S. ——, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001), we are required to apply federal law made

---

**23.** The Court addressed both Subclaims 2 and 3 at once, "The prosecutor did nothing more than invite the jury to consider Appellant's motives for testifying untruthfully and to con-

trast them with Baker's motives for her testimony." *Commonwealth v. Holloway,* 559 Pa. 258, 739 A.2d 1039, 1045 (1999)

retroactive to collateral review by the Supreme Court of the United States, not the Circuit Courts. Thus, Petitioner's argument simply cannot be persuasive under the strict standards required by the AEDPA, and relief can be denied for this reason alone. Additionally, it is important to note that Petitioner misinterprets and misapplies the cases he does cite.[24]

Rather than being an attack of any sort, it is clear that the prosecutor's statement in this instance was a response to earlier argument by defense counsel, questioning Shirley Baker's motive for testifying. (N.T. 5/21/86 at 25–26.) The idea of "fair response," which allows a party to respond to statements made by opposing counsel, is well-established federal law. *United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988). Under this standard, it is clear that the prosecutor's statement was not error.

The Pennsylvania Supreme Court addressed this issue during Petitioner's PCRA appeal, holding that "the prosecutor did nothing more than invite the jury to consider Appellant's motives for testifying untruthfully." *Holloway II*, 739 A.2d at 1045. The Pennsylvania Supreme Court's ruling was not contrary to federal law, as our own search has revealed no Supreme Court case controlling this issue and Petitioner has cited no Supreme Court precedent that requires a contrary holding by this Court. We also conclude that the Pennsylvania Supreme Court's decision did not involve an unreasonable application of clearly established federal law, as the idea of "fair response" is well established. Accordingly, we deny Petitioner relief on this subclaim.

Petitioner also maintains that the prosecutor's comment improperly injected the question of the possible penalty into the jury's guilt-phase deliberations, citing *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The Petitioner's argument is not convincing. *Zant* merely stands for the proposition that information necessary for penalty-phase sentencing might be prejudicial during guilt-phase deliberations, and thus requires a bifurcated trial. In this case, no information was disclosed in the guilt phase which should have been reserved for the penalty phase, and *Zant* is not applicable. The jury knew that the Petitioner was charged with a capital crime, having been so instructed during the jury selection. The prosecutor's statement was not in error, and thus could not have had a prejudicial effect on the trial, nor deprived Petitioner of his due process rights. We therefore deny Petitioner's claim because it is without merit.

### c. Subclaim IV—Review on the Merits under the AEDPA

In his fourth subclaim, Petitioner argues that the prosecutor improperly stated that the witness Shirley Baker feared for her life, and specifically was afraid of retribution from Petitioner. Petitioner contends that there was no evidence in the record to support such assertions, and that the statement improperly prejudiced the jury, depriving him of his right to due process. This subclaim was decided on direct appeal to the Pennsylvania Supreme Court and we therefore review the decision subject to § 2254(d) of the AEDPA. We find that the Pennsylvania Supreme Court's denial

---

**24.** In *Caldwell,* the court rejected a claim of prosecutorial misconduct arising from the prosecutor's speculation that the defendant gave untruthful testimony because his speculation was supported by other evidence. In *Rodrigues,* the U.S. Attorney attacked the integrity of defense counsel, claiming he had deceived the jury from the start of the trial regarding the nature of the charges.

of relief to Petitioner on this subclaim does not violate the strict standard of the AEDPA, and therefore we deny relief for this claim.

During his closing argument, while attempting to contrast Shirley Baker's motive for testifying with that of Petitioner, the prosecutor stated:

> [Shirley Baker is] testifying at peril of losing her life ... She knows what goes on in the street, and she knows what happened to her. I mean look, for messing up money, Rickey gets strangled twice, and shot in the head, twice. For coming in here and testifying in a capital murder case against the guys that did it, what do you think they would like to do to her ... What do you think Nasir would like to do to her?

(N.T. 5/21/86 at 59–60.) Petitioner argues that these statements deprived him of a fair trial, by referencing matters outside of evidence. Petitioner also contends that these statements rendered his death sentence fundamentally unfair, because the jury was prejudiced by being led to believe Petitioner posed a future risk to Baker.

The Pennsylvania Supreme Court denied this claim, after hearing it on direct appeal, ruling:

> Generally comments by a prosecutor do not constitute reversible error unless the

unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict. Clearly the comments here did not rise to such a level. Furthermore they 'were logical and proper inferences drawn from the surrounding facts. Most obvious was the fact that the victim had been eliminated for a mere shortage in receipts. That one might fear like revenge for the even worse betrayal of aiding the police, the inferences were in the ambit of fair comment.

*Holloway I*, 572 A.2d at 692–93 (citations omitted).

■■■ In reviewing Petitioner's claim, we are bound by the AEDPA. Petitioner cites no controlling cases that lead us to believe the decision of the Pennsylvania Supreme Court was contrary to federal law. Likewise, there is no indication that the decision was unreasonable, as the United States Supreme Court defines it.[25] Under the strict standards of the AEDPA we cannot say that the decision of the Pennsylvania Supreme Court is contrary to or an unreasonable application of federal law, and thus deny relief on this claim.[26]

---

25. We reiterate that the AEDPA's requirement that a state court decision be reasonable does not mandate that such a decision be correct. *See Williams v. Taylor*, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law.") (emphasis in original). As a result, we do not mean to imply by our ruling here that we consider the state court decisions to be either accurate or preferred applications of *Greer*. We merely find that those courts acted reasonably, i.e. that the outcomes arrived at were not unjustifiable under existing Supreme Court precedent.

26. Our denial of relief is not an endorsement of the prosecutor's statements. The prosecutor's comments are not excusable. His summation suggested to the jury that Petitioner was a future threat to Shirley Baker, although there was no evidence that validated his claim. His conduct could have had an impact on the jury's later penalty-phase deliberations, deliberations in which the jury ultimately chose to apply the death penalty.

> In 1934, Justice Sutherland famously set a high standard for prosecutorial conduct:
> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation

### 3. Claim III—Racial Discrimination in Jury Selection

 Petitioner claims that he is entitled to a new trial because during jury selection the Commonwealth exercised its peremptory strikes in a racially discriminatory manner in order to exclude African–Americans from his jury in violation of the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, as articulated by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Petitioner claims that the Commonwealth had no race-neutral reasons for striking these African–Americans and that any race-neutral reasons proffered for the exclusion of such potential jurors are pretextual. Further, Petitioner claims that a "recently released" Philadelphia District Attorney's Office ("DA's Office") training video, Jury Selection with Jack McMahon, produced approximately one year after Petitioner's trial, and a recent study of the DA's Office over a seventeen-year period including this case, David C. Baldus, et al., *The Use of Peremptory Challenges in Capital Murder Trials: A Legal and Empirical Analysis*, 3 U.Pa.J. Const.L. 3 (2001) (hereinafter "Baldus study" or "Baldus article"), as well as other evidence, show that the Philadelphia DA's Office systematically discriminated against African–Americans during jury selection in violation of *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).[27] Petitioner alleges that all prior counsel were ineffective in either failing to raise these claims or failing to properly raise these claims.

Our country has, unfortunately, had a long and ignoble history of both private and official racial discrimination. Racial discrimination by state actors, once condoned by our laws, is now proscribed; yet we must be ever vigilant to recognize and remedy any racial discrimination by state actors that still occurs. Only through such vigilance can we hope to prevent racially discriminatory state action in the future, and ensure that our citizens will be accorded equal justice under law.

to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). We believe that the prosecutor's statement regarding Shirley Baker's fears was of the very sort that Justice Sutherland sought to discourage. Nevertheless, we are constrained by the Pennsylvania Supreme Court's decision and the AEDPA, and must deny relief on this claim.

**27.** Petitioner characterizes the transcript as "recently released." However, neither the transcript nor the Baldus data are new evidence. Petitioner submitted the transcript of the McMahon videotape as an appendix to his brief to the Pennsylvania Supreme Court on PCRA appeal. (PCRA Br.Pa.S.Ct., App. 2.) He also cited to a limited amount of data on the strike rates of African–Americans and non-African-Americans by prosecutors during the ten-year period in which Petitioner's case was tried. (PCRA Br.Pa.S.Ct. at 25–26.) Preliminary results from this earlier Baldus analysis was due to be published at least six months after the brief was submitted. Petitioner did not submit a draft of the article, but rather included as an appendix another article that cited to the not-yet-published preliminary Baldus study, but focused primarily on the races of defendants and victims. (PCRA Br.Pa.S.Ct., App. 3: Death Penalty Information Center, *The Death Penalty in Black & White: Who Lives, Who Dies, Who Decides*, at 23 (June 1998).)

The history of racial discrimination in jury selection has mirrored the pattern evident in other areas of civil life. African–Americans were once barred by law from serving on juries. Even after the Supreme Court held that an African–American defendant was denied Equal Protection when members of his race were purposefully excluded from his jury, *Strauder v. West Virginia*, 10 Otto 303, 100 U.S. 303, 310, 25 L.Ed. 664 (1879), and recognized that such exclusion was likewise a denial of the potential juror's right to Equal Protection, *id.* at 308, state actors often unofficially continued to prevent African–Americans from serving on juries because of their race. The Supreme Court has long recognized that when persons are thus denied the opportunity to participate in the administration of the law, the harm extends not only to the potential juror and the defendant, but also to the entire community, because public confidence in the fairness of our judicial system is undermined. *See Batson*, 476 U.S. at 87, 106 S.Ct. 1712 (citing *Ballard v. United States*, 329 U.S. 187, 195, 67 S.Ct. 261, 91 L.Ed. 181 (1946)). Thus, in *Strauder*, the Court began its long effort to "eradicate racial discrimination in the procedures used to select the venire from which individual jurors are drawn." *Batson*, 476 U.S. at 85, 106 S.Ct. 1712. Eventually, in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Court recognized that racial discrimination in the exercise of peremptory challenges could also be a denial of Equal Protection, but it required a showing of pervasive racial discrimination by prosecutors in the jurisdiction over a long period of time. Finally, in *Batson v. Kentucky*, the Court held that racial discrimination in the exercise of peremptory challenges in the defendant's own trial, without requiring proof of a history of such discrimination, was a denial of both the defendant's and the potential jurors' rights to Equal Protection of Law under the Fourteenth Amendment. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

 We are concerned by the evidence of possible racial discrimination in the exercise of peremptory challenges by both the Commonwealth and defense counsel at Petitioner's trial. Such conduct by either party cannot be condoned, but we cannot excuse discrimination by the Commonwealth on the ground that defense counsel also discriminated. All potential jurors have a right not to be excluded on the basis of their race, and a defendant also has a right to a jury from which members of his race were not purposefully excluded on account of their race. We cannot, however, grant relief to the Petitioner on this basis. We are constrained by the procedural posture of the case, the acts and omissions of Petitioner's prior counsel, and the provisions of Section 104 of the Anti–Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, from both reaching the merits of this claim and from granting relief based on our review of the decision of the Pennsylvania Supreme Court on this issue.

#### a. Record of Voir Dire

During voir dire, after ADA Drew R. Barth's peremptory challenge of a Black prospective juror, Brenda Forrest, Petitioner's trial counsel objected that "I believe the District Attorney has now used all his challenges on black jurors. I believe he has developed a pattern of striking them." (N.T. 5/15/1986, at 129.) A prospective juror was entering the courtroom, so the trial judge, Hon. Albert F. Sabo, deferred discussion of the issue. *Id.* After several other potential jurors had been stricken by agreement or for cause, trial counsel again asserted that the ADA had developed a pattern of striking only Black prospective jurors, and he asked for a

mistrial. *Id.* at 141–42. In response, Judge Sabo gave the ADA an opportunity to explain his actions by asking: "Does the Commonwealth have anything to say at this time?" ADA Barth responded by confirming that nine jurors had been selected thus far, two of whom were Black. *Id.* at 142. He also asserted that he had not used his peremptory challenges *exclusively* against Blacks, but had also exercised one of his peremptory challenges to strike a white woman. *Id.* Judge Sabo also noted that the defense also struck a black woman, "juror number eight on yesterday's list." *Id.* Defense counsel noted that she had one son who was recently killed and another who was convicted of [either manslaughter or murder.] *Id.* at 142–43. There was some discussion about whether this son was convicted of manslaughter or murder, because the juror said that he was in jail for life. There was little discussion about whether the ADA was striking African–American venirepersons because of their race. Judge Sabo ended by saying "I'm talking about the one son that was in there. You also knocked off a potential black juror, but the record will speak for itself. All right, gentlemen." *Id.* at 143–44.

■ An examination of the voir dire sheet contained in the state court record indicates that at this point in the trial, after venireperson Frances Nace had been stricken for cause, the ADA had exercised eight peremptory challenges. Therefore a fair reading of the record indicates that the ADA admitted to having stricken seven African–American potential jurors. At this point of voir dire, defense counsel had exercised fourteen peremptory challenges.

Of these fourteen potential jurors, eight had been accepted by the Commonwealth before being peremptorily stricken by defense counsel. The African–American potential juror stricken by defense counsel, "juror number eight," was stricken when it was defense's turn to first question the venireperson, therefore this person was not "acceptable to the Commonwealth but stricken by the defense." [28] *Commonwealth v. Holloway* (*Holloway II*), 559 Pa.258, 739 A.2d 1039, 1045 (1999). The notes of voir dire and the voir dire sheet therefore show that at this point during voir dire, none of the venirepersons accepted by the Commonwealth but then stricken by the defense were African–Americans.

Defense counsel exercised four more peremptory strikes; of these potential jurors, only one had first been accepted by the Commonwealth. The notes of voir dire do not reflect the race of this person, Elizabeth A. Dooley (N.T. 5/15/1986, at 186–197). The first of these four, Peter J. Agresti, was identified for the record as a white person by the prosecutor after defense counsel exercised his peremptory challenge. (N.T. 5/15/1986, at 155.)

The Commonwealth exercised four more peremptory strikes, against Starlett J. Sandoval (N.T. 5/15/1986, at 144–50), Robert Keel, Jr. (N.T. 5/15/1986, at 169–71), John W. Hackley, Sr. (N.T. 5/16/1986, at 28–32), and Elouise M. Baldi (N.T. 5/16/1986, at 33–37). After the Commonwealth struck Ms. Sandoval, defense counsel noted for the record, without formally objecting, that she was Black. (N.T. 5/15/1986, at 50.) His assertion is uncon-

---

**28.** Pennsylvania requires that defendants or petitioners alleging a *Batson* violation make a record "identifying the race of venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected." *Holloway II,* 739 A.2d at 1045 (citing *Commonwealth v. Bronshtein,* 547 Pa. 460, 691 A.2d 907 (1997) and *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176 (1993)).

troverted in the record. When the Commonwealth struck Mr. Keel, defense counsel again noted for the record, without objecting, that the venireperson was Black. (N.T. 5/15/1986, at 171.) The prosecutor then noted for the record that the venireperson was a "single, young, unemployed, on welfare, black male." *Id.* After the Commonwealth struck Mr. Hackley, defense counsel noted without objecting that the venireperson was Black. The ADA then noted for the record that the venireperson was a Black male approximately the same age as the defendant. (N.T. 5/16/1986, at 32.) After the Commonwealth exercised its final peremptory challenge, against Ms. Baldi, defense counsel noted that she was Black. (N.T. 5/16/1986, at 37.) The prosecutor also offered reasons for his striking her: she was "a Black female, whose brother-in-law was convicted of narcotics charges. Narcotics would play a central role in the testimony of this case." *Id.* at 37–38.

The record does not reflect the races of the last three jurors selected-Sydney Bergman, Nicholas J. McGinty, and Brenda J. Ward.

A close reading of the record reveals that the following summary information was therefore available to the Pennsylvania Supreme Court on PCRA appeal: the Commonwealth exercised peremptory challenges against twelve venirepersons, eleven of whom were Black and one of whom was White; nine potential jurors were first accepted by the Commonwealth before being stricken by the defense, but at the most only one of these persons,

Elizabeth Dooley, could have been an African–American; of the first nine jurors chosen, two were Black and seven were White; the races of the final three jurors was unknown. Petitioner also asserted on PCRA appeal that in addition to examining the trial record, a comparison of juror names with voter registration records shows that except for the one white woman that the ADA admitted to having stricken, all other venirepersons peremptorily stricken by the Commonwealth were African–Americans, and that all except two jurors were White; however, he presented no actual evidence to the PCRA trial court or the Pennsylvania Supreme Court on PCRA appeal.

#### b. State Court Proceedings

Trial counsel moved for a mistrial based on the pattern of strikes by the prosecutor, which would have preserved the claims based thereon for appeal. Nevertheless, no such claim was raised in Petitioner's counseled direct appeal brief.[29] Petitioner did raise both the *Batson* claim as to discrimination in the selection of his jury, and the *Swain* claim as to systematic discrimination in the selection of juries in Philadelphia County, to the Pennsylvania Supreme Court on PCRA appeal. Petitioner also alleged ineffectiveness of all prior counsel in his PCRA appeal to the Pennsylvania Supreme Court. Because Petitioner failed to raise either the *Batson* or *Swain* claim on direct appeal, the Pennsylvania Supreme Court deemed them to be waived, 42 Pa. Cons.Stat § 9544(b), and held that it was barred from hearing them, *id.*

---

**29.** Petitioner alleges that he raised the *Batson* claim on direct appeal in a pro se filing that he filed some nine months after his counsel filed a brief on his behalf. The Pennsylvania Supreme Court deferred the decision of whether it would accept and consider the filing until oral argument on the counseled brief. There is no evidence of whether the court considered it or not; we only know that none of the issues raised therein were addressed by the Pennsylvania Supreme Court in its opinion affirming the judgment of sentence, nor did the court even mention the filing or its contents. *Holloway I,* 524 Pa. 342, 572 A.2d 687 (1990). *See* discussion in n. 38, *infra.*

§ 9543(a)(3). *See Commonwealth v. Holloway (Holloway II)*, 559 Pa.258, 739 A.2d 1039, 1044 (1999). Petitioner's allegation of ineffectiveness of all prior counsel, however, preserved the underlying *Batson* and *Swain* claims and overcame the waiver, inasmuch as it allowed the court to consider the Equal Protection claims as an underlying bases for the ineffectiveness claim.[30] *See id.;* § 9543(a)(4). The court expressly mentioned *Batson* and relevant state interpretations of *Batson*, but not *Swain*, in its opinion. *Id.* at 1045. Further, in deciding the ineffectiveness claim, the court found that it was unable to determine whether the *Batson* claim had arguable merit. It found that Petitioner had failed to make a record sufficient to consider whether the trial court had improperly failed to find a prima facie case, because he failed to provide specific evidence required by the Pennsylvania Supreme Court to determine whether an intent by the prosecutor to racially discriminate could be inferred. The court did not consider whether the reasons proffered by the prosecutor for his striking two African-

Americans were pretextual and entitled Petitioner to a new trial.

### c. Legal Background

A defendant has a "right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson*, 476 U.S. 79, 85–86, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (citing *Martin v. Texas*, 200 U.S. 316, 321, 26 S.Ct. 338, 50 L.Ed. 497 (1906)). In order to establish a race-based Equal Protection violation in the selection of his jury, a defendant must show that the prosecutor challenged members of a racial group because of their race "or on the assumption that black jurors as a group will be unable partially to consider the State's case against a black defendant." *Batson*, 476 U.S. at 89, 106 S.Ct. 1712. Previously, in *Swain v. Alabama*, the Court refused to "hold that the striking of Negroes in a particular case is a denial of the equal protection of the laws." 380 U.S. 202, 221, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In order to "preserve the peremptory nature of the prosecutor's challenge," the Court declined to examine the

---

**30.** In its opinion, the Pennsylvania Supreme Court stated that because Petitioner had failed to raise the Equal Protection claim on direct appeal and to the PCRA trial court, it was deemed waived; the court considered the claim only because ineffectiveness of PCRA trial court counsel was alleged. *See Holloway II*, 559 Pa. 258, 739 A.2d 1039, 1044 (1999). An examination of the record, however, shows that the *Batson* claim was raised to the PCRA trial court in the Supplemental Amended Petition under Post Conviction Relief Act and the Memorandum of Law in support thereof, both filed August 15, 1994, and in a Supplemental Memorandum of Law in Support of Petitions under Post Conviction Relief Act, filed April 30, 1997. In his opinion ruling on the PCRA petition and amendments and supplements thereto, Judge Sabo found that many claims, including that of racial bias in jury selection, did not even merit discussion in his denying the petition. His only statement as to these claims was that "[t]he

majority of these claims have not been discussed because no substantial evidence or rational law has been presented which would warrant further review. Mr. Holloway has had the benefit of three different counsels, all of whom had ample opportunity to research and argue the legal issues existing in this case. None of the attorneys have shown error in his conviction or sentence." *Commonwealth v. Holloway*, No. 1305, June Term, 1985, slip op. at 15 (Phila.Ct.Comm.Pl., July 16, 1997). The *Swain* claim of systematic discrimination in jury selection was not raised to the PCRA trial court. We therefore find that the *Batson* claim was fairly presented to every level of the state courts and is thus exhausted. *O'Sullivan*, 526 U.S. at 845, 119 S.Ct. 1728; *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). As will be explained *infra*, the issue of whether the *Swain* claim was exhausted is moot because *Batson* subsumed *Swain*.

actions of the prosecutor in the trial at issue, instead "relying on a presumption that he properly exercised the State's challenges." *Batson*, 476 U.S. at 91, 106 S.Ct. 1712 (citing *Swain* at 221–22, 85 S.Ct. 824).

*Swain* instead prohibited systematic discrimination against African–Americans such that in case after case they were peremptorily stricken from venires, so as to raise an inference that the prosecutors excluded African–Americans from the defendant's jury "for reasons wholly unrelated to the outcome of the particular case on trial" or to deny them "the same right and opportunity to participate in the administration of justice enjoyed by the white population." *Swain*, 380 U.S. at 224, 85 S.Ct. 824. To show an intent to discriminate such that the peremptory challenge system was "being perverted" in the proscribed manner under *Swain*, the defendant must show a pervasive systematic discrimination against African–Americans.[31] *Swain*, 380 U.S. 202, 223–24, 85 S.Ct. 824, 13 L.Ed.2d 759. Such a showing was required as a "predicate for attacking the peremptory strikes as they were used in [Defendant's] case." *Swain*, 380 U.S. at 226, 85 S.Ct. 824.

*Batson* overruled *Swain*, removing the requirement of a showing of systematic discrimination in order to prove an Equal Protection violation. *Batson* also overruled *Swain* to the extent that it had it foreclosed objections to the discriminatory use of peremptories in the course of defendant's trial. *Batson*, 476 U.S. at 90–93, 106 S.Ct. 1712. *Batson* "held that a defendant can raise an equal protection challenge to the use of peremptories at his own trial by showing that the prosecutor used them for the purpose of excluding members of the defendant's race." *Powers v. Ohio*, 499 U.S. 400, 405, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (citing *Batson*, 476 U.S. at 96, 106 S.Ct. 1712).

The first step in making a *Batson* claim is to establish a prima facie case of purposeful discrimination in the selection of the jury. To do so, the defendant must first show "that he is a member of a cognizable racial group" and that the prosecutor has peremptorily stricken members of the defendant's racial group.[32] *Batson*, 476 U.S. at 96, 106 S.Ct. 1712. Second, the defendant may rely on the fact that peremptory challenges will unfortunately permit " 'those to discriminate who are of a mind to discriminate.' " *Id.* (quoting

---

**31.** The Court appeared to create a high hurdle for defendants to overcome in proving an Equal Protection violation based on such systematic discrimination:

> [W]hen the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on added significance. *Cf. Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. In these circumstances, giving even the widest leeway to the operation of irrational but trial-related suspicions and antagonisms, it

would appear that the purposes of the peremptory challenge are being perverted. If the State has not seen fit to leave a single Negro on any jury in a criminal case, the presumption protecting the prosecutor may well be overcome.

*Swain*, 380 U.S. at 223–24, 85 S.Ct. 824.

**32.** The Supreme Court has since held that under the Equal Protection Clause, a criminal defendant may object to race-based exclusions of jurors through peremptory challenges whether or not the defendant and the excluded jurors share the same race. *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Here, however, Petitioner is African–American and objects to the exclusion of other African–Americans from his jury.

*Avery v. Georgia,* 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953)). "Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the [potential jurors] from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury ... raises the necessary inference of purposeful discrimination." *Id.* As examples of relevant circumstances that may be examined to infer discriminatory intent, the Court pointed to a " 'pattern' of strikes against black jurors included in the particular venire" and "the prosecutor's questions and statements during voir dire examination and in exercising his challenges." *Id.* at 97, 106 S.Ct. 1712.

 At the next step, after "the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.* at 97, 106 S.Ct. 1712. It is insufficient and impermissible for the prosecutor to merely state that "he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." *Id.* Nor may the prosecutor simply deny that he had a discriminatory motive or affirm his good faith in making individual selections. *Id.* at 98, 106 S.Ct. 1712. Instead, the prosecutor "must articulate a neutral explanation related to the particular case to be tried." *Id.* Such an explanation need not be "persuasive, or even plausible," *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); the explanation merely must be facially valid, with no inherent discriminatory intent. *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct.

1859, 114 L.Ed.2d 395 (1991) (plurality opinion).

 At step three, the trial court must "determine if the defendant has established purposeful discrimination." *Batson,* 476 U.S. at 98, 106 S.Ct. 1712. Such determination requires the trial court to examine the credibility of the prosecutor and decide whether the proffered explanations are pretextual.

The *Batson* Court explicitly declined "to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges." *Id.* at 99, 106 S.Ct. 1712.

### d. *Swain* Claim

Although the Pennsylvania Supreme Court never expressly mentioned *Swain* in its decision on the claim of ineffective assistance of counsel for failing to raise the claim of racial discrimination in jury selection, we believe that it did consider the *Swain* claim in its adjudication of the ineffective assistance of counsel claim. If we are correct, we must review the ineffectiveness claim raised by Petitioner[33] under the AEDPA's standard of review, which bars us from granting relief unless the Pennsylvania Supreme Court's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). Further, because PCRA's procedural rules act as an independent and adequate state ground barring us from examining the underlying *Swain* claim on the merits, we may only do so if Petitioner can show cause and prejudice to overcome the procedural default. *See Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). If

**33.** The ineffectiveness claim is itself a claim for habeas relief; it is not an allegation of ineffectiveness to be proven to show cause to excuse a procedural default.

we are incorrect, however, that the court considered the *Swain* claim as an underlying basis for the ineffectiveness claim, we would examine the *Swain* claim de novo, because it was fairly presented to the Pennsylvania Supreme Court, not adjudicated on the merits, and there was no ruling by the Pennsylvania Supreme Court that it was procedurally barred from considering the claim. *See, e.g., Appel v. Horn,* 250 F.3d 203 (3d Cir.2001).

It was not necessary for the Pennsylvania Supreme Court to mention expressly *Swain* or the evidence of systematic discrimination against African–American jurors that was proffered, i.e., the transcript of the McMahon tape or the Baldus study data, and therefore its decision not to do so was not an unreasonable application of, or contrary to, any U.S. Supreme Court precedent. Even though *Swain* required evidence of systematic discrimination, the heart of a jury selection-based Equal Protection claim raised by a defendant was and still is that potential jurors were excluded from the defendant's venire or jury because of their race. Evidence of systematic discrimination was only used to show an intent to discriminate in the trial of the defendant; it was not a claim in itself. Under *Swain,* the record in the defendant's case could not be used to conclusively show intent to discriminate, but the defendant was nevertheless required to show that members of his racial group were in fact stricken. *See Ford v. Georgia,* 498 U.S. 411, 420 n. 5, 111 S.Ct. 850,

112 L.Ed.2d 935 (1991) (explaining that reading *Swain* "without the requirement of proving discrimination in the selection of an objecting defendant's own jury" is impermissible). The Court reiterated its views on the differences between *Batson* and *Swain* several years before *Holloway II* was decided. In *Ford v. Georgia,* the Court explained:

> [b]ecause *Batson* did not change the nature of the violation recognized in *Swain,* but merely the quantum of proof necessary to substantiate a particular claim, it follows that a defendant alleging a violation of equal protection of the law under *Swain* necessarily states an equal protection violation subject to proof under the *Batson* standard of circumstantial evidence as well.

498 U.S. at 420, 111 S.Ct. 850. Because *Swain* simply required more proof than *Batson,* and such excess proof is no longer necessary, it was not unreasonable for the Pennsylvania Supreme Court to focus only on the evidence needed to prove a *Batson* claim, and to ignore the *Swain* claim entirely. In so doing, the court paralleled the analysis of *Ford v. Georgia;* therefore the court's focus on *Batson* was neither contrary to, nor an unreasonable application of, clearly established federal law as articulated by the Supreme Court of the United States on the subject of Equal Protection violations through racial discrimination in jury selection.[34]

34. "The threshold question under AEDPA is whether [Petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (Stevens, J., for the Court). *But see id.* at 412, 120 S.Ct. 1495 (O'Connor, J., for the Court) (" '[C]learly established Federal law, as determined by the Supreme Court of the United States' ... refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision."). We need not decide which of these standards to apply. The discussion in *Ford v. Georgia* of *Batson* and *Swain* is merely dicta, and we are only using it to illuminate the reasonableness of the Pennsylvania Supreme Court's application of *Batson* and its apparent interpretation of *Batson* obviating *Swain;* we are not asserting that the Court in *Ford* determined the relevant clearly established federal law.

Were we to reach and examine the merits of the *Swain* claim de novo, such as after a finding that the *Swain* claim was fairly presented but not adjudicated on its merits, after a showing of cause and prejudice under *Coleman,* or as a required component in showing ineffective assistance of counsel, we would also deny relief. As in *Swain* itself, the record in the instant case cannot support an inference that the Philadelphia District Attorney, and the Assistant District Attorneys, were bent on striking African–Americans regardless of trial-related considerations. *Swain* at 225–26, 85 S.Ct. 824. Although the Petitioner has proffered evidence that the Philadelphia District Attorney's Office may have used race as a factor in jury selection over a substantial period of time, the evidence does not show overwhelming, pervasive discrimination as required by *Swain.* *See* note 31, *supra.* In fact, to the extent that the transcript of the McMahon tape is indicative of the policy and practice of the Philadelphia DA's Office, *see* n. 68 *infra,* it suggested both that some classes of African–Americans should be avoided, but also that prosecutors considered certain classes of African–Americans to be highly desirable as jurors (PCRA Br.Pa.S.Ct., App. 3 at 56–59), and that African–Americans were being stricken for trial-related reasons. (*Id.* passim.) Similarly, the Baldus data tends to disprove the overwhelming lack of African–Americans serving on juries that *Swain* required.[35] Both the transcript and the study allow an inference that the Philadelphia DA's Office intended to discriminate against African–Americans, but they also lead to an inference that the

DA's Office did not intend to discriminate against African–Americans in the way prohibited by *Swain.* Therefore, the burdensome standard of proof required by *Swain* has not been met, and we would deny a *Swain* claim were it properly before us.

### e. *Batson* Claim

Petitioner's counsel did not raise the *Batson* claim on direct appeal despite the fact that trial counsel objected during voir dire that the prosecutor appeared to be using his peremptory challenges to remove African–Americans from the venire and moved for a mistrial. PCRA counsel alleged ineffectiveness of direct appeal counsel for failing to raise the claim previously. The PCRA bars the Pennsylvania Supreme Court from reviewing claims that could have been brought previously, unless, among other limited exceptions not relevant here, the failure to raise the claim previously was due to ineffective assistance of counsel. *See* Pa. Cons.Stat. §§ 9543(a)(3), 9544(b). The Pennsylvania Supreme Court therefore considered the *Batson* claim not as an independent claim, but only as an issue underlying a claim of ineffective assistance of counsel. *Holloway II,* 739 A.2d at 1044.

In its PCRA opinion, the Pennsylvania Supreme Court first tried to determine whether the Petitioner had shown that the underlying *Batson* claim has merit, because counsel cannot be ineffective for failing to raise a meritless claim. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *Commonwealth v. Peterkin,* 538 Pa. 455, 649 A.2d 121 (1994). The court determined that the Petitioner had provided insufficient evi-

---

**35.** *Swain* asserts that the fact of no African–American ever serving on a jury in a county over an indefinite, but very long, period of time, "might" be enough to support an inference of improper racial discrimination. Although the Baldus study contains a plethora of data, the Petitioner cites only summary statistics. (Pet. Reply Mem. at 65). However, even this data shows that in 326 capital cases over a seventeen-period, Philadelphia prosecutors accepted 1596 African–Americans as jurors and peremptorily struck 1942 African–American potential jurors.

dence to allow it to decide whether his *Batson* claim had merit:

> Appellant has failed to make a record "identifying the race of venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected." *Commonwealth v. Bronshtein*, 547 Pa. 460, 691 A.2d 907, *cert. denied*, 522 U.S. 936, 118 S.Ct. 346, 139 L.Ed.2d 269 (1997). "Where an appellant fails to make a record for review of a *Batson* challenge, this Court is unable to consider a claim that the trial court failed to find a prima facie case under *Batson.*" *Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176 (1993). Therefore, it is impossible to determine if Appellant's claim has arguable merit.

*Holloway II*, 739 A.2d at 1045. The court then noted that "Appellant does not even allege that counsel's ineffectiveness with respect to this issue 'so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.' 42 Pa. Cons.Stat. § 9543(a)(2)(ii). Accordingly, no relief is due." *Holloway II*, 739 A.2d at 1045–46.

■ The Pennsylvania Supreme Court adjudicated the claim of ineffective assis-

tance of prior counsel for failure to raise the *Batson* claim, deciding that all prior counsel were not ineffective.[36] We must apply the AEDPA in reviewing this decision, and in doing so we conclude that the adjudication of the ineffectiveness claim[37] did not result in a decision that was contrary to, or involved an unreasonable application of, either *Batson* or *Strickland.* 28 U.S.C. § 2254(d)(1). Because we have found that PCRA's procedural rules act as an independent and adequate state ground that bars us from examining the *Batson* claim on the merits, we may only do so if Petitioner can show cause for and prejudice from the procedural default that resulted from his failure to present the *Batson* claim on direct appeal. *See Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). We find that, given the state of the law and the record at the time of direct appeal, direct appeal counsel did not act unreasonably in not raising the *Batson* claim, and therefore cause has not been shown. Even if we were incorrect in finding that the PCRA rules are an independent and adequate state bar, and were required to examine the claim on the merits, we would not find a *Batson* violation on the record before us.[38]

---

**36.** There was some confusion at oral argument before us on August 2, 2001, as to which claim the Pennsylvania Supreme Court adjudicated. If its decision were an adjudication of the *Batson* claim, it made a finding that it is impossible to determine whether the *Batson* claim has merit, i.e. that the underlying claim was not proven by the party having the burden of proof. However, for the reasons explained previously, including the court's explicit statement that it would "treat each of the remaining issues [including *Batson* ] as a claim for ineffective assistance of counsel," *Holloway II*, 739 A.2d at 1044, we believe that it adjudicated the ineffective assistance of counsel claim, deciding that Petitioner did not "show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687, 104 S.Ct.

2052. In either event, sufficient grounds are not made out for us to conclude that "the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of" either *Batson* or *Strickland.* 28 U.S.C. § 2254(d)(1).

**37.** The ineffectiveness claim is itself a claim for habeas relief; it is not an allegation of ineffectiveness to be proven to show cause to excuse a procedural default.

**38.** We do not consider the *Batson* claim to have been exhausted on direct appeal by virtue of Petitioner's pro se filing of his Application Made Pursuant to PA.R.A.P. 2501(a) To File Pro Se Supplemental Brief on July 31,

## (1) Ineffectiveness Claim

Petitioner argues that he is entitled to a new trial because the Pennsylvania Supreme Court's decision on the ineffectiveness claim resulted in a decision that was contrary to, or involved an unreasonable application of, either *Batson* or *Strickland,* or both. Petitioner argues that the *Spence* rule is contrary to, or unreasonable application of *Batson,* and therefore the Pennsylvania Supreme Court erred (1) in not finding a prima facie *Batson* violation based on the record and Petitioner's examination of voter registration records that purportedly show the races of the potential and chosen jurors; (2) in retroactively applying the Pennsylvania *Spence* rule to him; and (3) in not finding that any viola-

tion of the rule was due to ineffective assistance of counsel. He further argues that with respect to the potential jurors for whom the prosecutor offered explanations for his strikes, the issue of a prima facie case is moot, so the *Spence* rule is irrelevant; the Pennsylvania Supreme Court's adjudication was contrary to, or an unreasonable application of, *Batson,* because the court should have considered the reasons given by the prosecutor and determined whether there had been a *Batson* violation.

### (a) Validity of the *Spence* Rule

 Pennsylvania's requirement that a defendant objecting to a prosecutor's allegedly discriminatory use of peremptory strikes must identify the race of potential

1989, some nine months after his counseled direct appeal brief was filed. Petitioner made this argument for the first time at an evidentiary hearing that we granted for the sole and limited purpose of allowing direct appeal counsel to be examined and cross-examined as to his reasons for not raising the *Batson* claim on direct appeal, in order to determine whether cause could be established for the procedural default resulting from his failure to raise the *Batson* claim on direct appeal. Petitioner did not make such an argument in his Petition, Memorandum of Law, or his Reply Brief.

Neither did PCRA trial level and PCRA appellate counsel argue the issue that Petitioner raised the *Batson* claim on direct appeal by virtue of his pro se filing. They only argued that direct appeal counsel was ineffective for failing to raise the *Batson* claim. We believe that if they had made such an argument, the Pennsylvania Supreme Court could have decided that it should consider the *Batson* claim directly, instead of finding it waived because it was not raised on direct appeal, and only considering it as a claim underlying a claim of ineffectiveness of counsel. Had the court had the benefit of this argument, it could have decided whether the procedural bar it ultimately applied was appropriate. We believe that we are bound by this procedural default. PCRA counsel did not raise this issue that was necessary for the Pennsylvania Supreme Court to examine the *Batson* claim on its

merits. We believe that this argument itself must be exhausted in order for us to consider it, because if we were to accept it now, it would entitle Petitioner to de novo review of the *Batson* claim. In other words, the argument and the evidence presented thereon were simply another back door way for Petitioner to argue that we should consider the *Batson* claim directly. This argument was not exhausted because it was not fairly presented to the Pennsylvania Supreme Court, and because it could not be raised there now, we find it to be procedurally defaulted. *See* Part III. B. 2, *supra.* Such a default cannot be overcome, because there is no constitutional right to counsel in collateral proceedings. *See, e.g., Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

Under the facts before us there is substantial doubt that a pro se filing by a person represented by counsel was sufficient to file, raise, and exhaust this claim. Even if we were to consider the *Batson* claim to be exhausted by this pro se filing, and find that the Pennsylvania Supreme Court did not adjudicate the claim on direct appeal and erred in stating that the claim was raised for the first time on PCRA appeal, we have examined the claim de novo herein in our consideration of whether counsel could have been ineffective for failing to raise it, and have found it to be without merit, even with the expanded record.

jurors stricken by the Commonwealth, the race of potential jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected was first articulated in *Commonwealth v. Spence*, 534 Pa. 233, 627 A.2d 1176, 1182–83 (1993). By its terms, the *Spence* rule only applies to the record before the appellate court, not before the trial court. *See id.* The Pennsylvania Supreme Court, however, has expanded the rule to require that the defendant make such a complete record before even the trial judge can decide whether there has been a *Batson* violation. In other words, jury selection must be complete before the objection may be ruled upon. *See, e.g., Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 631 (1995). The Petitioner argues that this requirement is fundamentally inconsistent with and therefore contrary to *Batson*, which contemplates that claims of discrimination be contemporaneously raised and resolved. In *Hernandez v. New York*, the U.S. Supreme Court noted that "*Batson* permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process." 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

■ The timing element of the *Spence* rule is not contrary to *Batson*. The Court declined to create specific procedures for a trial court to follow upon defendant's timely objection to the prosecutor's peremptory strikes. *Batson*, 476 U.S. at 99, 106 S.Ct. 1712. The Court recognized that a variety of jury selection practices are followed by state and federal trial courts, therefore the Court expressly made "no attempt to instruct these courts how to best implement" *Batson*'s holding. *Id.* at 99, 106 S.Ct. 1712 n. 24. *Batson* also contemplated allowing the trial court to choose whether to contemporaneously rule on such objections or wait until the end of jury selection, and if the trial judge found that there had indeed been impermissible discrimination, to strike the whole jury and empanel another. *Id.; see also Hernandez*, 500 U.S. at 358, 111 S.Ct. 1859 (noting that *Batson* permits such contemporaneous rulings, but not stating that *Batson* requires them). If the Court would have left the procedural decision to the trial judge, surely it is permissible for a state supreme court to make that decision on behalf of its trial courts.

■ Neither is the substance of the *Spence* rule an unreasonable application of *Batson*. The evidence required by the rule would show that members of a racial group were in fact stricken by the government, would help to show the totality of the circumstances surrounding jury selection, and are the underlying facts necessary to determine whether a "pattern of strikes" exercised against members of a racial group exists. Both the Supreme Court in *Batson*, 476 U.S. at 97, 106 S.Ct. 1712, and the Third Circuit in *United States v. Clemons*, 843 F.2d 741, 748 (3d Cir.1988), cite such a "pattern of strikes" as an example of the type of evidence that may be used to raise an inference of intent to discriminate to support a prima facie case. Neither case states that either showing such a pattern or supplying the evidence needed to determine whether there is such a pattern is dispositive. These cases merely indicate that such information is relevant. The Third Circuit reiterated this view in *Simmons v. Beyer*, which concisely set forth five general factors for evaluating a prima facie *Batson* claim. 44 F.3d 1160, 1167 (3d Cir.1995) ("In [*Clemons*] we elaborated on the first step of a *Batson* analysis, listing five factors that are relevant to a prima facie case: (1) the number of racial group members in the panel, (2) the nature of the crime, (3) the race of the defendant and the victim,

(4) a pattern of strikes against racial group members, and (5) the prosecution's questions and statements during the voir dire."). Despite the fact that these cases merely suggest examining the evidence that is required by the *Spence* rule, and expressly disavow any binding requirement on trial courts to examine specific types of evidence,[39] we cannot say that the *Spence* rule is an unreasonable application of *Batson*.[40] All three elements of the rule are individually helpful in determining whether members of a racial group were included in a particular venire and were in fact stricken, and in combination the elements are helpful in determining whether the prosecutor had a discriminatory intent in exercising such challenges.

### (b) Application of the *Spence* Rule to Petitioner

 The Pennsylvania Supreme Court's application of the *Spence* rule to Petitioner was not impermissibly retroactive. Petitioner cites to *Ford v. Georgia*, 498 U.S. 411, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991), which held that a Georgia rule first announced by state courts in 1987, under which *Batson* claims were deemed waived unless the asserted violation was contemporaneously objected to at trial, could not be retroactively applied to the petitioner, whose trial was held in 1984. *Ford* is inapposite because the *Spence* rule, as applied to Petitioner, does not require that a *trial* record have been made as to the race of potential and chosen jurors. Rather, it required only that the record before the reviewing court contain such evidence. *Spence*, 627 A.2d at 1182–83; *see also, e.g., Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 631 (1995) ("[A]ppellant failed to make an adequate record for appeal in that he has done nothing to inform the Court regarding the categories identified in *Spence*."). *Spence* was decided in 1993—after Petitioner's direct appeal was final. The supplements to the PCRA petition that raised the *Batson* issue were filed in 1994 and 1997, but they contained mere allegations of the race of some jurors. Even *Simmons*, which showed that it was both necessary and sufficient for the appellate record to reflect the evidence required under the *Spence* rule, was decided July 19, 1995—the same day that Judge Sabo granted Petitioner's

---

**39.** We note that, contrary to Petitioner's characterization of it, the *Spence* rule is not a "bright line test" for determining whether a prima facie case has been established. The rule does not speak to how a court will decide once it has this relevant information. Indeed, bright line tests based solely on the pattern of strikes are generally disfavored; such a pattern is merely a highly relevant factor used in inferring intent. *See Clemons*, 843 F.2d at 746 (canvassing cases) ("We find that establishing some magic number or percentage to trigger a *Batson* inquiry would short-circuit the fact-specific determination expressly reserved for trial judges.").

**40.** Neither is the substance of the *Spence* rule "contrary to" *Batson*. In *Williams v. Taylor*, the Court explained that the "contrary to" language of § 2254(d)(1) "suggests that the state court's decision must be substantially different from the relevant precedent" of the Supreme Court. 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The *Batson* standard is very broad and allows lower courts substantial leeway in setting procedures to be followed in applying its three-step procedure. The *Spence* rule falls within this broad standard and thus cannot be said to be "substantially different" or "diametrically opposed," and hence not "contrary to" *Batson*.

Further, there is nothing to indicate that the Pennsylvania Supreme Court would apply the *Spence* rule blindly in every case, even when there is an abundance of other evidence supporting a prima facie *Batson* case, such as might exist in the case of a racially charged crime, or when the prosecutor's questions during voir dire strongly indicate that race is a major factor. However, such is not the case before us.

request for a PCRA evidentiary hearing.[41] The hearing, however, was not held until February 10, 1997. Therefore PCRA counsel was clearly on notice that the races of the jurors had to be proven, not merely alleged, and that this could be done at a PCRA hearing if it had not been done previously. At the PCRA hearing, however, there was no mention of the *Batson* claim. After introducing new evidence on other claims, Petitioner's counsel rested on the petitions and memoranda that had been filed in the case for his arguments on the various issues. (N.T. PCRA Hrg., 2/10/97 at 11). Judge Sabo asked whether there was anything else to come before him, but counsel failed to mention anything else.

The Pennsylvania Supreme Court's actual application of the *Spence* rule was not unreasonable and comported with due process. The record provides much of the evidence required under the *Spence* rule, but not all of it.[42] To fill in the holes in the record on PCRA appeal, Petitioner asserted that an analysis of voter registration records shows that races of the jurors and potential jurors as required. Petitioner failed to submit copies of such voter registration records to the state courts at any stage of the PCRA process. Petitioner

was clearly on notice of the requirement to provide actual evidence because the issue was addressed in the brief to the Pennsylvania Supreme Court on PCRA appeal, with an argument that it not be retroactively applied to Petitioner. The Petitioner did not explain to the PCRA courts or to this Court the absence of such records at the PCRA appeal level, or allege an inability to submit such records to the Pennsylvania Supreme Court; he merely alleged that such records existed and proved the races of the prospective jurors. We cannot fault the Pennsylvania Supreme Court for adhering to the strict terms of its rule that such evidence be provided.[43]

■■■ PCRA appellate counsel requested a remand for a hearing to prove the race of the jurors, but the Pennsylvania Supreme Court denied the petition without remanding, and, indeed, without mentioning the request for a remand in its opinion. We cannot say that its refusal to remand was unreasonable. As just discussed, initial PCRA counsel was clearly on notice of the need to develop the record and had considerable opportunity to do so. Further, Petitioner saw fit to submit, for the first time on PCRA appeal, other evidence supporting his claim, such as the transcript

---

**41.** The request for an evidentiary hearing was a general one (R. at D–28, Supplemental Amended Petition under PCRA, filed 8/15/94, final page), as was the granting of an evidentiary hearing (R. at D–33). There is no evidence in the record that Petitioner either requested or was denied an evidentiary hearing specifically on the *Batson* claim.

**42.** A fair reading of the trial court record, which was explicitly made part of the PCRA record at the PCRA evidentiary hearing, reveals that the prosecutor exercised twelve peremptory challenges: eleven against African–Americans and one against a Caucasian. The record also shows that of the first nine jurors seated, only two are African–Americans. The record does not prove whether the other seven jurors were Caucasian or other

races; nor does it prove the race of the remaining three jurors. Finally, the record shows that the defense struck an African–American from the venire, but this person was not first accepted by the prosecutor; at the most one only one other juror could have been African–American and accepted by the prosecutor but then stricken by the defense.

**43.** The key evidence missing was the race of the last three jurors chosen. The Pennsylvania Supreme Court's conclusion as to whether a prima facie case existed could have reasonably turned on this information. If, for example, evidence had shown that all of these jurors were African–American, it is unlikely that the court would have concluded that the pattern of strikes raised an inference of racial discrimination.

of the McMahon tape and the article on racial discrimination in capital punishment. Voter registration records could have been likewise submitted. There is nothing to indicate that the court would not have considered the voter registration records to be sufficient evidence of the race of the jurors as required by the *Spence* rule.[44]

### (c) Pennsylvania Supreme Court's Refusal To Look at Strikes for which Explanations Were Given

The Pennsylvania Supreme Court refused to examine the reasons given by the prosecutor for striking African–Americans despite the fact that the trial judge had never made a finding as to the existence of a prima facie case, ending its examination of the issue because the defendant failed to provide the evidence needed to determine whether a prima facie case existed. We cannot say that this interpretation of *Batson*'s burden-shifting provision was unreasonable.

▮▮▮▮▮ Under some circumstances, when a prosecutor has offered reasons for his strikes without being required to do so by the trial judge, the reviewing court will overlook the Petitioner's failure to show a prima facie case, or the trial judge's failure to rule on the issue, as moot. *See Hernandez v. New York*, 500 U.S. 352, 358–359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). The Court has thus far only held that such is the case when "the trial court has ruled on the ultimate question of intentional discrimination." *Id.* at 359, 111 S.Ct. 1859. The Third Circuit has modified and expanded this principle. *See United States v. Uwaezhoke*, 995 F.2d 388, 392 (3d Cir.1993), *cert. denied,* 510 U.S. 1091, 114 S.Ct. 920, 127 L.Ed.2d 214 (1994) ("If the government is found at any subsequent stage of the case either to have tendered an explanation that is not race neutral or to have acted with racial animus, the conviction must be overturned without regard to whether the defendant established a prima facie case."). *See also Johnson v. Love,* 40 F.3d 658, 665 (3d Cir.1994) ("Where the record as a whole as ultimately developed permits a reasonable argument that the judgment is so tainted, the issue of taint must be resolved; it

---

**44.** There does not seem to be any good reason for PCRA trial or appellate counsel to have failed to provide the voter registration records, or, indeed, to otherwise have failed to provide the evidence required by the *Spence* rule. As previously explained, counsel at both levels were clearly on notice that such a record must be developed in order to state a prima facie *Batson* claim in appellate courts, even if such a record were not developed at trial. We may not review the decision of the Pennsylvania Supreme Court as to the reasonableness of counsel's conduct as a basis for granting the writ, however, because ineffectiveness of PCRA counsel is simply not a claim cognizable by this Court. *See* 28 U.S.C. § 2254(i); *Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987).

We may, however, review the implicit decision of the Pennsylvania Supreme Court that trial and direct appeal counsel were not ineffective for failing to comply with the *Spence* rule. We find that this decision was a reasonable application of *Strickland.* The *Spence* rule was not yet in existence, and counsel is not required to be prescient. *See, e.g., Sistrunk v. Vaughn,* 96 F.3d 666, 671 (3d Cir. 1996) (holding that direct appeal counsel could not have been ineffective for failing to raise a *Batson*-type claim before *Batson* had been decided by the Supreme Court); *Government of the Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir.1989) ("There is no general duty on the part of defense counsel to anticipate changes in the law." Because trial and direct appeal counsel could not have known of the requirements of the *Spence* rule, their failure to comply with it was not unreasonable, and thus the court's decision was reasonable.)

cannot be avoided by a finding that the defendant failed to present a prima facie case."); *United States v. Clemmons*, 892 F.2d 1153, 1156 (3d Cir.1989). The Pennsylvania Supreme Court is not bound in any case by the holdings of the Third Circuit. Neither does the Pennsylvania Supreme Court's decision run afoul of *Hernandez:* the trial court never ruled on the ultimate question of intentional discrimination, *Hernandez*, 500 U.S. at 358–59, 111 S.Ct. 1859; and *Hernandez* was decided after Petitioner's direct appeal became final so Petitioner would not have gotten the benefit of it, *see Williams v. Taylor*, 529 U.S. 362, 390, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), and it was also only a plurality opinion. The court in *Holloway II* merely adhered to the strict terms of *Batson*, and thus cannot be said to have applied it unreasonably.

#### (d) Conclusion

The Pennsylvania Supreme Court, on PCRA appeal, decided that Petitioner had not proven that his prior counsel performed deficiently in failing to raise the *Batson* claim, because the court could not even determine whether the underlying claim had merit. Because we have decided that: Pennsylvania's *Spence* rule is a not an unreasonable application of *Batson;* the Pennsylvania Supreme Court's application of the *Spence* rule to Petitioner was not unreasonable; and that its refusal, in the absence of a finding of a prima facie case, to look at the explanations for peremptory strikes given by the prosecutor was not an unreasonable decision, we conclude that the Pennsylvania Supreme Court was not unreasonable in finding that the underlying *Batson* claim had not been proven. We find that the court's adjudication of the ineffectiveness claim, using the finding that the underlying claim had not been

proven, was not an unreasonable application of *Strickland*, because *Strickland* instructs that if the petitioner has not shown that underlying claim has merit, counsel cannot have been ineffective for failing to raise it. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052.

#### (2) Procedurally Defaulted *Batson* Claim

 We have found that PCRA's procedural rules, 42 Pa. Cons.Stat. §§ 9543(a)(3) and 9544(b), act as an independent and adequate state ground that bars us examining the *Batson* claim on the merits, and we may only examine the claim on the merits if Petitioner can show cause for and prejudice from the procedural default that resulted from his failure to present the *Batson* claim on direct appeal. *See Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); Part III. B. 2, *supra.* Petitioner alleges ineffective assistance of counsel on direct appeal to excuse the default. This allegation has been exhausted, as required, *see Edwards v. Carpenter*, 529 U.S. 446, 452, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000); *Murray v. Carrier*, 477 U.S. 478, 487–92, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), by being fairly presented to the PCRA hearing court and to the Pennsylvania Supreme Court on PCRA appeal. We believe our determination of whether ineffective assistance of counsel exists, for the purpose of establishing cause, is de novo, even though we have just held, under the AEDPA standard of review, that the state's adjudication of the claim of ineffective assistance of direct appeal counsel was not unreasonable. *See Edwards*, 529 U.S. at 452–53, 120 S.Ct. 1587 (applying de novo review to allegations of ineffectiveness of counsel as cause and prejudice to excuse a procedural default); Part III. B.

2 & n. 12, *supra*.[45] We find that, given the state of the law and the record at the time of direct appeal, direct appeal counsel did not act unreasonably in not raising the *Batson* claim, and therefore cause has not been shown.[46] Even if we were incorrect in finding that the PCRA rules are an independent and adequate state bar, and were required to examine the claim on the merits, we would not find a *Batson* violation on the expanded record before us.[47]

### (a) Further Development of the Facts

The Commonwealth objects to any further development of the facts underlying the *Batson* claim, but we have allowed limited discovery. Petitioner cannot succeed in showing cause for his default unless appellate counsel was ineffective for failing to pursue the *Batson* claim. Counsel cannot have been ineffective if the *Batson* claim had no merit. *See Strickland*, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). As stated, we believe we must look into the existence of cause de novo. Based on our comprehensive review of the record, and considering the Petition and legal memoranda of both parties, we concluded that the Petitioner had shown good cause for us to exercise our discretion and order limited discovery as to this claim pursuant to Rule 6 of the Rules Governing Section 2254 Cases,[48] because such an expanded record might have shown that there had been a prima facie *Batson* violation.[49] If a prima facie *Batson*

---

45. Nevertheless we have a concern. Obviously exhaustion is required to allow the state court to act. If they do so must we respect their adjudication? If not, why require exhaustion?

46. *Batson* violations are within those categories of cases for which prejudice is presumed. A *Batson* violation is a structural error, affecting the entire trial process, and is thus per se prejudicial. *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *Batson,* 476 U.S. at 100, 106 S.Ct. 1712 ("If the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed."). If we were to reach the issue of prejudice, we would be required to find that prejudice was established.

47. If we were incorrect as to the adequacy of these rules in barring our review of the underlying claim, we would also be faced with issue of whether the Pennsylvania Supreme Court's implicit finding that trial counsel failed to object and preserve the *Batson* issue for appeal, and its subsequent application of the contemporaneous objection waiver, is an independent and adequate state ground barring our review. If it were, Petitioner would have to show cause and prejudice as to trial counsel. In the course of our examining whether appellate counsel acted reasonably in failing to raise the *Batson* claim, we examined the merits of the claim, because counsel cannot have been ineffective for failing to raise a meritless claim. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Because we have found, even on the expanded record before us, that a *Batson* violation has not been proven, trial counsel could not have been ineffective in failing to object, even if one could conclude that his statements alerting the trial court to the ADA's pattern of striking only Blacks, his moving for a mistrial, and his subsequent noting for the record the race of all jurors peremptorily stricken by the Commonwealth (N.T. 5/15/86 at 129, 141, 150, 171; 5/16/86 at 32, 37) should not be considered an objection sufficient to preserve the issue for appeal.

48. Our order was also based on our authority to order expansion of the record to include "additional materials relevant to the determination of the merits of the petition." Rule 7 of the Rules Governing Section 2254 Cases.

49. Our order was for the limited purpose of determining whether cause was present. Furthermore, we believe that, when making de novo review, ordering limited discovery or expansion of the record pursuant to Rule 6 or Rule 7 of the Rules Governing § 2254 Cases is not inhibited by AEDPA's restrictions on holding evidentiary hearings, 28 U.S.C. § 2254(e)(2). There is also authority that

violation had been shown, the burden of proof would have then shifted to the Commonwealth and required us to give the Commonwealth an opportunity to rebut the prima facie case by offering any race-neutral reasons that the prosecuting ADA might have had for striking African–Americans. *See Batson v. Kentucky,* 476 U.S. 79, 97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). On July 5, 2001, we therefore vacated the portion of our prior order of August 7, 2000 denying discovery as to evidence supporting the claim of racial discrimination in the selection of Petitioner's jury, and ordered that both the Commonwealth and Petitioner provide to both opposing counsel and the Court such discovery materials as they had in their actual or constructive possession or control regarding the racial composition of the entire venire, the races of the potential jurors challenged by the Commonwealth both for cause and peremptorily, the races of the seated jurors, and the reasons for the Commonwealth's exercise of peremptory challenges at Petitioner's trial.

Petitioner provided evidence as to the contents of voter registration records that he had referred to in his Petition, his memoranda of law, and in his brief to the Pennsylvania Supreme Court on PCRA appeal. The data appears to have been derived from a search of a voter registration database in June 1998 and indicates the names, addresses, races and years of birth of some of the venirepersons. The Commonwealth provided a number of documents. First, there was a list of the twelve jurors and two alternates, presumably made by ADA Barth as the jury was selected, or shortly thereafter. The list includes the juror numbers, race and gender, as well as other facts elicited during voir dire, such as whether the person was married or had children, and if so, how many; neighborhood of residence; and type of employment. Second, there were fifteen pages of notes regarding 86 of the 87 venirepersons questioned. For each potential juror, the notes include juror number; race and gender; the disposition of questioning, e.g. peremptory challenge or challenge for cause by the Commonwealth or the defendant; answers to some of the questions propounded by counsel; and occasionally, what may be construed as mental impressions of the ADA. Third, there were six dot-matrix-printed pages listing the jury panels, containing juror numbers and names. Written on these lists were notes, presumably made by ADA Barth, as to the answers given by the

providing discovery is not an evidentiary hearing. *See Boyko v. Parke,* 259 F.3d 781, 789–90 (7th Cir. 2001); *McNair v. Haley,* 97 F.Supp.2d 1270, 1279–86 (M.D.Ala.2000). The *McNair* court stated: The AEDPA did not amend Rule 6 or Rule 7, and "the only way to bridge the gap between AEDPA's modification of requirements for an evidentiary hearing and the conclusion that AEDPA restricts federal habeas review to the state court record is to read the reference to evidentiary hearings as a metonym for all evidence." *McNair,* 97 F.Supp.2d at 1281. Principles of statutory construction direct us to examine the words of the statute, *see United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986), used in "their ordinary and usual sense," *Caminetti v. United States,* 242 U.S. 470, 485–86, 37 S.Ct. 192, 61 L.Ed. 442 (1917). Section 2254(e)(2) directs that we "shall not hold an evidentiary hearing" in certain circumstances. There is no reason to believe that "evidentiary hearing" means something other than "evidentiary hearing." *See McNair,* 97 F.Supp.2d at 1281–82 (finding no clear legislative intent to the contrary). An evidentiary hearing is a formal proceeding in court "at which evidence is presented, as opposed to a hearing at which only legal argument is presented." Black's Law Dictionary 725 (7th ed. 1999). Ordering that the parties provide discovery of certain documents to each other under Rule 6 and that they submit the documents to the Court under Rule 7 is quite different than holding an evidentiary hearing.

jurors to the questions propounded by Judge Sabo to the panel as a whole before individual questioning began, such as whether anyone personally knew someone involved in the case.[50]

If we may look at such evidence for the limited purpose of determining whether cause is present, such evidence confirms that the Commonwealth exercised peremptory challenges against twelve venirepersons, eleven of whom were Black and one of whom was White. The evidence also confirms that of the first nine jurors chosen, two were Black and seven were White, and shows, for the first time, the races of the final three jurors—two White and one Black. The evidence also shows that none of the nine potential jurors who were first accepted by the Commonwealth before being stricken by the defense were African–Americans.

Based on the discovery evidence submitted by both parties, on July 24, 2001, our deputy clerk contacted counsel for both parties, Thomas W. Dolgenos, Esq., for the Commonwealth and David Wycoff, Esq., for Petitioner, to schedule an evidentiary hearing, pursuant to Rule 8 of the Rules Governing Section 2254 Cases, so the prosecutor in Petitioner's case, Drew R. Barth, Esq., could authenticate the notes and aid in deciphering any illegible or ambiguous notes.[51] Further, if we would have thereafter found a prima facie *Batson* violation

to exist, we could have given him the opportunity to articulate his reasons, if possible more than fifteen years after trial, for exercising peremptory challenges against African–Americans. If we had found a prima facie case, the second step of the *Batson* analysis would have required us to allow the Commonwealth to attempt to provide race-neutral reasons in this way. Unfortunately, Mr. Barth is no longer an ADA with the Philadelphia District Attorney's Office, but Mr. Dolgenos was able to locate him in another state. Both counsel spoke with Mr. Barth, who informed them that due to a psychiatric disability, he is incapable of testifying at an evidentiary hearing, and he has no specific recollection of the case. On July 25, 2001, we held a telephone conference with both counsel, during which Mr. Dolgenos informed us of the lack of availability of Mr. Barth, and the reasons therefor.[52] Neither counsel disputed that Mr. Barth was unavailable. We requested that counsel examine the evidence and file a joint stipulation as to the contents of the evidence to the extent possible. Counsel agreed to do so, with the Commonwealth preserving its argument that an evidentiary hearing or other factual development at this stage was not proper. We received such stipulations on August 1, 2001, and promptly scheduled, then held, oral arguments on the evidence on August 2, 2001, at which time Petitioner

---

**50.** There were also eight pages of notes that were written in obviously different handwriting than the other lists and were extremely difficult to decipher. There appear to be names of fifteen or sixteen persons with notes written under each name. The names are sufficiently legible for us to conclude that none of them referred to members of the venire at Petitioner's trial.

**51.** Petitioner's trial counsel, Barry Denker, is deceased. If he had been alive, we probably would have sought his testimony as to his recollection of voir dire.

**52.** We therefore never held an evidentiary hearing on any aspect of the merits of the stand-alone *Batson* claim itself. If Mr. Barth had been available and we had made an attempt to hold an evidentiary hearing on the facts underlying the *Batson* claim, we would have been squarely presented with the question of whether 28 U.S.C. § 2254(e)(2) would have restricted our power to hold such a hearing.

filed a Motion for Summary Judgment on the *Batson* claim.[53]

■ Thereafter, we realized that because the *Batson* claim had not been raised at the PCRA evidentiary hearing that was held on February 10, 1997, Petitioner's appellate counsel had never been examined to determine his reasons for not raising the *Batson* claim on direct appeal. Because the reasonableness of his representation would be dispositive of cause to excuse Petitioner's procedural default of his *Batson* claim, if we found that such claim had merit, we felt it prudent to give him the opportunity to explain himself, if possible, instead of merely relying on case law and our own knowledge and analysis to determine whether he acted reasonably. On August 3 our deputy clerk located Petitioner's direct appeal counsel, Mr. Robert R. Redmond, in another district. On the same day, we conferred with both counsel on the record by telephone about the possibility of holding an evidentiary hearing or using other methods to take Mr. Redmond's evidence. On August 6, after considering Petitioner's letter of that date as-serting the need for a hearing,[54] rather than using other means of taking evidence, and of his right and desire to be present; the Commonwealth's letter of that date objecting to our holding an evidentiary hearing, based on the AEDPA's restrictions on federal habeas courts' power to conduct such hearings; and on the oral arguments of counsel via telephone conference call on the propriety of such a hearing, we scheduled a hearing for August 16 to take the evidence of Mr. Redmond.[55] On August 14 the Commonwealth filed a Response to Petitioner's Motion for Summary Judgment on the *Batson* Claim and a Motion for Reconsideration of Grant of Evidentiary Hearing. The evidentiary hearing was held on August 16, 2001, at which time we denied the Motion for Reconsideration. Both parties filed post-hearing letter-briefs on August 17, 2001.

Based on Mr. Redmond's testimony at the evidentiary hearing, on both direct and cross-examination, and the exhibits presented at the evidentiary hearing, insofar as they reflect on Mr. Redmond's credibility, we make the following findings of

53. We commend counsel for their alacrity in providing discovery, attempting to schedule an evidentiary hearing, and scheduling and participating in oral arguments on an expedited basis, as well as on their skill and professionalism in doing so.

54. We specifically instructed counsel that in this case we would accept, and indeed encouraged, this informal method of communication with us in order to expedite our consideration of any issues arising with regard to the *Batson* claim.

55. The hearing was held in the face of an objection by the Commonwealth that the hearing was untimely and barred by the AEDPA. We believe we were not precluded from holding an evidentiary hearing by 28 U.S.C. § 2254(e)(2), which applies only if Petitioner has "failed to develop the factual basis of a claim in State court proceedings." We held an evidentiary hearing to ascertain underlying

facts needed by us to determine whether direct appeal counsel acted unreasonably, which would support a finding of cause, for a showing of cause and prejudice under *Coleman*, and thus allow us to examine the *Batson* claim on the merits. Cause and prejudice is merely an excuse, allowing us to consider the merits of an otherwise procedurally defaulted ground for habeas relief; it is not a claim, or a ground for habeas relief, in itself. We have already determined that the Pennsylvania Supreme Court's adjudication of the claim of ineffective assistance of direct appeal counsel for failing to raise the *Batson* claim was reasonable under 28 U.S.C. § 2254(d)(1); now we are merely examining that allegation of ineffective assistance, de novo pursuant to the doctrine of procedural default, to determine whether that default may be excused. *See* n. 12, *supra.*

fact: [56]

1. Mr. Redmond had been practicing law for more than ten years before he was appointed as Petitioner's direct appeal counsel, handling numerous criminal trial and appellate matters, including trials in which he made a record to establish the facts needed to show a *Batson* claim.

2. Mr. Redmond was aware of the possibility that a *Batson* claim could be asserted on direct appeal in Petitioner's case, because a motion for a mistrial had been made during voir dire, and a motion for a new trial had been made after Petitioner's conviction, both based on the allegation that the Commonwealth systematically excluded African–American venirepersons from Petitioner's jury.

3. Mr. Redmond reviewed the trial record of voir dire and found that it did not clearly disclose the races of all the jurors or the majority of venirepersons peremptorily stricken by the Commonwealth or disclose justifications or attempts at justifications for the majority of the peremptory challenges exercised by the Commonwealth.

4. Mr. Denker, Petitioner's trial counsel, was unavailable for questioning by Mr. Redmond to help to build the record of the races of the jurors accepted and the venirepersons stricken by the Commonwealth.

5. Mr. Redmond felt that the prevailing law did not set forth a clear standard of what actions would constitute a *Batson* claim, or of what type of record would be required in order to prove a *Batson* claim.

**56.** We believe that we are barred by § 2254(e)(2) from considering any of the evidence adduced by Petitioner at the August 16, 2001 evidentiary hearing to prove his newly presented argument that the *Batson* claim was fairly presented on direct appeal, an argument which itself was never fairly presented in state court. See n. 38, *supra.* The only exception we know of to the application of (e)(2) to evidentiary hearings is the procedural default doctrine of *Coleman* and *Murray,* which we believe is unchanged by the AEDPA. *See* Part III. B. 2. & n. 12, *supra.* Petitioner would have us create a new exception to examine the evidence for the purpose of showing that the *Batson* claim was fairly presented on direct appeal. This purpose clearly does not fit within a showing of cause, the only reason for which we could have held the hearing. Indeed, while trying to show that Petitioner raised the *Batson* claim pro se, Petitioner also argued that direct appeal counsel was reasonable in not raising the claim himself. Because the purpose for which Petitioner would have us use this evidence, and the argument thereon, does not fit within the one exception to the application of (e)(2), we must consider whether Petitioner can overcome the barrier presented by (e)(2).

We find that Petitioner must satisfy the requirements of (c)(2)(A) & (B), because Petitioner "failed" to raise this argument during his state collateral proceedings and adduce evidence thereon at the PCRA hearing. Petitioner had the opportunity to present evidence on any factual issue that he wished, and he failed to do so. The lack of development of the record was due to the "lack of diligence, or some greater fault, attributable" to Petitioner or his counsel. *Williams v. Taylor,* 529 U.S. 420, 432, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000); 28 U.S.C. § 2254(e)(2). Petitioner cannot show that the narrow criteria of (e)(2) are satisfied. He cannot show that his claim relies on either a new, retroactive constitutional law that was previously unavailable, or a factual predicate that could not, with the exercise of due diligence, have been previously discovered. § 2254(e)(2)(A). Neither can he show that the facts supporting his claim are sufficient to establish, by clear and convincing evidence, that but for constitutional error no reasonable fact-finder would have found him guilty of the underlying offense. 28 U.S.C. § 2254(c)(2)(B). Therefore we find that § 2254(e)(2) bars us from considering the evidence adduced at the evidentiary hearing for the purpose of showing that the *Batson* claim was fairly presented to the Pennsylvania Supreme Court on direct appeal and was thus exhausted. We may only consider such evidence for the purpose of determining whether Mr. Redmond acted reasonably in deciding not to raise the *Batson* claim himself in the direct appeal brief he filed on behalf of Petitioner.

6. Mr. Redmond did not pursue the *Batson* claim on direct appeal because he felt that the trial record did not contain enough evidence to raise an inference that a prima facie case existed or that there was otherwise a meritful *Batson* claim in light of the prevailing law at the time he filed the appeal.

7. Mr. Redmond felt that, on the basis of the record before him and the uncertainty in the standard to be applied, due to the limited number of cases applying *Batson* at the time he filed the appeal and the uncertainty in the standards to be applied, the claim was weaker than other claims he could raise, and he felt that it was more important to focus on stronger claims.

### (b) Reasonableness of Direct Appeal Counsel's Decision Not To Assert the *Batson* Claim

■ We find that appellate counsel was not unreasonable for failing to pursue the *Batson* claim. When a petitioner alleges that his attorney was ineffective in pursuing a particular strategy, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. The Supreme Court held, in *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivo-

lous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins,* 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (citing *Jones* ). In explaining the reasonableness of appellate counsel's decision not to raise every colorable claim, the *Jones* Court noted that "experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones,* 463 U.S. at 751, 103 S.Ct. 3308. In *Robbins,* the Court noted that while "it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent." 528 U.S. at 288, 120 S.Ct. 746. Finally, the *Robbins* Court explained that to show counsel acted unreasonably in failing to raise a claim, the petitioner would have to show "that [the] particular nonfrivolous issue was clearly stronger than issues that counsel did present." *Id.*

We have found that Mr. Redmond concluded that the trial record was incomplete, such that it did not contain enough evidence to raise an inference that a prima facie case existed or otherwise included enough evidence to prove a *Batson* violation in light of the prevailing law at the time he filed the direct appeal brief.[57] Be-

---

**57.** Appellate counsel could not alter the trial record. In light of the contemporaneous objection rule and the need to build a record at trial, the Pennsylvania Supreme Court may not have given him permission to supplement the record. Even if he had received permission to supplement the record and had investigated to attempt to determine the races of the jurors, the venire, and the persons peremptorily stricken by the Commonwealth, such as by investigating voter registration records, as was done by PCRA appeal counsel, a *Batson* claim was weak under existing law. Nor could counsel have been ineffective for

failing to present such evidence as required by the *Spence* rule, even if he could have expanded the record, because counsel is not required to be prescient. *See, e.g., Sistrunk v. Vaughn,* 96 F.3d 666, 671 (3d Cir.1996) (holding that direct appeal counsel could not have been ineffective for failing to raise a *Batson*-type claim before *Batson* had been decided by the Supreme Court); *Government of the Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir.1989) ("There is no general duty on the part of defense counsel to anticipate changes in the law.").

cause an attorney can reasonably not raise claims that are without merit, *see Strickland,* 466 U.S. at 691, 104 S.Ct. 2052, or appear to be without merit, *see Robbins,* 528 U.S. at 288, 120 S.Ct. 746, his decision that the claim was either weak or without merit was reasonable, given the state of the record and the law at that time.

Based on *Commonwealth v. Hardcastle,* 519 Pa. 236, 546 A.2d 1101 (1988), the only opinion of the Pennsylvania Supreme Court applying *Batson* before Petitioner's direct appeal brief was filed, a reasonable advocate would likely believe that Petitioner's *Batson* claim had very little chance of success.[58] In *Hardcastle,* the court found that there had been no *Batson* violation upon a pattern of strikes and racial composition of the jury similar to those in Petitioner's case.[59] Fourteen African–Americans had been questioned during voir dire, and the Commonwealth had exercised twelve of the fifteen peremptory challenges it used against African–Americans. 546 A.2d at 1103. The resulting jury included one African–American. *Id.* Hardcastle's trial and judgment of sentence occurred before the *Batson* decision was issued, but Hardcastle's defense counsel preserved the issue by making a motion for a mistrial, subsequent to voir dire and prior to trial, based on the prosecutor's impermissible use of the challenges. *Id.* at 1104. The Pennsylvania Supreme Court therefore made "a post hoc evaluation of the record, examining each of the Commonwealth's fourteen peremptory challenges to determine whether appellant has made out a prima facie case of improper use." *Id.* Because the prosecutor had never been required to explain the

reasons for her strikes, the Pennsylvania Supreme Court canvassed the voir dire transcript in search of race-neutral reasons to justify each of the strikes against African–Americans. The court concluded:

> A review of this record indicates that an identifiable reasonable basis for a challenge was available in at least ten of the Commonwealth's twelve peremptory challenges. In the other two instances the Commonwealth had the opportunity to observe the witnesses and their response to questioning prior to exercising the peremptory challenge. In addition, although the Commonwealth had ample challenges remaining, there were no challenges offered to two black jurors, one of whom ironically was challenged by the defendant. On this record we find that appellant has not made out a prima facie case of the Commonwealth's improper use of peremptory challenges.

*Id.* at 1105.

Based on the facts of the *Hardcastle* case, and the decision and analysis by the Pennsylvania Supreme Court, a reasonable advocate could have believed that Petitioner's *Batson* claim would have little chance of success before the Pennsylvania Supreme Court. The record of Petitioner's voir dire showed that eleven of the twelve strikes exercised by the Commonwealth were against African–Americans, and two of the first nine jurors seated were African–Americans, and that defense counsel had also struck an African–American. These facts are substantially similar to the corresponding facts in *Hardcastle,* and because the race of the final three jurors was

---

**58.** Counsel cannot have been ineffective for failing to anticipate changes in the law that might have made the *Batson* claim seem stronger, because, as we have just explained, *see* n. 57, counsel is not required to be prescient.

**59.** Hardcastle has since been granted federal habeas relief by a district court based on his *Batson* claim. *Hardcastle v. Horn,* 2001 WL 722781, No. 98–CV–3028 (E.D.Pa., June 27, 2001).

unknown, the case might have seemed even weaker than that in *Hardcastle*. A reasonable advocate could have also expected the Pennsylvania Supreme Court to engage in a "post hoc evaluation of the record" as it did in *Hardcastle*, looking for race-neutral reasons for the strikes for which no reason was given, and looking for evidence that the reasons given were not pretexts. Based on our review of the record, we believe that such race-neutral or non-pretextual reasons could be found as to each juror stricken, were a court of a mind to find them. A reasonable advocate could as easily come to the same conclusion. Even if the record did not indicate "an identifiable reasonable basis" for each challenge, as the Pennsylvania Supreme Court had sought in *Hardcastle*, that court could have again relied on its conclusion that "the Commonwealth had the opportunity to observe the witnesses and their response to questioning prior to exercising the peremptory challenge," and therefore the challenges must have been reasonable. *Hardcastle*, 546 A.2d at 1103.

The analysis in *Hardcastle* conflates the prima facie case analysis with that of possible race-neutral reasons for strikes and the determination of whether such reasons are pretexts. Given this analysis, a reasonable advocate would have been justified in not proceeding even though the prosecutor in Petitioner's case had offered specific reasons for some of his strikes. In addition, no cases binding on the Pennsylvania Supreme Court had yet held that when such reasons had been offered, a court might or must ignore the absence of a prima facie case and examine the reasons to determine whether they were race-neutral or pretexts. *See* Part III. e. (1)(c), *supra*.

We find that Petitioner has not shown that the *Batson* claim *clearly* had a better chance of success than issues that counsel

did present in the direct appeal, *see Robbins*, 528 U.S. at 288, 120 S.Ct. 746, because based on the record that he had and the law at the time, he could not have expected the Pennsylvania Supreme Court to find even a prima facie case of racial discrimination in the selection of Petitioner's jury, and therefore direct appeal counsel was not unreasonable in deciding not to raise the *Batson* claim. Moreover, even on the expanded record before us, we find that Petitioner's *Batson* claim does not have merit, and therefore direct appeal counsel could not have been unreasonable for failing to raise it. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. Each of these reasons is sufficient for us to find that direct appeal counsel's representation of Petitioner was not ineffective when he chose not to and did not raise the *Batson* claim, and we do now make such a finding; therefore Petitioner cannot show cause to overcome the procedural default that arose because the claim was not raised on direct appeal.

**(c) Lack of a Prima Facie Case**

We do not find a prima facie case of a *Batson* violation on the expanded record before us. In *Batson*, the Court directed that the trial court examine the totality of the circumstances to determine whether the court could infer discriminatory intent on the part of the prosecutor in exercising his peremptory challenges. *Batson*, 476 U.S. 79, 97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). As examples of relevant circumstances that may be examined to infer discriminatory intent, the Court pointed to a " 'pattern' of strikes against black jurors included in the particular venire" and "the prosecutor's questions and statements during voir dire examination and in exercising his challenges." *Id.* at 97, 106 S.Ct. 1712. The Third Circuit, in *United States v. Clemons*, also directed that trial courts examine all relevant factors, and suggested

five factors types of evidence that would be relevant: (1) the number of racial group members in the panel, (2) the nature of the crime, (3) the race of the defendant and the victim, (4) a pattern of strikes against racial group members, and (5) the prosecution's questions and statements during the voir dire. 843 F.2d 741, 748 (3d Cir.1988). The Third Circuit made clear that its list was merely illustrative and should not be construed as preventing trial judges from addressing other facts and circumstances. *Id.* Subsequently, in *Jones v. Ryan,* the Third Circuit also directed that statistical disparities should be examined "in determining whether a prima facie case has been established." 987 F.2d 960, 971 (3d Cir.1993) (citing *Batson,* 476 U.S. at 95, 106 S.Ct. 1712 (citing *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977))).

In directing that the totality of the circumstances be examined, the *Clemons* court declined to create a bright line rule as to the number or percentage of challenged Black jurors that might establishing a prima facie case, because such a rule would be "contrary to the letter and spirit of *Batson.*" *Id.* 843 F.2d at 746. The Third Circuit explained that "striking a single black juror could constitute a prima facie case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks." *Id.* at 747 (citing *United States v. Gordon,* 817 F.2d 1538, 1541 (11th Cir.1987), *vacated on reh'g in part on other grounds,* 836 F.2d 1312 (11th Cir.1988)). The court also "doubt[ed] the significance of including a single black on a panel if, at the same time, the government used most of its peremptory challenges (e.g., thirteen of sixteen) to strike blacks with backgrounds similar to the white jurors ultimately selected. In that case, the mere presence of a single black on the jury would not necessarily prevent a finding of a prima facie case."

*Id.* & n. 4 (citing *United States ex rel. Yates v. Hardiman,* 656 F.Supp. 1006, 1016 (N.D.Ill.), *rev'd* 830 F.2d 195 (7th Cir.1987), which had this factual situation, not as precedent but "to illustrate the shortcomings of per se rules"). The Third Circuit again noted that it could not "conclude that inclusion of blacks on a jury bars a prima facie case, especially where other facts and circumstances may constitute an inference of prosecutorial discrimination in the selection process." *Id.* at 748.

Petitioner and the victim are members of the same race, (N.T. 5/19/86, at 57) (testimony of medical examiner that the victim was a "Negro male"), and the crime contains no apparent racial overtones, therefore these considerations do not support the finding of a prima facie case.

The notes of voir dire reveal nothing explicit in the statements or questions of the prosecutor that would indicate that he considered race to be a factor in any way in jury selection. Race was explicitly mentioned only three times during the entire voir dire, and each time defense counsel brought up the subject. In two cases, relatives of the potential jurors had been victims of crime, and defense counsel inquired as to the race of the attackers. In both cases African–Americans were accused of committing the crimes. Both potential jurors indicated that such facts would not influence them in the instant case, the trial of an African–American. As to the first, the Commonwealth found her acceptable, but the Defense exercised a peremptory challenge. As to the second, the Commonwealth challenged for cause because the venireperson indicated that he was unable to impose the death penalty. A third venireperson denied that she would have any difficulty sitting as a juror in a case in which the defendant was

Black, but the defense peremptorily struck her anyway. Therefore, the prosecution's questions and statements during voir dire do not support the finding of a prima facie case.

For the purposes of discussion we will assume that the notes of voir dire were taken by ADA Drew R. Barth. These notes appear to reflect the race and gender of 86 of 87 of the venirepersons questioned by the court and counsel,[60] including those questioned after the first twelve jurors and before all of the alternates were chosen.[61] Of the 86 persons for whom there was such information, 51 persons were white and 35 were African–Americans. These notes also show that the prosecutor exercised eleven out of twelve, or 91.6 %, of his peremptory challenges against African–Americans, and defense counsel exercised eighteen out of nineteen, or 94.7 %, of his peremptory challenges against whites.[62] Further, the notes, as well as the voter registration records submitted by Petitioner, show that nine jurors were white, three were African–Americans, and both alternates were white.[63] No African–American potential jurors were first accepted by the prosecution but then peremptorily stricken by the defense.[64]

We find it more helpful to examine the prosecutor's peremptory strikes and the resulting racial composition of the trial jury in light of the venirepersons who were not stricken for cause or stricken by

60. The fact that these notes reflect the race of each venireperson does not in itself, or in combination with other factors, raise an inference of racial discrimination in the selection of the jury. Voir dire in this case began exactly two weeks after *Batson* was handed down, and therefore no trial participant could know what would be required to prove a *Batson* claim or rebut such an allegation, because *Batson* established only broad standards. We find it more plausible to infer that the ADA kept track of the race of each venireperson to later show that he had not violated *Batson* than to infer that he kept track of their races in an attempt to discriminate. The notes appear to have been made contemporaneously, as voir dire progressed. Keeping track of the race of all venirepersons already questioned would not seem to further a goal of discriminating in the selection of the remaining jurors, unless the goal was a certain ratio of Blacks and Whites, and the ADA simply kept track of the races of all venirepersons in an attempt to keep track of the races of the chosen jurors. The evidence of the races of the venirepersons reflected in these notes, presumably observed by and recorded by the ADA, cannot be used to discern the intent of the ADA, because it is open to multiple credible interpretations. It is also doubtful that the ADA would keep notes of actual discrimination.

61. With regard to the alternates, there was one challenge for cause by the Commonwealth of an African–American; one peremptory strike by the defense of a white person; and two alternates, also white. We will not consider the alternates in our analysis of the pattern of peremptory strikes.

62. We recognize that the Defense's strikes are not necessarily relevant to whether the prosecutor violated *Batson;* we include the information merely in the interest of presenting a comprehensive picture of the voir dire. It is also plausible, as the Commonwealth asserts, that it was apparent to the ADA that defense counsel was striking Whites almost exclusively, and, as a matter of strategy in order to preserve his peremptory challenges, he did not strike many Whites whom he otherwise might have, in reliance on the likelihood that defense counsel would strike them.

63. The voter registration records submitted by the Petitioner indicated that one of the jurors identified by the Commonwealth as Black, Horace Eggleston, is listed as "O," presumably "Other." The record of voir dire, however, indicates that defense counsel and the court considered Mr. Eggleston to be Black.

64. The Pennsylvania Supreme Court would require such information under its *Spence* rule.

agreement.[65] These venirepersons, rather than the entire venire, are the ones who were actually available for peremptory strikes.[66] If these persons are subjected to analysis, it appears that fifteen African–Americans and twenty-seven whites were available for selection as jurors. In other words, 35.7 % of the pool of persons available to be jurors were African–American, and 64.3 % of this pool were white. The resulting jury was 25 % African–American and 75 % white, which does not seem to be a large statistical disparity from what was available. Indeed it is a difference of only one juror. Viewing the data in this way, it is very difficult to infer any sort of racial discrimination by the ADA during voir dire. Of course we could look at the data differently, by only examining the pool of persons available to the ADA to strike, i.e. removing from consideration all persons who were stricken by the defense before the ADA had an opportunity to do so: 42.4 % of the pool were African–American, and 57.6 % were White. This would make the statistical disparity greater—two jurors. Instead of focusing on the actual trial jury, we could focus only on the strikes exercised by the prosecutor. He struck 78.6 % of the African–Americans available for him to strike, but struck only 5.3 % of the whites available for him to strike. Another way of looking at his strikes is that, of the people he could have stricken, 21.4 % of the African–Americans and 47.4 % of the whites ended up on the jury. This latter way of looking at the pattern of strikes does not seem nearly as troubling as the former.

The foregoing analysis illustrates the ease of manipulating data or interpreting statistics differently so as to further particular goals.[67] Any number of results are equally possible. We therefore reiterate the need expressed by the Third Circuit to eschew using bright line tests or relying on statistics alone to find a prima facie case, and instead to consider all of the relevant circumstances.[68] After weighing

---

**65.** Nine African–Americans and six whites were stricken by the Commonwealth for cause; two African–Americans and five whites were stricken by the defense for cause; and nine African–Americans, ten whites, and one person of unknown race were stricken by agreement of counsel.

**66.** We recognize that as voir dire progressed, the ADA could not know the racial composition of this subset of the venire, or even of the entire venire. It appears that jurors were brought in to the courtroom in three sets of two panels, i.e. approximately 40 persons at a time. There is no indication on the printed lists of these panels that the ADA counted or kept track of the race of the venirepersons, even though notes were made on these lists. The only evidence that the ADA kept track of the race of the venirepersons is that in the notes that appear to have been made as voir dire progressed.

**67.** We also therefore decline to use the Baldus study to aid us in determining whether there is a prima facie *Batson* case before us.

**68.** The transcript of the jury selection training video produced by the Philadelphia District Attorney's Office sometime in the year following Petitioner's trial is troubling. Nevertheless, even if we could impute any racial policy set forth in the video to the District Attorney's Office, if we had evidence that it was actually used as a training video for prosecutors, we decline to do so, because it has no bearing on this case. First, we would not retroactively find that such a policy existed at the time of Petitioner's trial. Second, there is no evidence that ADA Barth was aware of such a policy, and if he was, that he adhered to it. There is no evidence that he ever viewed the tape, but even if he did, he would have done so long *after* Petitioner's trial. Further, even if the tape were relevant, we could draw no persuasive conclusions from it. Some strikes and acceptances of jurors appear consistent with the teachings in the videotape, but others appear to disregard it.

the foregoing factors, we conclude that a prima facie case has not been established.[69]

### (d) Explanations Offered by the Prosecutor for His Strikes

Even in the absence of a finding of a prima facie case, we are required to examine any reasons actually given by the prosecutor for his strikes. In *Hernandez v. New York*, a plurality of the U.S. Supreme Court found that the issue of the prima facie case was moot when the prosecutor has attempted to explain the reasons for his peremptory strikes without "prompting or inquiry from the trial court" and "the trial court has ruled on the ultimate question of intentional discrimination." 500 U.S. 352, 358–359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality) (quoting *United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant.")) Even before *Hernandez*, the Third Circuit examined any such reasons proffered by a prosecutor before a prima facie case had been found. *See United States v. Clemmons*, 892 F.2d 1153, 1155–56 (3d Cir.1989) ("In addition, independent of the strength of the evidence tendered as a prima facie case, once a prosecutor attempts to explain a peremptory challenge, we believe the trial and reviewing courts should look to the entire record to determine if intentional discrimination is present. If the prosecutor's explanation raises more concern than it puts to rest, courts cannot effectively close their eyes to that fact by simply deciding that the defendant has not made out a prima facie case."); *see also United States v. Clemons*, 843 F.2d 741, 748–49 (3d Cir. 1988) (examining reasons offered by prosecutor after the district court ordered him to do so, "out of an abundance of caution," even though the district court never made a finding that a prima facie case existed).

The Third Circuit has modified and expanded this principle. In *United States v. Uwaezhoke*, the prosecutor, in response to a question from the trial court before it had ruled on the prima facie case issue, explained why he had exercised his peremptory challenge. 995 F.2d 388 (3d Cir. 1993), *cert. denied*, 510 U.S. 1091, 114 S.Ct. 920, 127 L.Ed.2d 214 (1994). In subsequently examining the *Batson* claim, the Third Circuit held: "If the government is found at any subsequent stage of the case either to have tendered an explanation that is not race neutral or to have acted with racial animus, the conviction must be overturned without regard to whether the defendant established a prima facie case.". *Id.* at 392. In *Johnson v. Love*, the Third Circuit explained that its precedent required it to consider explanations of prosecutors made even in the absence of a finding of a prima facie case, but it also noted that the record before it reflected a prima

---

69. Perhaps if Petitioner had sought to develop the factual basis of this claim at the proper time, i.e. at his PCRA evidentiary hearing, the outcome may have been different. If ADA Barth had been available to testify, and had, for example, identified the notes as his and explained why he kept track of the races of the jurors, perhaps the PCRA court, or this Court, on habeas review, could have found a prima facie case, if ADA Barth kept track of race for a reason that raised an inference of discrimination. As we explained earlier, Petitioner's PCRA hearing counsel was clearly on notice of the need to develop the record, but he did not even attempt to do so. Because Petitioner, or his counsel, whose fault is attributable to Petitioner, failed to develop the record at the earliest opportunity, his key witness, Mr. Barth, is no longer available, and even if he were, we might be barred by § 2254(e)(2) from taking his evidence. This shows the need for making a record early on.

facie case. 40 F.3d 658, 663–64 (3d Cir. 1994) (citing *Hernandez, Uwaezhoke,* and *Clemmons* approvingly). Therefore we will examine the actual statements offered by the prosecutor that appear in the record of testimony of voir dire, even though Judge Sabo never made a finding that a prima facie case existed.[70] In doing so, we find that the reasons given by the prosecutor were race-neutral, even though the race of each juror is mentioned in the explanation, and that these reasons are not pretextual.

During voir dire, after ADA Barth's peremptory challenge of a Black prospective juror, Brenda Forrest, Petitioner's trial counsel objected that "I believe the District Attorney has now used all his challenges on black jurors. I believe he has developed a pattern of striking them." (N.T. 5/15/1986, at 129.) Judge Sabo deferred discussion of the issue. *Id.* After the ADA struck another African–American, defense counsel again asserted that the ADA had developed a pattern of striking only Black prospective jurors, that only two of the nine jurors selected were Black, and then he asked for a mistrial. *Id.* at 141–42. In response, Judge Sabo gave the ADA an opportunity to explain his actions by asking: "Does the Common-

wealth have anything to say at this time?" ADA Barth responded:

> Sure, Judge. As Mr. Denker has indicated, number one, we have nine seated in the box, two of whom are black. One black male and one black female. Mr. Denker is incorrect when he tells the Court that I have used my pre-empts exclusively on blacks, that's not true. I've struck a white woman also.

*Id.* at 142. ADA Barth said nothing further on the topic at that time. Instead, Judge Sabo noted that the defense also struck a black woman, "juror number eight on yesterday's list." *Id.* Thereafter Judge Sabo discussed this juror and the possible reasons that Mr. Denker struck her, and then ended discussion on the topic, taking a recess. *Id.* at 142–44.

In his Motion for Summary Judgment on the *Batson* Claim, Petitioner encourages us to consider the statement by ADA Barth to be a failure to give race-neutral reasons for his strikes in response to Judge Sabo's inquiry, and find that his statements were not race-neutral reasons, or any type of reason for the strikes. (Mot. Summ. J. at 5–8.) Petitioner asserts that the statements are at most nothing more than generalized denials of discrimination, which do not satisfy *Batson*'s requirement that race-neutral reasons be

---

**70.** Even if it were proper for us to examine the handwritten notes of the prosecutor to look for his reasons for striking African–American venirepersons, instead of relying on his actual statements, we would not find a *Batson* violation based on these notes. We believe that we would have been required under *Batson* to hold a hearing to allow the prosecutor to testify and be cross-examined as to his reasons for striking African–Americans. We would not have been restricted by 28 U.S.C. § 2254(e)(2), because after finding a prima facie case, the burden of proof would have shifted to the Commonwealth; in the absence of its rebuttal, Petitioner would have been entitled to habeas relief. We could not have relied on the prosecutor's notes, because

they are ambiguous. The very nature of notes makes them ambiguous-they are jottings, partial thoughts, incomplete accounts of the occurrences they call to mind. The prosecutor was not asked to write down his reasons; the notes are mostly data about venirepersons, with a few mental impressions that are open to interpretation. Only if the notes had clearly indicated the prosecutor's subjective intent in exercising his peremptory challenges, so as to be a substitute for testimony on that topic, would they have been useful; at step 2 of the *Batson* analysis, neither the Court nor the parties may scour the record for evidence on which to base conjectures of possible race-neutral, or race-based, reasons for the strikes.

given. *Batson,* 476 U.S. at 98, 106 S.Ct. 1712 ("Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirming his good faith in making individual selections.'") (quoting *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)). We agree that these statements were not "any type of reason" for the strikes, but we disagree that they were generalized denials of discrimination as prohibited by *Batson.* The statement is, as a whole, ambiguous as to the intention of the ADA in making it. One could infer that the ADA was denying that he had a discriminatory motive, but one could as easily infer–and indeed, need not infer, just take the literal meaning of his statement–that the ADA was merely confirming the number of African–Americans seated on the jury as that which had been asserted by defense counsel, but then pointing out that defense counsel's assertion as to his exercise of peremptory challenges was incorrect. Because the intention of the statement is ambiguous, and because when it was made, the trial court had not found a prima facie, we cannot assume that ADA Barth's statements were actually an attempt to give reasons of the sort required by *Batson.* Therefore, we can consider such statements to be neither an attempt to rebut a prima facie case, nor an explanation that should be regarded such, so as to require our examination of it under *Johnson v. Love,* 40 F.3d 658 (3d Cir.1994), and similar cases previously discussed.

Petitioner also argues that the notes of voir dire reveal that in the cases of two of the three African–American venirepersons for whom the prosecutor gave reasons for exercising peremptory strikes, Robert Keel and John Hackley Sr., the reasons given were not race-neutral and were pretextual. We find that the reasons given by the prosecutor were race-neutral, even though the race of each juror is mentioned in the explanation, because the record clearly shows a give-and-take between defense counsel and the ADA in which defense counsel identified the stricken jurors as Blacks, and the ADA acknowledged that they were Black, and then noted other identifying characteristics or reasons for striking them.

When we closely analyze the reasons given and look at all the surrounding circumstances, including the prosecutor's questions to these venirepersons, and their answers, we find that intentional racial discrimination has not been proven. The prosecutor noted for the record that Mr. Keel was a "single, young, unemployed, on welfare, black male." (N.T. 5/15/86 at 171.) However, it appears that Mr. Keel may have also had some difficulty in comprehending or answering the questions asked of him by defense counsel: "Q. What area of the city do you live in? A. West Oak Lane. East Germantown. Q. Are you employed? A. No, I'm not. Q. What members make up your household? A. Welfare, I say. Q. I'm sorry? A. Welfare." In this context, we would not find that the Commonwealth intentionally racially discriminated when it peremptorily struck Mr. Keel.[71]

After the Commonwealth struck Mr. Hackley, defense counsel noted without objecting that the venireperson was Black. (N.T. 5/16/86 at 32.) The ADA then noted for the record that the venireperson was a Black male approximately the same age as the defendant. In his Motion for Summary Judgment on the *Batson* Claim, Petitioner encourages us to find as a matter of

---

**71.** Petitioner challenged the strike of Mr. Keel in his earlier filings, but at oral argument his counsel stated that such challenge would not longer be pursued, and, indeed, Mr. Keel is not mentioned in the Motion for Summary Judgment.

law that this explanation is pretextual. He explains that the Commonwealth accepted numerous white jurors approximately the same age as the defendant, including some only a few years older or younger than Petitioner, and some with the same birth year. We decline to find his explanation pretextual as a matter of law, because the Commonwealth also accepted Horace Eggleston, who was also a Black male and was born in the same year as Petitioner. At worst, the ADA's explanation appears to be incomplete, but we can not find it to be a pretext to mask racial discrimination on this basis. Examining the record as we must at this third stage of the analysis, we also find other reasons to believe that the explanation offered was not an impermissible pretext. The record shows that Mr. Hackley lived in the neighborhood in which the crime occurred, and although he did not know many people in the neighborhood by name, he would recognize many people from the neighborhood. This raises the possibility that even though he might not have recognized the names of potential witnesses, he might have known them once he saw them. In this context, we would not find that the Commonwealth intentionally racially discriminated when it peremptorily struck Mr. Hackley.

#### (e) Conclusion

We have found that, given the state of the law and the record at the time of direct appeal, direct appeal counsel did not act unreasonably in not raising the *Batson* claim, because Petitioner has not shown that the *Batson* claim *clearly* had a better chance of success than issues that counsel did present in the direct appeal. Further, we would not find a *Batson* violation even on the expanded record before us, because no prima facie case has been shown, and the specific reasons given by the prosecutor for exercising some of his peremptory challenges are both race neutral and not

pretexts for racial discrimination. Therefore, even if such record had been available to direct appeal counsel, he would not have been ineffective for failing to raise the claim. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Each of these reasons is sufficient for us to find that direct appeal counsel's representation of Petitioner was not ineffective when he chose not to and did not raise the *Batson* claim, and we do now make such a finding; therefore Petitioner cannot show cause under *Coleman* to overcome the procedural default that arose as a result of the claim not being raised on direct appeal.

#### 4. Claim IV–Challenges to the Use of the Statement Purported To Be Petitioner's

■ Petitioner claims that he was convicted based on a purported statement that he did not actually make, without the benefit of any warning that such a statement could be used against him, despite the lack of any record of the interrogation at which the purported statement was supposedly made, and despite the fact that the court failed to instruct the jury as to its duty to determine whether any statement was voluntarily made. The heart of Petitioner's defense was that he never waived his right to remain silent, never made a statement regarding the Caldwell murder, and his purported statement was fabricated by the interrogating officer, Detective Gilbert, who based the statement on the prior statement of Shirley Baker. Petitioner alleges further that the Commonwealth created circumstances that deprived him of the means of challenging this alleged confession by the decision of the police that only one officer question him, so that there were no other witnesses; by the failure of the police to make a recording of the interrogation, alleged waiver of rights, and alleged confession; and by the failure of the

prosecutor to disclose impeachment evidence in Detective Gilbert's personnel and internal affairs files.

### a. Waiver of Right To Remain Silent

Petitioner first argues that he did not voluntarily waive his right to remain silent. Specifically, he argues that at the suppression hearing, the Commonwealth failed to show that he had been given his *Miranda* warnings, that he waived his rights thereunder, and that any such waiver, if it even occurred, was voluntary, knowing and intelligent. He argues that the trial court therefore erred in ruling that his alleged statement was admissible. This claim was fairly presented to the Pennsylvania Supreme Court on direct appeal and was thus exhausted. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996). The claim was adjudicated on the merits, therefore we review that court's decision under the AEDPA standard.

■■■■ *Miranda v. Arizona* requires that, in order to protect the privilege against self-incrimination, certain warnings be given to persons in custody before they are interrogated by the police, and that the person waive his right to remain silent and to the assistance of an attorney, or else any statement made by the person is inadmissible against him in court. 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Whether the warnings were given and whether Petitioner waived his rights are issues of fact, but whether the waiver was voluntarily, knowingly, and intelligently given is an issue of federal constitutional law. *Brewer v. Williams,* 430 U.S. 387, 403, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The government has the burden of establishing the propriety of the waiver. *See id.* at 404, 97 S.Ct. 1232 ("[I]t [is] incumbent upon the State to prove an 'intentional relinquishment or abandonment of a known right or privilege.'") (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)).

■■■■ If the warnings were given and the Petitioner appeared to waive his rights, a court must undertake a two-pronged inquiry to determine whether the waiver was voluntary, knowing and intelligent. First, a court must determine whether the waiver was voluntary "'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *United States v. Velasquez,* 885 F.2d 1076, 1084 (3d Cir. 1989) (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (citation omitted)). Second, a court must determine whether the waiver was "'made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* In making this two-pronged inquiry, a court must consider the totality of the circumstances surrounding the interrogation. *Moran,* 475 U.S. at 421, 106 S.Ct. 1135 ("Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."); *see also United States v. Sriyuth,* 98 F.3d 739, 748–49 (3d Cir.1996).

■■■■ In denying Petitioner's motion to suppress his alleged statement, Judge Sabo made factual findings that the defendant had been given his *Miranda* warnings and that he had waived them. (Denial of Motion to Suppress, Findings of Fact & Conclusions of Law, 5/13/86, at 6.) He then reached the legal conclusion that such waiver was voluntary, knowing, and intelligent. (*Id.* at 7–10.) The Pennsylvania Supreme Court, applying its deferential *Lark* standard for reviewing the trial

court's decision,[72] concluded that the "record supports the suppression court's finding that the appellant was provided with *Miranda* warnings, voluntarily and intelligently waived his *Miranda* rights, was permitted to consult with his attorney and wife by telephone when requested and was arraigned within six (6) hours of his arrest," and therefore that the admission of his statement was proper. *Holloway I,* 572 A.2d at 691.

We are required to presume the correctness of state court factual findings, and Petitioner may rebut them only upon a showing of clear and convincing evidence. 28 U.S.C. § 2254(e)(1). We may only grant the writ if the state court "decision was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." *Id.* (d)(2). Petitioner has failed to make the requisite showing. Judge Sabo credited the testimony of Detective Gilbert instead of that of Petitioner. Detective Gilbert testified that he gave Petitioner his *Miranda* warnings, asked him seven questions to assure that Petitioner understood his rights and waived them, and recorded the answers to the questions, as well as the time that they were asked, on the interview sheet.[73] (N.T. 5/12/86, at 32–36, 39–45.) There is no other evidence that Detective Gilbert warned Petitioner or that Petitioner waived his rights.[74] The only contradictory evidence is Petitioner's own testimony at the suppression hearing, denying that he was warned or that he made a statement.[75] The evidence is, at

**72.** The Pennsylvania Supreme Court employs a standard of review that recognizes that the trial judge, before whom the witnesses actually appear, is in a much better position than the reviewing court to assess the relative credibility of witnesses whose stories are contradictory. "Our responsibility on review is 'to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from those findings.'... In making this determination, this Court will consider only the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted." *Commonwealth v. Lark,* 505 Pa. 126, 477 A.2d 857, 859 (1984) (quoting *Commonwealth v. Kichline,* 468 Pa. 265, 361 A.2d 282, 290 (1976) (citations omitted)).

**73.** Detective Gilbert testified that he read the following questions to Petitioner, and Petitioner gave the following replies:
(1) "Do you understand that you have a right to keep quiet and you do not have to say anything at all?" "Yes."
(2) "Do you understand that anything you say, can and will be used against you?" "Yes."
(3) "Do you want to remain silent?" "No."
(4) "Do you understand that you have a right to talk to a lawyer before we ask you any questions?" "Yes."

(5) "Do you understand that if you cannot afford to hire a lawyer, and you want one, we will not ask you any questions until a lawyer is appointed for you free of charge?" "Yes."
(6) "Do you want either to talk with a lawyer, at this time, or have a lawyer with you while we ask you questions?" "No."
(7) "Do you want to answer questions of your own free will, without force or fear and without any threats or promises having been made to you?" "Yes."
(N.T. 5/12/86, at 32–34.)

**74.** Detective Graham testified that he read the whole interrogation form back to Petitioner verbatim, without adding any commentary or questions. When he reached the portion dealing with the *Miranda* warnings, he simply read the answers, but not the questions that generated the answers, because it was his job to read only what appeared on the form, and the questions were not on it. *See* note 73, *supra.* Detective Graham also testified that after he finished reading the statement to Petitioner, he acknowledged having made it, but he still refused to sign it. (N.T. 5/13/86 at 18.)

**75.** Petitioner testified unconvincingly that he had only recently learned of the requirement of *Miranda* warnings by going to the law library while he was in prison. He claimed that he had never been warned during the

best, in equipoise;[76] therefore Petitioner has not sustained his burden to rebut the presumption of the correctness of the state court's factual findings by clear and convincing evidence, and we find that the state court decisions were not based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2), (e)(1).

In determining that Petitioner's waiver was voluntarily, knowingly, and intelligently made, Judge Sabo undertook an analysis like that required by *Moran*, 475 U.S. at 421, 106 S.Ct. 1135, looking at the totality of the circumstances on the basis of the record established at the suppression hearing and his findings of fact. The Pennsylvania Supreme Court reviewed the facts, using its deferential standard of review as to contradictory evidence resolved by the trial court, and concluded that the trial judge did not err. Although the court did not cite to any legal basis for its conclusion that the waiver was voluntarily, knowingly, and intelligently made, we presume that it

used the same basis as the trial court. *See Sistrunk v. Vaughn*, 96 F.3d 666, 674 (3d Cir.1996). Because this standard was substantially similar to the standard required by the U.S. Supreme Court in *Moran*, we find that the resulting decision was not contrary to federal law that was clearly established at the time of the state court decision. 28 U.S.C. § 2254(d)(1); *Werts v. Vaughn*, 228 F.3d 178, 197 (3d Cir.2000) (petitioner must show that "Supreme Court precedent requires an outcome contrary to that reached by the relevant state court").

Neither was the trial court's decision, or the review of it by the Pennsylvania Supreme Court, an unreasonable application of *Moran*. First, the voluntariness of the waiver is not at issue.[77] The record barely hints that the police resorted to physical or psychological pressure to elicit Petitioner's statement; instead, Petitioner claims that he never made the statement.[78] Second, a

course of any of his prior arrests and had never heard of such a thing, even from television. (N.T. 5/13/86, at 50).

**76.** Petitioner asserts that certain failures in procedure are evidence that he was not given the warnings and that he did not waive his rights. These include the failure to use a separate form listing the rights and questions with spaces for a defendant to sign or initial to indicate that he is waiving his rights, and the disappearance of a "chronology" form that would have indicated the occurrence and time thereof of various events during the course of his arrest and interrogation. Neither of these forms is mandatory, however, so we find that the failure of the police to use them or produce them does not aid Petitioner in meeting his evidentiary burden. Petitioner asserts that the fact that he neither initialed the answers to the questions on the interview sheet, nor signed the sheet, indicates that he was never warned and never waived his rights. This evidence is unavailing because it does not help to prove or disprove that Detective Gilbert advised Petitioner of his rights or that Petitioner orally waived them. Petitioner also asserts that his statement is corroborated

by the testimony of his wife, Delores Kareem, and of Bernard Wyman, the lawyer he called after the statement was typed by Detective Gilbert. These persons were not present during Petitioner's arrest and interrogation, however, and therefore any knowledge they have would be from the Petitioner's hearsay statements to them, so they can not corroborate his assertions.

**77.** See discussion in Part III. C. 4. d., *infra*.

**78.** Petitioner testified that when he was brought in for questioning, Detective Gilbert introduced himself as the partner of Detective Gerrard, to whom Petitioner had previously supplied information on unrelated cases. Detective Gilbert then asked for Petitioner's help in providing incriminating information against Leroy "Bubbles" Johnson. (N.T. 5/13/86 at 43–44.) Detective Gilbert did not warn Petitioner of his rights, but nonetheless Petitioner asked to speak to a lawyer, because whenever he had provided information before, he had always done so with the protection of an immunity agreement. (*Id.* at 44–46.) Detective Gilbert, however, simply be-

review of the totality of the circumstances, as conducted by Judge Sabo, shows that the waiver was made with an awareness of the nature of the right being abandoned and the consequences of the decision to abandon it.

Judge Sabo relied on Detective Gilbert's testimony that he warned Petitioner of his rights, as well as the indication on the interview sheet that Detective Gilbert warned Petitioner of his rights at 11:50 p.m. May 30, 1985. Detective Gilbert then asked Petitioner seven questions designed to ensure that Petitioner understood the rights and was voluntarily, knowingly, and intelligently waiving them. Detective Gilbert recorded Petitioner's answers to the questions on the interview sheet and testified as to the answers at the suppression hearing. (N.T. 5/12/86, at 32–36.) Based on these questions and answers, Detective Gilbert concluded that Petitioner understood his rights, and voluntarily, intelligently, and knowingly waived them, and indicated a willingness to talk. Detective Gilbert then took an oral interview from Petitioner, and thereafter memorialized the statement by typing questions and Petitioner's answers thereto. Judge Sabo also noted that all questioning ceased when Petitioner asked to speak to an attorney. Petitioner subsequently spoke to his wife and to his attorney, and no further questioning took place after these phone calls.

Judge Sabo also considered Petitioner's arguments when looking at the totality of the circumstances. He considered Petitioner's argument that he would not have been inclined to make an inculpatory statement because he knew that Freeman had been acquitted and therefore the government had a weak case. He also considered Petitioner's arguments that Detective Gilbert's failure to use a separate written waiver form, the loss of the chronology, and his refusal to sign the statement cast doubt on the validity of the waiver and show that the statement was involuntary, especially in light of the fact that Petitioner asked to speak with a lawyer. He noted that neither the waiver form nor the chronology are required, however, and that Petitioner's refusal to sign the statement is a factor that should properly be considered by the jury in determining how much weight to give the statement.

Judge Sabo's examination of the totality of the circumstances was sufficiently comprehensive, and the facts it was based upon sufficiently supported by the record, so that his decision, and that of the Pennsylvania Supreme Court in reviewing his decision, were reasonable applications of *Moran*. We therefore find that the state court decisions that Petitioner was warned as required by *Miranda v. Arizona*, and that he voluntarily, knowingly and intelligently waived his right to remain silent, were neither contrary to, nor unreasonable application of, clearly established federal law, and Petitioner may not find relief on this basis.[79]

gan to type a document, occasionally asking Petitioner questions about other matters. (*Id.* at 46–47.) Petitioner asked to talk to his wife but was not immediately allowed to telephone her. When Detective Gilbert finished typing the statement, he asked Petitioner to read it, but he refused to do so, fearing that he was being framed, and worried about the possibility of his fingerprints being on the document. (*Id.* at 47.) Petitioner disavowed the statement, and then Detective Gilbert brought in two Detectives who attempted to read the document to Petitioner. He refused to listen to what they were saying, instead chanting loudly to block them out. He again denied having made the statement and refused to sign it. (*Id.* at 48.)

79. Although Petitioner does not allege ineffective assistance of counsel regarding this subclaim specifically, in Claim XV he alleges that all prior counsel were ineffective to the extent

### b. Lack of Audiotaping or Videotaping of Alleged Confession

Petitioner argues that the lack of audio- or videotaping of his alleged confession deprived him of due process, effective assistance of counsel, and the heightened reliability required in capital cases, because he was denied the means to challenge the reliability and voluntariness of his alleged confessions. Petitioner raised this issue in his supplemental PCRA brief to the Pennsylvania Supreme Court, as a matter of both state and federal constitutional law, both on the merits and alleging prior counsel's ineffectiveness for failing to raise the claims. Petitioner raised this claim to the PCRA hearing court only in a pro se filing, but it is unclear whether it was or even could have been considered by the PCRA hearing court. We need not decide whether this claim was fairly presented to all levels of the state courts, because even if we were to find these claims to have been exhausted by virtue of being fairly presented, instead of procedurally defaulted, our analysis would not differ. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996).

Because the claim was not raised on direct appeal, the Pennsylvania Supreme Court deemed them to be waived.[80] *Commonwealth v. Holloway (Holloway II),* 559 Pa. 258, 739 A.2d 1039, 1043–44 (Pa.

1999). Because Petitioner alleged ineffectiveness of all prior counsel, however, the court adjudicated the claims from the standpoint of a ineffectiveness claim. *See id.* We must therefore do so as well, applying the AEDPA standard.

The Pennsylvania Supreme Court determined that counsel could not have been ineffective for failing to raise the underlying claim as to the alleged requirement of taping the confession, because no Pennsylvania case had ever required such a recording. Petitioner argues that because the court pointed only to a lack of Pennsylvania cases requiring such recordings, the court did not adjudicate the claim of ineffectiveness of counsel for failure to raise recording issue under a federal due process theory, and thus Petitioner is entitled to de novo review of this claim. We reject this argument. The Pennsylvania Supreme Court of necessity adjudicated a claim of ineffectiveness of counsel, but examined the merits of the underlying claim, because if it had no merit, counsel could not have been ineffective for failing to raise it. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. In so doing, the court quite properly considered its own law as a guideline for the reasonableness of counsel's actions. In the process of reviewing the Pennsylvania Supreme Court's decision on the ineffectiveness claim for reasonableness under the AEDPA, we find

they failed to raise or properly litigate each substantive issue in the Petition. Our review of the state court decisions as to the *Miranda* issue convinces us not only that the state court decisions were reasonable, but also that they were correct. Therefore we would find that any ineffectiveness claim based on this issue would fail because the underlying issue has no merit.

**80.** The Supreme Court of Pennsylvania appears to have treated this claim as waived both for a failure to raise the claim at the suppression hearing and for failure to raise it

on direct appeal as required by 42 Pa. Cons. Stat. §§ 9543(a)(3) and 9544(b). We have already found that such bases for the waiver are independent and adequate state grounds barring our review of the underlying substantive claim; we now find that each were properly applied by the Pennsylvania Supreme Court as to this claim. Therefore, to review this claim on the merits, we would be required to find cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default. *See* Part III. B. 2, *supra.*

that, under *Arizona v. Youngblood,* the underlying claim does not have arguable merit, therefore counsel cannot have been ineffective for failing to raise it. Therefore we find both that under the AEDPA the Pennsylvania Supreme Court's decision on the ineffectiveness claim was reasonable, and that we would not be able to find cause to excuse the default barring us from considering the underlying claim directly. Thus Petitioner is not entitled to relief on this subclaim.

There are no federal cases requiring the preservation through audiotaping or videotaping of custodial interrogations. The only cases cited by Petitioner deal with the preservation of already existing physical evidence. Therefore we conclude that at the time that Petitioner's direct appeal became final, and even now, there is no clearly established federal law, as determined by the Supreme Court of the United States, that would require such recording.[81] Therefore the decision of the Pennsylvania Supreme Court as to the ineffectiveness of counsel for failing to assert the need for or right to such recording is neither contrary to, nor an unreasonable application of, clearly established federal law. 28 U.S.C. § 2254(d)(1).

In examining this claim to determine whether cause nonetheless exists to excuse Petitioner's default, we are not bound by our previous determination that the Pennsylvania Supreme Court was reasonable when it determined that counsel was not ineffective. *See* n. 12, *supra.* Nonetheless, we come to the same conclusion as that court, because only by extending the law could the right asserted by Petitioner exist, and even if it were so extended his claim still would not succeed on its facts. Counsel has not acted unreasonably by failing to press a claim for which there is

no precedent or no merit. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 (counsel cannot be ineffective for failing to raise a meritless claim); *cf. Smith v. Robbins,* 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) ("[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.").

The Supreme Court precedent finding a right closest to that sought by Petitioner is *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). In *Youngblood,* the Court held that the failure of police to preserve potentially useful evidence is not a denial of due process of law unless the defendant can show bad faith on part of police. *Youngblood* deals with the preservation of existing evidence, not the creation of evidence, as would be the case of making an audiotape or videotape. Further, Petitioner is unable to show bad faith on the part of the police in failing to make an audio- or videotape of his statement, so the claim lacks even arguable merit.

In *Youngblood,* the Court first explained that the good faith or bad faith of the state is irrelevant under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), i.e. in cases in which the state fails to disclose to the defendant material exculpatory evidence. The Court held, however, that "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood,* 488 U.S. at 57, 109 S.Ct. 333. The Court explained

---

**81.** In fact, at the time of Petitioner's statement, it appears that no state required such

recording in all cases as a matter of state constitutional law either.

that part of the reason for the difference is that " '[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.'" *Id.* at 57–58, 109 S.Ct. 333 (quoting *California v. Trombetta,* 467 U.S. 479, 486, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). The Court also explained that it was unwilling to read the Due Process Clause "as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58, 109 S.Ct. 333.

Petitioner's entire statement, had it been recorded, was only "potentially useful" evidence. The contents may have contained exculpatory statements, but we cannot ascertain whether that was the case in the absence of an audio- or videotape recording. On the current record, the questions and answered recorded through typing contain no exculpatory evidence; at best they provide some mitigating evidence. Therefore, because we "face the treacherous task of divining the import of [a statement] whose contents are unknown and ... disputed," the statement is only "potentially useful." *Youngblood,* 488 U.S. at 58, 109 S.Ct. 333 (quoting *Trombetta,* 467 U.S. at 486, 104 S.Ct. 2528).

*Youngblood* requires that the Petitioner show that the police acted in bad faith in failing to preserve his statement in order for the failure to have been a denial of due process. At the time of the statement, it was not the practice of the Philadelphia Police Department to audiotape or videotape confessions. There is no evidence that the lack of such a policy reflected bad faith as against all defendants, to deny them the ability to rebut allegations made by the police or the ability to present a defense. Further, it cannot be said the

Petitioner was singled out in any way for treatment that had the effect of denying him the ability to present a defense, even though Petitioner appears to allege bad faith regarding the conduct of Detective Gilbert. Detective Gilbert interrogated Petitioner without any neutral person present, and indeed without any other police officer present, so that at the suppression hearing the matter was one of the detective's word against that of Petitioner. This argument is specious, because a Detective Graham also testified that he read the statement to Petitioner and that Petitioner acknowledged making the statement, but then refused to sign it. (N.T. 5/19/86, 158–68, 207–11.) Therefore, there was not simply a "swearing contest" between Petitioner and Detective Gilbert.

We find that *Youngblood* is clearly distinguishable from the instant case, because *Youngblood* and its forerunners establish a limited right only to the preservation of *already existing* physical evidence. The creation of evidence through the requirement of audiotaping or videotaping of custodial interrogations and statements cannot be said to be within the protection of *Youngblood.* Even if it were, there is insufficient evidence in this case for us to conclude that the police acted in bad faith in failing to audiotape or videotape Petitioner's statement. Therefore, any claims based on the federal constitution's mandating such recording are completely without merit, and thus we deny them.

### c. *Brady* Claim

Petitioner argues that the Commonwealth failed to disclose at trial or during post-conviction proceedings material impeachment information with respect to Detective Gilbert's credibility. In his PCRA appeal to the Pennsylvania Supreme Court, Petitioner alleged that the PCRA trial court erred in denying discovery as to

Detective Gilbert's personnel records, thus denying Petitioner due process of law. In the course of this claim, Petitioner alleged that any information in Detective Gilbert's personnel or internal affairs files that casts doubt on his credibility should have been provided pre-trial, citing *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). (PCRA Br.Pa.S.Ct. at 59–60). In his Supplemental PCRA Brief, in his claim that he was denied due process because his interrogation was not audio-taped or videotaped, he squarely indicated that discovery was requested in order to develop a claim regarding impeachment material as to Detective Gilbert under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). (Supp. PCRA Br.Pa.S.Ct. at 5 n. 4.) In its decision, the Pennsylvania Supreme Court did not refer to the *Brady* claim in finding that the failure to preserve the confession by audiotape or videotape was meritless; nor did it mention the *Brady* claim in deciding that the PCRA court's decision to deny discovery as to Detective Gilbert's personnel or internal affairs files was within its discretion because Petitioner "identifie[d] no specific information that would have been admissible in his case." *Holloway II*, 739 A.2d at 1047. We find that this claim was fairly presented to the PCRA hearing court and the Pennsylvania Supreme Court on PCRA appeal, but it was not adjudicated on the merits by the Pennsylvania Supreme Court, and thus we exercise de novo review. *See Appel v. Horn*, 250 F.3d 203, 210 (3d Cir.2001); *Hameen v. State of Delaware*, 212 F.3d 226, 248 (3d Cir.2000). Upon review, we find that there was no *Brady* violation because any evidence that would have been uncovered either would not have been favorable to the Petitioner, or would not have been material.[82]

 Prosecutors have an affirmative duty to disclose material evidence favorable to defendants, including both exculpatory evidence, *see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and impeachment evidence, *see United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. 3375; *see also Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The prosecution is only "obligated to produce certain evidence actually or constructively in its possession or accessible to it." *United States v. Perdomo*, 929 F.2d 967, 970 (3d Cir.1991) (imputing knowledge known by any member of the "prosecution team" to the prosecutor); *see also Hollman v. Wilson*, 158 F.3d 177, 180 (3d Cir.1998), because evidence not within this category logically could not have been suppressed. Knowledge of one member of the prosecutor's office will be imputed to the whole office. *See Giglio v. United States*, (deciding this issue with respect

---

82. It is possible to deduce that, in the course of deciding the due process claim arising from the denial of discovery, the Pennsylvania Supreme Court reasoned that there could have been no *Brady* violation because any evidence that would have been uncovered was inadmissible, and therefore not material and no prejudice could have resulted. If we were to make this deduction, we would find that the *Brady* claim was adjudicated on the merits and review the decision of the Pennsylvania Supreme Court under the AEDPA standard. Were we to do so, we would conclude that the decision was a reasonable application of *Brady* and its Supreme Court progeny, because there was no *Brady* violation in this case.

to the U.S. Attorney's office); *see also, e.g., Mattis v. Vaughn,* 128 F.Supp.2d 249 (E.D.Pa.2001) (applying *Giglio* to members of the Philadelphia District Attorney's Office). The knowledge of a police officer investigating a crime is also imputed to the prosecutor because "the prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

The Third Circuit has not spoken as to whether police personnel and internal affairs files are considered evidence that is in the constructive possession of the prosecutor or accessible to him, *see Perdomo,* 929 F.2d at 970, thus requiring that any information in such files that could impeach a police officer testifying in a certain case be disclosed to defense counsel. In *Perdomo,* the court made clear that "nondisclosure is inexcusable where the prosecution has not sought out information readily available to it.... [T]he availability of information is not measured in terms of whether the information is easy or difficult to obtain but by whether the information is in the possession of some arm of the state." 929 F.2d at 971. The court held that the U.S. Attorney had a duty to search local Virgin Islands criminal records to determine whether its witness had a criminal record, which would have been impeachment evidence.

Subsequently, in *United States v. Joseph,* the Third Circuit clarified that "constructive possession" means "that although a prosecutor has no actual knowledge, he should nevertheless have known that the material at issue was in existence." *United States v. Joseph,* 996 F.2d 36, 39 (3d Cir.1993). The court refused to "interpret *Brady* to require prosecutors to search their unrelated files to exclude the possibility, however remote, that they contain exculpatory information." *Id.* at 41. Instead, the Third Circuit held that when prosecutor has neither actual knowledge nor "cause to know of the existence of *Brady* material in a file unrelated to the case under prosecution, a defendant, in order to trigger an examination of such unrelated files, must make a specific request for that information—specific in the sense that it explicitly identifies the desired material and is objectively limited in scope." *Id.*

In the case of police personnel and private internal affairs records,[83] we believe that the duty to disclose should be governed by the "constructive possession" standard of *Joseph,* because such files are unrelated to the substantive case file. Under *Joseph,* if the prosecutor had no reason to know of *Brady* material in the personnel or internal affairs files,[84] he

---

83. Such records are often protected by law and policy.

84. None of the evidence cited by the Petitioner now and before the Pennsylvania Supreme Court shows that the prosecutor should have known that Detective Gilbert's personnel files contained *Brady* material. This evidence was either not in existence at the time of Petitioner's trial, or it is unreasonable to expect it to have been in Detective Gilbert's personnel file, and thus available to the prosecutor. The affidavits from others who had dealings with Detective Gilbert allege misconduct by Detective Gilbert as early as 1983, but none of the affidavits were made before Petitioner's trial, nor even by the time his appeal became final. (Pet. Apps. 17–22). Petitioner also refers to extensive testimony taken in 1997 in the case of *Commonwealth v. Harvey,* Nos. 0305, 0309 & 0314, July Term, 1983 (Phila C.P.), on the subject of allegations of misconduct raised in several of these affidavits. Clearly, such testimony could not contain impeachment evidence available to the prosecutor in 1986. We must also note that the improper conduct of Detective Gilbert made public in *Commonwealth v. Lester,* 392 Pa.Super. 66, 572 A.2d

would have a duty to examine them only if the defendant made a specific request, and the record does not reveal that a specific request was made in this case. Even if we were to conclude, however, that the duty to examine such records is more properly governed by the "readily available" standard of *Perdomo*, because "the information is in the possession of some arm of the state," *Perdomo*, 929 F.2d at 971, that is "closely aligned with the prosecution," *Joseph*, 996 F.2d at 41 (explaining the *Perdomo* holding), Petitioner's argument lacks merit.

Based on the record before us, it is not clear whether the prosecutor examined such records. Even if he did not conduct such a search, and therefore failed to turn over material exculpatory and impeachment evidence to the defense, we conclude that there has been no *Brady* violation in this case.

■ Both the Petitioner and the Commonwealth failed to mention in their filings related to the Petition before us that all internal police department files on Detective Gilbert were reviewed *in camera* by Hon. Joseph I. Papalini of the Court of Common Pleas in 1992 before he denied Petitioner's motion for discovery of such files, concluding that there was no material exculpatory or impeachment evidence contained therein.[85] At a PCRA hearing held for the purpose of determining whether Judge Papalini would order that the city solicitor allow Petitioner's counsel to examine such records, the city solicitor looked through the files and indicated that there were several complaints against or investigations of Detective Gilbert. The city so-

licitor, a prosecutor, and Petitioner's counsel agreed that Judge Papalini should first examine such records *in camera* so that he could properly decide whether the records themselves, or information contained therein, should be disclosed. Judge Papalini explained that he would search such files to determine whether there were any complaints or investigations that would shed light on Detective Gilbert's credibility, i.e. that he would look for any evidence that would bolster the Petitioner's argument that Detective Gilbert "lied and made up a statement." (PCRA Status Hrg., N.T. 10/30/92, at 21.) Petitioner and other persons had made allegations of fabrication of statements or of physical abuse, or both. Judge Papalini indicated that physical abuse was irrelevant, but that anything about Detective Gilbert's fabricating statements was relevant. (*Id.* at 21–27.) In addition, Detective Gilbert may have been in violation of a residency requirement and lied about his residence. The evidence showed that he sold his house in Philadelphia in 1987, but it was unknown when he moved out of Philadelphia, just that sometime in 1988 it was established that he was living in New Jersey. Judge Papalini agreed to review the files for evidence that Detective Gilbert lied about the location of his residence before Petitioner's trial. He also agreed to provide Petitioner's counsel with the names of anyone who alleged untruthfulness by Detective Gilbert so that Petitioner's counsel could independently investigate such allegations.

Judge Papalini reviewed the personnel and internal affairs files and announced his

---

694, 696–97 (1990), well after Petitioner's trial, as well as alleged in some of the affidavits before us, that he allowed prisoners to have conjugal visits in return for their cooperation or confessions may be reprehensible, but it would not have been admissible to impeach his credibility. Neither such misconduct, nor

allegations of physical abuse, are relevant to the issue of Detective Gilbert's truthfulness.

**85.** Such review excuses the prosecutor from his duty to review such records to determine whether they contained *Brady* material.

findings of fact and conclusions of law during a status hearing on December 15, 1992. He stated that he had "reviewed the file with the city solicitor's office and the information that is contained in there would not be very relevant to [Petitioner's] inquiry. I checked it all through and there isn't anything in there that would be of substantial interest to your client." (PCRA Status Hrg., N.T. Dec. 15, 1992, at 2.). Based on this examination of the evidence and finding of facts, Judge Papalini quashed Petitioner's subpoena for the personnel records. (*Id.* at 3.)

Read alone, Judge Papalini's statements on December 15 could be construed merely as a conclusion of law as to the materiality of any evidence contained in the personnel files. However, reading his statement in conjunction with his stated purpose in reviewing the files, and his agreement to disclose the names of anyone who alleged that Detective Gilbert made false statements, we conclude that he also made the finding of fact that the records revealed nothing that adversely impacted Detective Gilbert's credibility.

We must presume that Judge Papalini's factual findings as to the contents of the personnel records are correct. *See* 28 U.S.C. § 2254(e)(1). Petitioner may only overcome that presumption by clear and convincing evidence. *See id.* The evidence cited by Petitioner does not assist him, as it was not in existence at the time of his trial. In fact, none of the affidavits were in existence at the time of the hear-

ing, either. The only evidence now before us that could have been presented to Judge Papalini, but was not, was the *Lester* case, and although that case indicates that Detective Gilbert may have engaged in misconduct, that misconduct does not implicate his truthfulness.[86] *Commonwealth v. Lester,* 392 Pa.Super. 66, 572 A.2d 694, 696–97 (1990). Therefore, Petitioner has not shown by clear and convincing evidence that Judge Papalini erred in making his factual findings about the contents of Detective Gilbert's files. Thus, we find that there was no evidence in them that the prosecutor would have been obligated to disclose under *Brady* had he examined them, and we deny this claim.[87]

### d. Jury Instructions

Petitioner argues that the trial court's instructions to the jury concerning the requirements of *Miranda v. Arizona* were prejudicially inadequate, in that the jury was instructed only to find whether Petitioner had been warned, but not instructed that it was required under Pennsylvania law to determine whether the Petitioner voluntarily, knowingly and intelligently waived his rights, and thus the failure to instruct violated Petitioner's due process rights under the Fourteenth Amendment. Petitioner also argues that the trial judge completely failed to instruct the jury on the voluntariness of the confession, likewise violating Petitioner's due process rights. Finally, Petitioner argues that tri-

---

**86.** *Lester* does not use the first name of Detective Gilbert. However, a Detective Lawrence Gerrard testified in the case, and the testimony in the instant case indicates that a Detective Lawrence Gerrard was Detective Ernest Gilbert's partner. Therefore we deduce that the Detective Gilbert referred to in *Lester* is Detective Ernest Gilbert.

**87.** In light of the foregoing analysis and conclusions, it would be improper and unneces-

sary to disturb our order of August 7, 2000, denying discovery as to Detective Gilbert's personnel and internal affairs files or other documentation in the actual or constructive possession of the Commonwealth regarding Detective Gilbert's credibility, because Petitioner has not shown "good cause" for such an order of discovery as required by Rule 6(a) of the Federal Rules Governing Section 2254 Cases.

al counsel was ineffective for failing to object or offer an appropriate instruction.

### (1) Instruction on Voluntariness of Petitioner's Statement

Petitioner's claims that the trial court erred in failing to instruct the jury that it could not consider appellant's purported statement against him unless it found that he gave the statement voluntarily, and that trial counsel was ineffective for failing to object or offer an appropriate instruction, were raised to the PCRA hearing court and in the initial PCRA brief. We therefore find that they were fairly presented to the state courts and were are thus exhausted. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996). Because they had not been raised on direct appeal, the Pennsylvania Supreme Court deemed them waived under both the contemporaneous objection requirement and the PCRA's procedural rules. *Holloway II,* 739 A.2d at 1044. Because Petitioner alleged ineffectiveness of all prior counsel, however, the court adjudicated the claims from the standpoint of an ineffectiveness claim. *See id.* We have already determined that the two waiver rules relied on by the Pennsylvania Supreme Court are independent and adequate state grounds that bar our review of such waived claims absent a showing of cause and prejudice, *see* Part III. B. 2., *supra,* and we now find that they were correctly applied to this subclaim. We therefore apply the AEDPA standard in reviewing the court's decision as to counsel's ineffectiveness for failing to raise the underlying claims previously, and we can only examine the underlying claims if cause and prejudice are shown to excuse the default.

Our AEDPA review consists of determining whether the Pennsylvania Supreme Court unreasonably applied *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), or whether its decision was contrary to *Strickland,* when it decided that appellate counsel's failure to argue the following claims were neither unreasonable nor prejudiced Petitioner: (1) the trial court failed to properly instruct the jury that if it found that Petitioner in fact made a statement, it was required under Pennsylvania law to determine whether he had voluntarily done so, thus violating Petitioner's due process rights under the Fourteenth Amendment by failing to so instruct; and (2) trial counsel was ineffective for failing to request such an instruction. The Pennsylvania Supreme Court found that the underlying claims had no merit, explaining that

> Such an instruction would have been inconsistent with Appellant's claim that he never gave any statement to police; therefore, it was reasonable for trial counsel not to request the instruction. Moreover, there was no evidence that the police coerced Appellant in any way. Finally, Appellant cannot demonstrate that the absence of the instruction affected the outcome of the trial. Consequently, this claim warrants no relief.

*Holloway II,* 739 A.2d at 1047. Because we agree that these underlying claims lack merit,[88] counsel cannot have been ineffective for failing to raise them, *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052, and thus

[88] We need not examine all of the reasons given by the Pennsylvania Supreme Court for its decision. We agree that there was no evidence of coercion, and therefore that there was no right to such a jury instruction and the absence of such an instruction could not have affected the outcome of the trial in any way, and certainly not so that there is a reasonable probability that the outcome would have been different if there had been an instruction.

we find the Pennsylvania Supreme Court's decision to be neither contrary to, nor an unreasonable application of, *Strickland,* and not based on an unreasonable determination of the facts in light of the evidence presented.[89] 28 U.S.C. § 2254(d)(1) & (2).

■ As a matter of substantive federal law, a defendant is not necessarily entitled to a jury determination of voluntariness in cases such as the one before us in which the trial court denied such a claim before trial. *See Lego v. Twomey,* 404 U.S. 477, 489–90, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). On direct appeal, the Pennsylvania Supreme Court affirmed the trial court's determination on voluntariness. Petitioner can only succeed if, as he claims, he had a right to a jury instruction on the voluntariness of his confession as a matter of state law, and the denial of that right denied him due process under the Fourteenth Amendment.

■ Petitioner cites two cases for the proposition that he had a right to the jury determination on voluntariness under Pennsylvania law. *See Commonwealth v. Cunningham,* 471 Pa. 577, 370 A.2d 1172, 1179 (1977); *Commonwealth v. Coach,* 471 Pa. 389, 370 A.2d 358, 361 (1977). This right gives defendants a second chance to test the voluntariness of their statements that had been ruled admissible by the trial judge. This right does not require the trial judge to instruct the jury on voluntariness in every case, however. Rather, "under this approach, the defendant is permitted to introduce evidence at trial relating to the voluntariness of a challenged statement. When a jury is so confronted it may not assess the evidentiary weight to be given to the evidence until it first makes an independent finding that the confession was voluntarily made." *Cunningham,* 370 A.2d at 1179. The Pennsyl-

vania Supreme Court has repeatedly explained that defendants are only entitled to jury instructions if the evidence presented at trial supports such an instruction. *See, e.g., Commonwealth v. Holland,* 518 Pa. 405, 543 A.2d 1068, 1071–72 (1988) (finding that there "must be some relationship between the law upon which an instruction is required and the evidence presented at trial," and concluding that "there was no basis in the record to support charging the jury on the voluntariness of [Petitioner's] confessions"). Therefore we must determine whether Petitioner adduced sufficient evidence at trial to be entitled to a jury instruction on voluntariness, assessing the Pennsylvania Supreme Court's decision that "there was no evidence that the police coerced Appellant in any way," *Holloway II,* 739 A.2d at 1047, for reasonableness under the AEDPA. 28 U.S.C. § 2254(d)(1) & (2).

The evidence asserted both on PCRA appeal and before us is so paltry that we would be extremely hard pressed to conclude that voluntariness was at issue. There is absolutely no evidence of physical coercion in the record. The record barely hints that the police resorted to any psychological pressure. Petitioner testified that Detective Gilbert informed him that Johnson had a contract out on Petitioner's life when he asked for Petitioner's help in implicating Johnson in the Caldwell murder. (N.T. 5/20/86 at 104–06.) Petitioner characterizes this as a "veiled threat" to coerce him to confess. (Pet. Mem. L. at 42.) We fail to see how that information could have affected Petitioner, because he admitted to knowing of the contract already, and it did not cause him to voluntarily present himself to the police to implicate Johnson, and thus at-

---

**89.** Because the underlying claims lack merit, we need not further consider whether Peti-

tioner's procedural default could have been overcome.

tempt to remove Johnson from the streets and protect himself. Petitioner also makes a vague argument that if he made a statement it was in response to a promise that the police would help him if he implicated Johnson, but Petitioner points to not a shred of evidence of such an inducement. (Pet. Mem. L. at 42–43.) We are similarly unconvinced by any of Petitioner's other assertions that purport to show that his statement was not voluntary,[90] and we therefore find that he was not entitled to an instruction on the voluntariness of his confession. Thus we find that neither his due process claim nor his ineffectiveness of counsel claims have merit and that the decision of the Pennsylvania Supreme Court was both reasonable and based on a reasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(1) & (2).

### (2) Instruction on Waiver of *Miranda* Rights

Petitioner's claims as to the faulty *Miranda* instruction were raised his the Supplemental PCRA brief. In its PCRA decision, however, the Pennsylvania Supreme Court asserted that it had addressed these claims on direct appeal, and therefore refused to consider them again. *Holloway II*, 739 A.2d at 1043–44. On direct appeal, however, the only issues regarding the statement dealt with whether the suppression court had properly admitted the statement into evidence. During the course of this review, the Pennsylvania Supreme Court found that the suppression court had properly found that the Petitioner had voluntarily, knowingly, and intelligently waived his *Miranda* rights, but there was no consideration of the trial court's instruction to the jury as to this issue. Because the issue as to the jury instruction was never raised on direct appeal, we respectfully find that neither the due process claim as to the faulty *Miranda* instruction, nor the ineffective assistance of trial counsel claim for failure to request such an instruction, was adjudicated on the merits by the Pennsylvania Supreme Court in either *Holloway I* or *Holloway II*. In *Holloway II*, the court did not cite an independent and adequate state ground that would bar review, as it did with the voluntariness claims. Instead, it cited a ground that would have been adequate, had the court been correct in asserting that it had decided the claim previously. But because we respectfully find that the court was not correct in asserting this, we also find that the ground for failing to adjudicate the claim on PCRA review was inadequate. Therefore we examine these claims de novo without requiring that cause and prejudice be shown for the failure of direct appeal counsel or PCRA trial counsel to raise these claims.

Petitioner derives no advantage from our exercise of plenary review, however, because his claims are completely meritless. Petitioner points to no cases that indicate that he has a right to a jury determination of whether his waiver of *Miranda* rights was voluntary, knowing, and intelligent. He only points to cases that deal with his right to present evidence

---

**90.** According to Petitioner, "the jury was well aware that Shirley Baker had given a statement and testified with the expectation that her cooperation would be to her benefit." Further, "Petitioner was unwilling to sign a statement until he could talk to an attorney, [and after he did so he] refused to sign the statement." We fail to understand the relevance of these statements. Finally, he argues that because the chronology was missing, he was entitled to an instruction that the jury should consider any unnecessary delay in arraignment in determining voluntariness. There was, however, other evidence as to the time that elapsed between his arrest and arraignment—less than six hours—so Petitioner would not have been entitled to such an instruction on this basis.

to the jury as to whether the statement was made voluntarily. (Pet. Mem. L. at 39.) Therefore, his argument that his due process rights were violated because he was denied his right to a jury determination on the *Miranda* waiver is without merit, because he has not proved that such an underlying right exists. Because there is no such right, counsel cannot have been ineffective for failing to assert it. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. We therefore deny the claims based on the failure of the trial court to instruct on the *Miranda* waiver issue and counsel's ineffectiveness in failing to request such an instruction.

### 5. Claim V–Shirley Baker's Secretly Biased and False Testimony

Petitioner claims that the prosecution suppressed impeachment evidence concerning a deal it had made with its key witness, Shirley Baker, violating his rights under the Sixth, Eighth, and Fourteenth Amendments, as articulated by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. Petitioner asserts that he is entitled to an evidentiary hearing under *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), to develop this claim. Petitioner also claims that the prosecution's failure to correct false testimony given by Baker concerning her prior arrest record violated his Fourteenth Amendment right to due process. Finally, Petitioner claims that during closing arguments, the prosecutor improperly vouched for Baker's veracity in order to bolster her credibility (N.T. 5/21/86 at 41–43, 60–63).

Petitioner raised the issues of the alleged deal and the failure to correct false testimony in his filings to the PCRA hearing court and in his initial PCRA brief

before the Pennsylvania Supreme Court, and we find them to have been fairly presented, and thus exhausted.[91] *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996). Because these issues were not raised previously, however, the Supreme Court of Pennsylvania deemed them to be waived. *Commonwealth v. Holloway* (*Holloway II* ), 559 Pa. 258, 739 A.2d 1039, 1044–45 (Pa.1999). Because Petitioner alleged ineffectiveness of all prior counsel, however, the court indicated that it would adjudicate these claims from the standpoint of ineffectiveness claims. *See id.*

We have already found that 42 Pa. Cons. Stat. §§ 9543(a)(3) and 9544(b) are independent and adequate state grounds that bar federal review of claims that are deemed waived based on those rules. We now find these rules to have been properly applied to this subclaim. Therefore, to review these two subclaims on the merits, we would be required to find cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default. *See* Part III. B. 2, *supra.*

As to the first, then, we apply the AEDPA to the claim of ineffective assistance of counsel, because that was the claim adjudicated by the Pennsylvania Supreme Court. As to the second, the uncorrected false testimony, the court clearly applied the procedural bar, but it appears never to have addressed the ineffectiveness claim based on it. *Holloway II,* 739 A.2d at 1042, 1044, 1046. Therefore there appears to be no adjudication on the merits of the ineffectiveness claim that we would review under the AEDPA, but we are still bound by the procedural bar, and may address

---

**91.** Petitioner has made no argument to us regarding the alleged Eighth Amendment vio-

lation, and therefore we deem such a claim to be waived.

the subclaim on the merits only if the procedural default can be overcome.

The third subclaim, the prosecutor's improper vouching for Baker's veracity, appears to have been raised for the first time in Petitioner's Memorandum of Law in support of his federal habeas petition. This claim is therefore exhausted by operation of 42 Pa. Cons.Stat. § 9545, and is procedurally defaulted. *See* Part III. A & B.2., *supra*. Therefore, we may only examine this subclaim on its merits if there is cause and prejudice to excuse the default.

### a. *Brady* Claim

In adjudicating the claim that direct appeal counsel was ineffective for failing to raise the *Brady* claim, the Pennsylvania Supreme Court decided that Petitioner's *Brady* claim as to the deal had no merit, because the Petitioner failed to present any evidence to substantiate this claim. *See Holloway II,* 739 A.2d at 1046 ("This claim is based on pure conjecture, as Appellant presents absolutely no evidence of such a 'deal.' "). By making this determination, the court concluded that the ineffectiveness claim did not entitle Petitioner to relief, because counsel cannot be ineffective for failing to raise a meritless claim. *See Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *Holloway II,* 739 A.2d at 1046. We agree that the underlying *Brady* claim has no merit, and therefore we also agree that the *Strickland* claim has no merit, and thus we find under the AEDPA that the Pennsylvania Supreme Court's adjudication of the ineffectiveness claim was not an unreasonable application of, or contrary to, Supreme Court precedent.[92]

The Petitioner asserts that a deal existed between the prosecution and Baker for her testimony, and that withholding evi-dence of this deal from Petitioner was a violation of his Fourteenth Amendment right to due process, because the prosecution has a duty to disclose all exculpatory information and evidence that could be used to impeach the credibility of the prosecution's witnesses. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (prosecutors have an affirmative duty to disclose material exculpatory evidence to defendants); *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375 (1985) (same as to material impeachment evidence). The Petitioner alleges that the prosecution and Baker had a deal such that "she was guaranteed to receive an extremely lenient sentence if she testified consistently with her statement, but that if she deviated from it the Commonwealth would be free to pursue a heavy sentence." (Pet. Mem. L. at 46). He deduces that a deal must have existed, because after Baker testified for the prosecution, Baker only received time served-six months—and non-reporting parole for six drug related arrests that carried a maximum of 60 to 120 years of prison time. The Petitioner claims that these facts show a prima facie case that a de facto deal existed, and that the prosecution was required to disclose it.

We agree with the Pennsylvania Supreme Court that the *Brady* claim underlying a claim of ineffective assistance of counsel has no merit, because the claim is based on raw speculation. Not only is there no evidence that a deal of the type asserted by Petitioner existed, Baker repeatedly denied it. Instead, Baker testified that the deal was that she would testify truthfully, and the prosecution would then tell her sentencing judge that she cooperated in that way. She hoped there-

---

**92.** We therefore need not consider whether Petitioner could have overcome the procedur-al default that bars us from deciding the *Brady* claim on the merits.

by to get a more lenient sentence, but she expressly denied that anything specific had been promised to her or that she should do anything other than testify truthfully. (N.T. 5/19/86 at 135–41.) Further, at her sentencing, Baker's counsel disclosed to the sentencing court the fact of her cooperation in Petitioner's case, and the prosecutor confirmed that fact, and made no sentencing recommendation. No other deal was disclosed to the sentencing judge. (N.T. 9/7/86, 4, 6; *Commonwealth v. Shirley Baker*, No. 2556, October Term 1982, No. 1915, March Term 1983, No. 2522, April Term, 1983.). We therefore find that the Pennsylvania Supreme Court's determination that the underlying *Brady* claim had no merit was a reasonable one under both § 2254(d)(1) and (d)(2).

 Even if there had been a deal of the type asserted, we would not find prejudice in this case. There is constitutional error only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. In this case, Baker was extensively examined and cross-examined about the drug charges on which she had pled guilty, but had not yet been sentenced, and on the penalties she faced. Defense counsel diligently insinuated that the deal she had was not to testify truthfully, but to testify so as to convict Petitioner. He implied that because she had not yet been sentenced, her ultimate sentence would be lower if Petitioner were convicted than if he were acquitted. Defense counsel's extensive effort to impeach Baker's credibility leads us to believe that even if there had been some type of a deal, other than the one disclosed at trial, there is not a reasonable probability that the jury would have weighed Baker's credibili-

ty so differently so as to alter the outcome of the trial.

Thus, because there is no evidence at all that the prosecution had a deal with Baker like that asserted by Petitioner,[93] and even if there were, there would be no prejudice, we find that the Pennsylvania Supreme Court's decision was reasonable; there is no basis for our granting an evidentiary hearing or ordering discovery on the procedurally defaulted *Brady* claim; and Petitioner is not entitled to habeas relief based on the *Brady* claim. We therefore will deny relief as to this subclaim.

### b. False Testimony Claim

Petitioner also claims that the prosecution's failure to correct false testimony given by Baker concerning her arrest record violated his Fourteenth Amendment right to due process. According to Petitioner, Baker testified falsely under examination by the Commonwealth on redirect that she had never been arrested prior to her arrests on the open drug cases on which she had pled guilty and was awaiting sentencing. He alleges that in fact, in addition to these open cases, Baker had two prior arrests for selling drugs and a prior conviction for possession. Petitioner asserts that the Commonwealth knew of these other incidents, or is presumed to know of them, and it had a duty to correct this false testimony. Petitioner acknowledges that the prior incidents themselves would not have been admissible, had he sought to introduce them as impeachment evidence, because they were not *crimen falsi.* He argues instead that the fact that Baker lied about the existence of such incidents impugns her credibility, and the Commonwealth should not be allowed to benefit from this false testimony.

---

**93.** There is therefore no evidence that the Commonwealth allowed Baker to testify false-ly as to the nature of the deal, and we reject any claims based thereon.

■■ The rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), applies to the discovery, after trial, of information that had been known to the prosecution but unknown to the defense. *See United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The Court in *Agurs* explained that the *Brady* rule applies when the "undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *Id.; see also Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (even if the prosecution has not solicited false evidence it may not allow it to go uncorrected when it appears ). However, the prejudice requirement is different: "a conviction obtained by the knowing use of perjured testimony ... must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (citing *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (quoting *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959))).

Concurring in *Strickler v. Greene,* Justice Souter explained that the "reasonable likelihood" prejudice standard used in perjured testimony cases has been treated by the Court as "synonymous with 'reasonable possibility' and thus [the Court has] equated materiality in the perjured-testimony cases with a showing that suppression of the evidence was not harmless beyond a reasonable doubt." 527 U.S. 263, 299, 119 S.Ct. 1936, 144 L.Ed.2d 286 (Sout-

er, J., concurring) (citing *Bagley,* 473 U.S. at 678–680, 105 S.Ct. 3375, and n. 9 (opinion of Blackmun, J.); *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (defining harmless-beyond-a-reasonable-doubt standard as no " 'reasonable possibility' that trial error contributed to the verdict"); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (same)). Therefore, it appears that the prosecution's failure to correct testimony that it should have known was false would entitle a defendant to relief unless there is no "reasonable possibility" that the trial error contributed to the verdict.

■■ We need not decide whether Petitioner would be entitled to relief under this showing of prejudice.[94] This claim is procedurally defaulted by virtue of its not having been raised on direct appeal. Before we could ever reach the *Napue* showing of prejudice Petitioner must satisfy the greater burden of showing actual prejudice, which requires that the petitioner "shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions," *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original). *See* Part III. B. 2, *supra.*

■■ Further, in order to show cause for the default, he would have to show that counsel was ineffective for not raising the claim on direct appeal,[95] requiring a show-

94. We are troubled by the fact that Petitioner repeatedly refers to the standard to be applied as "any likelihood" that the false testimony could have affected the judgment of the jury, instead of "any reasonable likelihood." (Pet. Mem. L. at 45; Pet. Reply Mem. at 77.) There is a considerable difference in these two standards: "any likelihood" is essentially

a per se prejudice standard upon a showing that false testimony was used.

95. Petitioner asserts that his "state court counsel were ineffective to the extent that they failed to raise and litigate this claim," (Pet. at 41), but does not otherwise attempt to demonstrate or argue cause. As we explained

ing of cause and prejudice under *Strickland*. Petitioner cannot show cause, because the underlying claim does not have merit. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. It appears that, even though the Commonwealth has not contested the issue before us on the merits, Baker did not testify falsely, or at least not perjuriously, or at such a level of falsity that the prosecutor should have known that the testimony was false.

Baker's testimony on the number of her arrests, when they occurred, and which ones were open is quite confusing. (N.T. 5/19/86 at 97–106; 134–35.) On cross-examination she was extensively questioned by defense counsel as to her arrests and open cases, and the questioning indicated that defense counsel had her arrest record in his possession. She testified that she had six open cases, and he asked whether she really had eight open. (N.T. 5/19/86, at 97.) She did not seem able to recall exactly when the arrests occurred—just sometime in 1982 or 1983—or which ones were the result of sales to which under cover police officer. (*Id.* at 103.) Defense counsel then probed, asking "In fact, it involves the year, 1982, June, January, March, April and August?," and Baker confirmed that. (*Id.* at 104–105.)

Petitioner claims that on redirect, when the prosecutor asked Baker about the open cases, specifically asking, "Were there any other cases that you had other than cases for selling drugs?," Baker answered falsely with the statement "I never been arrested before. I never even got suspended from school. I never got arrested before. This is my first time being arrested by dealing drugs for them." (*Id.* at 134–35.) It is not

clear that Baker testified falsely. She may have testified accurately, or she may have been confused about exactly what the prosecutor was asking. Petitioner does not analyze Baker's arrest record and explain which of her convictions were supposed to have been open at the time of trial, but a comparison of her record to the notes of testimony from her sentencing indicate that the open cases were the arrests from March, April, and June of 1982. The January arrests are indeed prior to these, but because defense counsel mentioned the January cases as among the open ones, and Baker confirmed, and because she testified that her arrests were for selling drugs for Petitioner and Johnson, it is not clear that she in fact testified falsely.

Therefore, because Baker does not appear to have in fact testified falsely, and even if she did, it would not be so apparent that no reasonable attorney would have failed to raise the claim, we find that direct appeal counsel did not act unreasonably in not raising it. Therefore direct appeal counsel was not ineffective, and cause cannot be shown to excuse the procedural default. We will therefore deny relief as to this subclaim.

#### c. Improper Vouching Claim

Petitioner argues that during closing arguments, the prosecutor improperly vouched for Ms. Baker's veracity in order to bolster her credibility. Petitioner's presentation of this subclaim is confusing. It is related to the previous two, in that such bolstering, if impermissible, exacerbated both the alleged *Brady* violation and the

---

*supra,* Part III. C. 3. e. (2)(b), in evaluating whether direct appeal counsel was unreasonable for failing to raise the *Batson* claim, it is very difficult for a petitioner to show that his appellate counsel was ineffective for failing to assert a claim, *see Smith v. Robbins*, 528 U.S.

259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000), because it is important to weed out weaker arguments and focus on, at most, a few key issues, *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

impact of the false testimony, and Petitioner argues that the Commonwealth should not be allowed to benefit therefrom. However, Petitioner also bases this subclaim on the legal theory that a prosecutor's assurances of a witness's veracity violate the defendant's rights to due process and a fair trial. If this claim is merely an extension of the other two, we dismiss it outright, because it does not alter our conclusions as to the previous two claims. We believe, however, that this argument was intended to be a separate subclaim. Because the facts and legal theory it is based upon were never presented to the state courts, we deem it exhausted because it could not be raised there now, *see* 42 Pa. Cons.Stat. 9545, and thus procedurally defaulted, requiring a showing of cause for and actual prejudice from the failure to raise it previously, before we would be able to grant relief on the merits, if such relief were warranted.

■ Such relief would not be warranted, because this claim has no merit. We must examine the comments of the prosecutor in the context of the trial as a whole to determine whether there was error. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). If the alleged misconduct was indeed error, the court must determine if the error so infected the trial as to make the resulting conviction a denial of due process. *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). Petitioner complains of the prosecutor's repeatedly referring to the deal with Shirley Baker as one for "truthful testimony," citing five instances of such remarks. He asserts that these statements imply "that the prosecutor has ways of determining whether the witness is telling the truth, and that the prosecutor had in fact determined that she is telling the truth. Accordingly, it consti-

tutes improper vouching." (Pet. Reply Mem. at 77.) Such remarks are not error. First, they are permissible comments on the evidence adduced at trial, i.e. Baker's testimony that the deal was that she would testify truthfully, and the prosecution would tell her sentencing judge of that fact. Second, they were an attempt to mitigate defense counsel's effort to discredit that evidence on cross-examination. Third, they were also a fair response to defense counsel's closing argument implying that Baker expected much more from her deal than she was admitting. *See United States v. Robinson,* 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988); (N.T. 5/21/86 at 25–26).

Because this subclaim has no merit, we would not grant relief, even if we could examine it directly on the merits.

### 6. Claim VI–Ineffectiveness of Trial Counsel During the Guilt Phase

Petitioner claims that trial counsel was ineffective at the guilt phase for several reasons. First, he argues that counsel was ineffective for failing to investigate, prepare, and present substantial evidence that was available to cast doubt upon the testimony of prosecution witness Shirley Baker. Second, he argues that counsel was ineffective for failing to call Daniel Freeman as a witness to support his alibi defense, and to show that he was acquitted of the Caldwell homicide. Third, he argues that counsel rendered ineffective assistance when he failed to challenge the unsigned statement attributed to Petitioner as the fruit of an illegal arrest.

### a. Failure To Investigate, Prepare, and Present Substantial Evidence Available To Impeach the Testimony of Shirley Baker

Petitioner claims that there were numerous methods available of impeaching

Shirley Baker, and trial counsel failed to attempt to do so with any of them. These methods include (1) using evidence of Freeman's acquittal to impeach Baker; (2) showing that Baker could not have seen the victim inside the van belonging to Johnson; (3) showing that from her stated position in her apartment, she could not have seen Petitioner and Freeman get inside the van; (4) showing that Baker had a history of animosity toward Petitioner, and therefore was biased against him, as a result of Petitioner's ending an intimate relationship with her because of her drug addiction and lack of trustworthiness; (5) presenting evidence that if the shotgun had gone off inside Freeman's pants leg, the result would have been much more severe than "a white spot" on the pants, and (6) impeachment with inconsistent testimony from Freeman's trial.

This subclaim was raised to the PCRA hearing court and to the Pennsylvania Supreme Court on PCRA appeal.[96] Because this issue was not raised previously, the Supreme Court of Pennsylvania deemed it to be waived. *Commonwealth v. Holloway* (*Holloway II* ), 559 Pa. 258, 739 A.2d 1039, 1044–45 (Pa.1999). Because Petitioner alleged ineffectiveness of all prior counsel, however, the court indicated that it would adjudicate this claim from the standpoint of a claim of ineffectiveness of such counsel. *See id.* We have already found that 42 Pa. Cons.Stat. §§ 9543(a)(3) and 9544(b) are independent and adequate state grounds that bar federal review of claims that are deemed waived based on those rules, and we now find that they are properly applied, at least as to direct appeal counsel. Therefore, to review this subclaim on the merits, we would be required to find cause and prejudice or a fundamen-

tal miscarriage of justice to excuse the procedural default. *See* Part III. B. 2, *supra.* We review the adjudication of the claim of ineffectiveness of direct appeal counsel for failure to raise the claim under the AEDPA, 28 U.S.C. § 2254(d)(1).

The Pennsylvania Supreme Court considered whether the underlying claim of trial counsel ineffectiveness had merit, because if it did not, subsequent counsel could not have been ineffective for failing to raise it. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. The court recounted the various ways that Petitioner asserts trial counsel should have impeached Baker, and then stated:

> Even if any of these claims had arguable merit, Appellant does not prove, or even allege, that counsel's errors "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa. Cons.Stat. 9543(a)(2)(ii). Accordingly, no relief is due.

*Holloway II,* 739 A.2d at 1048.

■ Under the PCRA statute, before the Pennsylvania Supreme Court may consider a waived or otherwise procedurally barred claim, the Petitioner must both make this prejudice showing and show that counsel was ineffective in his course of conduct that created any procedural bars. It is not clear, however, whether the Pennsylvania Supreme Court applied this prejudice showing separately as an additional procedural hurdle, or merely as part of the showing of ineffectiveness of counsel. We will assume that this prejudice standard is equivalent to that required to show ineffective assistance of counsel under *Strickland* and thus review the court's finding of no allegation or showing of prejudice under the AEDPA.

---

**96.** We find this subclaim to have been fairly presented to the Pennsylvania courts and thus exhausted. *See O'Sullivan v. Boerckel,* 526

U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996).

■ We believe that this prejudice determination is equivalent to that required by *Strickland.* *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052 (prejudice exists if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," and a reasonable probability is "a probability sufficient to undermine confidence in the outcome"); *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (showing of prejudice under *Strickland* requires that "counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect"); *see also United States v. DeRewal,* 10 F.3d 100, 104 (3d Cir.1993) (defining prejudice as deprivation of · "a trial whose result is reliable"). Even if the standards could be considered different, the Pennsylvania standard cannot be considered to be "contrary to" *Strickland.* To be "contrary to" Supreme Court precedent, "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent *requires* the contrary outcome." *Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 888 (3d Cir.1999). *Strickland* does not require the contrary outcome in this case, because not only is there no prejudice, but counsel cannot be said to have acted unreasonably. Therefore, a decision based upon this provision cannot be said to be "contrary to" *Strickland* 's requirement of prejudice.

The court's determination that Petitioner made no allegation nor showed any

prejudice due to subsequent counsel's failure to raise the claim of trial counsel ineffectiveness was also a reasonable application of *Strickland.*[97] The Petitioner has the burden of showing that counsel's deficient performance prejudiced him. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. The only statements in the Petitioner's PCRA brief that could reasonably be read as allegations of prejudice are the following: "Shirley Baker was the key witness against Appellant. If the jury did not believe Baker, the only evidence against Appellant was his purported statement, which he denied having made. Thus, impeaching Baker's credibility was one of counsel's primary duties." (PCRA Br. Pa.S.Ct. at 38.) Even if we disagreed with the Pennsylvania Supreme Court that such a statement was not an *allegation* of prejudice, we would not find its determination to be unreasonable, and we also agree that there was no *showing* of prejudice.

As we explained in Claim V, trial counsel extensively cross-examined Baker on her history of drug use and drug selling, the many drug charges pending against her, and the deal she made with the prosecution for her testimony. *See* Part III. 5. a, *supra.* In light of the strenuous efforts of trial counsel to impugn her credibility, show that she was biased and show that her testimony was unreliable, we agree that there was not such prejudice as to render the trial unfair and the verdict suspect, or to show a reasonable probability that the outcome would have been different, as required by *Strickland.* Therefore, we not only find that the Pennsylvania's Supreme Court's determination as to prejudice was not an unreasonable

---

97. We recognize that in light of the U.S. Supreme Court's limiting the applicability of *Lockhart* in *Williams,* 529 U.S. at 391–98, 120 S.Ct. 1495, it could be argued that 42 Pa. Cons.Stat. § 9543(a)(2)(ii) is an unreasonable

application of *Strickland.* We do not believe it is, but if it is, we would merely apply a de novo *Strickland* analysis and reach the same conclusion.

application of *Strickland,* we would not find prejudice such that the procedural default barring us from granting us relief on the underlying claim was overcome.

We would not find that counsel acted unreasonably, either, were we able to reach the issue. Trial counsel could not have used evidence of Freeman's acquittal to impeach Baker, because he was barred by the trial court's order forbidding him to refer to this acquittal. Even if he had argued that *Commonwealth v. Quaranta* permitted introduction of evidence of Freeman's acquittal to impeach Baker, as Petitioner asserts that he should have, the evidence probably would not have been admissible. 295 Pa. 264, 145 A. 89 (1928) ("[T]he fact of acquittal of a [person], as shown by verdict and judgment, is competent proof to affect the credibility of eyewitnesses who have testified to [the person's] presence at the homicide and participation therein."). Baker was not an eyewitness; rather she testified as to the statements and actions of Freeman and Petitioner before they left her presence to commit the murder, and she testified as to their admissions after they did so.

Several other subclaims fail for lack of evidence. The only evidence that Baker could not have seen Caldwell in the van is the affidavit of Freeman, who asserts that one could not see into the van when the windows were closed, because of the van's custom windows. Baker testified, however, that the windows were open, thus making Freeman's assertion only marginally relevant. Petitioner presents no evidence that Baker could not have seen Petitioner and Freeman get inside the van. Likewise, although he asserts that the victim's brother, Alfonso Walker, who testified at trial, could have testified as to Baker's animosity toward Petitioner, he presents no evidence, not even an affidavit, that

Walker knew of such animosity or would have testified on that subject in a way helpful to Petitioner. Petitioner alleges no other evidence of such animosity, or any evidence of the allegation that he and Baker had had an intimate relationship and she was biased against him because he ended it as a result of her drug addiction and lack of trustworthiness.

Petitioner also argues that trial counsel should have presented expert evidence that if the shotgun had gone off inside Freeman's pants leg, the result would have been much more severe than "a white spot" on the pants, as Baker testified. Baker testified on cross-examination, however, that when Petitioner and Freeman returned, Petitioner stated that Freeman "almost shot his leg off." The testimony proceeded as follows:

Q. Did he show his leg?

A. He was showing a white spot on his pants. He was showing his pants leg to Bubbles, Danny Freeman.

Q. That the conversation was that Blackie, Danny Freeman, almost shot his leg off?

A. Yes.

Q. You mean his own leg?

A. Yes.

Q. You mean in the pants with the gun?

A. Yes. That's what he said.

(N.T. 5/19/86 at 126.) Trial counsel did not act unreasonably in not trying to impeach Baker's testimony with a ballistics expert. Such an expert would not have impeached her testimony. She could have been testifying truthfully, even if Petitioner's statements about the gun going off inside the pants leg were not accurate. Further, such an occurrence and the statement regarding it made by Petitioner are not relevant to whether his admissions as to strangling and shooting Caldwell were truthful,

because the statement about the gun going off was not an admission.

Finally, counsel was not unreasonable in failing to impeach Baker with inconsistent testimony from Freeman's trial, which Petitioner alleges the court would have let him try to do if he would disclose them to the prosecutor. (N.T. 5/19/86 at 119–122.) First, reasonable counsel would not necessarily have known before trial that the prosecutor did not also have a copy of the notes of testimony of the trial of an accomplice of the defendant before him on the same crime, because reasonable attorneys, both defense counsel and prosecutors, would likely obtain such notes in the course of trial preparation. Second, trial counsel had underlined key testimony in the notes that he planned to use to impeach Baker, and he did not want to disclose these mental impressions to the prosecutor-a reasonable reaction. Third, he offered to allow the prosecutor to review the notes of testimony, but asked for an adjournment so that he could review them thereafter and finish preparing his cross-examination. This reasonable offer was rebuffed when the Judge Sabo refused an adjournment, and then even decided not to break for lunch as he had planned to do, forcing trial counsel to continue with his cross-examination without the notes and threatening him with contempt if he tried to use them. Under such circumstances, trial counsel did not act unreasonably.

Finding neither prejudice nor unreasonable actions by trial counsel, we deny relief as to any claim based on trial counsel's alleged ineffectiveness in his impeachment of Baker.

### b. Failure To Call Daniel Freeman as a Witness To Support Alibi Defense, and To Show that He Was Acquitted of the Caldwell Homicide

Petitioner claims that counsel was ineffective because he failed to call Daniel Freeman, Petitioner's alleged accomplice who had been acquitted of the murder, as a witness. Petitioner asserts that Freeman could have supported Petitioner's alibi defense, and his acquittal could have impeached Baker's credibility.

This subclaim was raised to the PCRA hearing court and to the Pennsylvania Supreme Court on PCRA appeal.[98] Because the Pennsylvania Supreme Court considered it to have been *raised* before the PCRA court because that court had *decided* the claim, the Pennsylvania Supreme Court considered the claim directly, without applying any procedural bars.[99] *Holloway II*, 739 A.2d at 1044, 1048. We therefore review its decision under the AEDPA, 28 U.S.C. § 2254(d)(1).

The court decided that Petitioner's trial counsel was not ineffective for not calling Freeman, because Petitioner could not show prejudice, i.e., that "the absence of the witness was so prejudicial as to have denied Appellant a fair trial." *Holloway II*, 739 A.2d at 1048. The court found that Petitioner's alibi was not supported by Freeman's affidavit, and that "Freeman's testimony easily could have incriminated" Petitioner, and thus "counsel's decision not to call Freeman as a witness was reasonable," and thus the ineffectiveness claim fails.

---

**98.** We find this subclaim to have been fairly presented to the Pennsylvania courts and thus exhausted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996).

**99.** The court could have asserted that the claim was waived because it was not raised on direct appeal.

The prejudice standard applied by the court is thoroughly consistent with the prejudice that must be shown under *Strickland,* therefore it is not contrary to *Strickland.*[100] We also find that the application of *Strickland* was reasonable. Petitioner presents a sworn affidavit from Freeman, now deceased, that he was available and would have testified that on the evening of the offense he had seen Petitioner in a bar, where Petitioner got sick, and that Petitioner went home to lie down. Freeman stated that later, about 11:30 p.m., he saw Petitioner being helped into a car by a man and a woman Freeman did not recognize. Freeman denied any participation in the homicide, and denied being in Baker's apartment during the relevant time period.

The Pennsylvania Supreme Court decided that Freeman's testimony would not have helped Petitioner's alibi defense, because the latest that he saw Petitioner was at about 11:30 p.m., and the medical evidence shows that the murder was committed sometime between midnight and approximately 1:45 a.m. when the body was found. Despite the fact that this evidence also bolsters the testimony of Carmella Davis, who testified that she went to see Petitioner that evening, found him ill, and took him home with her with the aid of another male friend, we cannot say that the Pennsylvania Supreme Court's interpretation of the evidence was unreasonable. We also agree with the court that trial counsel was reasonable in not calling Freeman because he would reasonably be concerned that Freeman would incriminate Petitioner. Because both trial counsel and Freeman died before the PCRA evidentiary hearing, the only evidence we have is Freeman's affidavit. However, this evidence is not strong enough to rebut the presumption of reasonable representation that we must accord trial counsel. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Trial counsel knew that Freeman had been acquitted and could not be retried, and thus his strongest motive to refrain from implicating Petitioner if he testified no longer existed.

Petitioner also argued before the Pennsylvania Supreme Court, and before us, that if trial counsel had called Freeman as a witness, the Commonwealth surely would have tried to impeach him with his alleged involvement in the murder, and then trial counsel would have been able to introduce evidence of his acquittal under *Commonwealth v. Meredith,* 493 Pa. 1, 425 A.2d 334, 338 (1981). We agree that if the Commonwealth would have thus attempted to impeach Freeman, alluding to the fact that he was arrested and tried for the crime, trial counsel could have offered evidence of his acquittal. However, Petitioner's assertion as to the Commonwealth's likely trial strategy is mere speculation. It is just as plausible that the Commonwealth would have strenuously attempted to avoid opening that door even while trying to place him with Petitioner, because the Commonwealth would not want the jury to know that Freeman had been acquitted, and that Baker had been its key witness at that trial as well. Therefore, because there is no evidence on which to base this assertion, we find it to be without merit.

We therefore conclude that the Pennsylvania Supreme Court's determination that trial counsel acted reasonably in not calling Freeman as a witness, and its conclu-

---

**100.** Petitioner cannot "demonstrate that Supreme Court precedent *requires* the contrary outcome," *Matteo,* 171 F.3d at 888, because there is no reasonable probability that the outcome of the trial would have been different, i.e. no probability sufficient to undermine our confidence in the outcome. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

sion that no prejudice resulted from that failure, thus resulting in its finding that counsel was not ineffective, were reasonable applications of *Strickland.*

c. **Failure To Challenge the Unsigned Statement Attributed to Petitioner as the Fruit of an Illegal Arrest.**

Petitioner claims that trial counsel was ineffective at his suppression hearing because he did not challenge Petitioner's purported statement as the fruit of an illegal arrest in addition to the Fifth Amendment *Miranda* and voluntariness grounds raised, and appellate counsel was ineffective for failing to raise the claim of trial counsel's ineffectiveness. Petitioner asserts that the affidavit of probable cause used to procure the arrest warrant was based on the hearsay statement of Shirley Baker, who was neither an accomplice, eyewitness to, or victim of the crime. She was merely an informant, and because she had no direct knowledge of the crime, the police were required to have a reasonable basis for concluding that her information was reliable. Petitioner alleges that Baker was presumptively unreliable and the police knew it, because she made the statement while under arrest in the self-serving attempt to obtain lenient treatment, and the police failed to put that information in the affidavit of probable cause. Therefore, alleges Petitioner, the affidavit of probable cause was defective, so his arrest was without probable cause, and the unsigned statement attributed to him was the fruit of an illegal arrest and should have been suppressed.

This subclaim was raised to the PCRA hearing court and to the Pennsylvania Supreme Court on PCRA appeal.[101] Because

this issue was not raised previously, the Supreme Court of Pennsylvania deemed it to be waived. *Holloway II,* 739 A.2d at 1044–45. Because Petitioner alleged ineffectiveness of all prior counsel, however, the court indicated that it would adjudicate this claim from the standpoint of a claim of ineffectiveness of subsequent counsel. *See id.* We have already found that 42 Pa. Cons.Stat. §§ 9543(a)(3) and 9544(b) are independent and adequate state grounds that bar federal review of claims that are deemed waived based on those rules, and we now find them to have been properly applied as to this subclaim. Therefore, to review this subclaim on the merits, we would be required to find cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default. *See* Part III. B. 2, *supra.* We review the adjudication of the claim of ineffectiveness of direct appeal counsel for failure to raise the claim under the AEDPA, 28 U.S.C. § 2254(d)(1).

The Pennsylvania Supreme Court examined the underlying merits claim, i.e. trial counsel's ineffectiveness for failing to challenge the statement as the fruit of an illegal arrest, because direct appeal counsel could not have been ineffective for failing to raise a meritless issue. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. The court found that Baker was reliable, and other witnesses corroborated her statement. Therefore the court found that trial counsel was not ineffective for not challenging the statement on this basis. *Holloway II,* 739 A.2d at 1046.

We find that the Pennsylvania Supreme Court's adjudication of the claim of direct appeal counsel's ineffectiveness, finding that he was not ineffective because the underlying claim had no merit, is a reason-

---

**101.** We find this subclaim to have been fairly presented to the Pennsylvania courts and thus exhausted. *See O'Sullivan v. Boerckel,* 526

U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996).

able application of *Strickland*, because we agree that the underlying claim has no merit. We agree that other witnesses corroborated important parts of Baker's statement, and that her statement itself was reliable.

The affidavit of probable cause was based on Shirley Baker's statement and two other civilian informants who corroborated significant portions of her statement, as well as a number of police officers.[102] It is true that no eyewitnesses to the crime have ever come forward, and Shirley Baker is the only person to state that Petitioner admitted committing the murder. However, the affidavit of probable cause included a statement by Avis Caldwell, the victim's sister, that corroborates part of Baker's statement. Ms. Caldwell stated that at the victim's funeral, Johnson spoke to Ms. Caldwell and told her that the victim had been in Johnson's van the night of the murder, but he disappeared from it, along with all of the valiums Johnson had in the van; Johnson opined that someone had snatched the victim from the van; a few days after the murder, Johnson had his van cleaned and then the van disappeared from the neighborhood for about six months. This partially corroborates Baker's statements that Johnson had told Petitioner that the victim was in Johnson's van, high on pills, and that when they came back, the victim was no longer in the van. Baker also had stated that about a week after Caldwell's funeral, she told her friend Cheryl and a girl called "Geech," and hinted to Caldwell's brother, that Johnson and Petitioner had something to do with Caldwell's murder. Not long af-

terwards, Johnson and Petitioner threatened her, telling her that she might get hurt if she kept talking about the murder. The affidavit of probable cause includes a statement by a Gail Burgess, who may or may not be "Geech," that Shirley Baker told her that if anything happens to Baker, it would be Freeman and Petitioner who did it, because they had killed Caldwell.[103] Baker also stated that the reason for Caldwell's murder was that he was dealing drugs for Johnson and Petitioner, and that he had messed up the money. Ms. Burgess also stated that Caldwell had been selling drugs for Johnson and Petitioner until about a week before he was murdered, when they fired him for messing up their money.

In addition to this corroboration, Baker's statement has inherent indicia of reliability. Baker made several statements against her penal interest, admitting that she had been a drug dealer, starting in 1979, for Petitioner and Johnson, and that she was daily dealing drugs for them at the time of the murder.

We therefore agree that trial counsel was not unreasonable in failing to challenge Petitioner's statement as the fruit of an illegal arrest, and find under the AEDPA that the Pennsylvania Supreme Court's adjudication of the claim of direct appeal counsel's ineffectiveness for failing to raise the claim of trial counsel's ineffectiveness was not unreasonable.

### 7. Claim VII–Improper Instruction on Accomplice Liability

Petitioner argues that he is entitled to habeas relief because the trial court's jury

---

102. We have examined the copy of Baker's statement and the copy of the affidavit of probable cause that are in the record transmitted by the Clerk of Quarter Sessions Court of Philadelphia, because parts of Baker's statement filed as an exhibit to the Petition for a Writ of Habeas Corpus were redacted or otherwise illegible.

103. We acknowledge that such statements are hearsay, but they appear to have been made shortly after the murder occurred, at a time when none, or very few, of the reasons given by Petitioner in Claims V and VI to doubt Baker's veracity existed.

instruction on accomplice liability relieved the Commonwealth of its obligation to prove every element of every offense beyond a reasonable doubt, depriving him of his right to due process. Petitioner raised this claim for the first time in collateral proceedings,[104] and therefore the Pennsylvania Supreme Court deemed the claim to be waived both for the failure of trial counsel to contemporaneously object, and for the failure of direct appeal counsel to raise both the claim of trial counsel's ineffectiveness for failing to do so and the underlying claim. *Holloway II*, 739 A.2d at 1043–44. Because Petitioner alleged ineffectiveness of all prior counsel, however, the Pennsylvania Supreme Court treated the claim before it as one of ineffective assistance of direct appeal and trial counsel. *Id.* at 1044. Having previously found that these waiver rules are independent and adequate state grounds barring federal review of the waived claim, we now find them to be properly applied as to this claim and we review the Pennsylvania Supreme Court's decision as to the ineffectiveness of counsel under the AEDPA, and may only review the due process claim if a showing of cause and prejudice is made to excuse the default. *See* Part III. B. 1 & 2, *supra*. We find that the Pennsylvania Supreme Court's denial of relief did not violate the AEDPA's standard and therefore also deny relief on this claim.

In particular, Petitioner objects to Judge Sabo's instruction:

In order to find the defendant guilty of murder in the first degree, you must find that the defendant caused the death of another person, or that an accomplice of the defendant caused the death of another person. That is, you must find that the defendant and an accomplice's acts is the legal cause of the death of Richard Caldwell, and thereafter, you must determine if the killing was intentional.

(N.T. 5/21/86 at 131–132).

Petitioner argues that this instruction misstated Pennsylvania law regarding accomplice liability, and allowed the jury to convict Petitioner without finding that he possessed the intent to kill beyond a reasonable doubt, as required by Pennsylvania law and due process. Petitioner cites *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), in which the Supreme Court held that in order to convict, a jury must find that every element of a crime was proven beyond a reasonable doubt. Petitioner concludes that because the charge allowed the jury to find the defendant guilty without finding that he possessed the intent to kill beyond a reasonable doubt, the Pennsylvania Supreme Court's denial of relief was contrary to federal law.

Petitioner is correct that *Winship* requires that each element of a crime be proven beyond a reasonable doubt. Petitioner is also correct in arguing that intent to kill is one element of first degree murder in Pennsylvania and must be proven beyond a reasonable doubt. Read alone, Judge Sabo's instruction would seem to allow the jury to convict, even if Petitioner did not possess the intent to kill required under Pennsylvania law. However, Petitioner was also charged with conspiracy to commit a crime, and found guilty. The conspiracy was one in which murder was the objective, and the jury, properly instructed on this charge, found beyond a reasonable doubt that Petitioner did en-

---

**104.** This claim was fairly presented to both the PCRA hearing court and to the Pennsylvania Supreme Court, and therefore we find that it is exhausted. *See O'Sullivan v. Boerck-* *el*, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996).

gage in this conspiracy. Thus Petitioner was found by the jury to possess, beyond a reasonable doubt, the intent to kill that is required by law, despite the contested instruction.[105]

While the Pennsylvania Supreme Court did not explicitly state this line of reasoning in denying relief on this claim, the cases cited by the court did, and this analysis is entirely reasonable. We conclude that the Pennsylvania Supreme Court's denial of relief was neither contrary to, nor an unreasonable application of federal law.[106] Consequently, we deny relief for this claim.

### 8. Claim VIII–Improper Instruction on Burden of Proof

Petitioner argues that he is entitled to habeas relief because the trial court's jury instruction failed to explain that the Commonwealth had the burden of proving every element of any homicide offense beyond a reasonable doubt, depriving Petitioner of due process. Petitioner raised this claim for the first time in collateral proceedings,[107] and therefore the Pennsylvania Supreme Court deemed the claim to be waived both for the failure of trial counsel to contemporaneously object, and for the failure of direct appeal counsel to raise both the claim of trial counsel's ineffectiveness for failing to do so and the underlying claim. *Holloway II*, 739 A.2d

at 1043–44. Petitioner alleged ineffectiveness of all prior counsel, however, so the Pennsylvania Supreme Court treated the claim before it as one of ineffective assistance of direct appeal and trial counsel. *Id.* at 1044. We have already found that these waiver rules are independent and adequate state grounds barring our review of the waived claim, and we now find them to have been properly applied to this claim. We therefore review the Pennsylvania Supreme Court's decision as to claim of the ineffectiveness of counsel under the AEDPA, and may only review the due process claim if a showing of cause and prejudice is made to excuse the default. *See* Part III. B. 1 & 2, *supra.* We find that the Pennsylvania Supreme Court's denial of relief did not violate the AEDPA's standard and therefore also deny relief on this claim.

In particular, Petitioner objects to Judge Sabo's instruction:

> But I repeat that during your deliberations, in order to find the defendant guilty of any class of criminal homicide encompassed in said general murder Bill, you must first find that the Commonwealth has established by the evidence introduced, or has proven each and every essential element of that class of criminal homicide beyond a reasonable doubt, as I have previously defined

---

**105.** Because the jury found intent to kill despite the contested instruction, Petitioner's argument that the Pennsylvania Supreme Court misapplied *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), is rendered moot. *Boyde* held that when there is an ambiguous jury instruction, the court must determine if there is a reasonable likelihood that the jury interpreted it so as to render an unconstitutional verdict. This jury found that Petitioner possessed the intent to kill, thus there is no possibility that the instruction was misapplied.

**106.** Indeed, for the reasons stated above, we would reach the same conclusion were we to exercise plenary review on the substantive claim after a showing of cause and prejudice or fundamental miscarriage of justice.

**107.** This claim was fairly presented to both the PCRA hearing court and to the Pennsylvania Supreme Court, and therefore we find that it is exhausted. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996).

and explained the meaning of that term to you.

Further, I shall now instruct you as to the elements of each of those offenses involved in this case. As I do so, you should keep in mind that after considering all of the evidence, you are entitled to find the defendant guilty of any one of those offenses which you find is established beyond a reasonable doubt by the evidence presented in this courtroom, based on the instructions which I shall now give you as to the elements of each offense.

(N.T. 5/21/86 at 125–26). Petitioner specifically objects to the Judge's failure to instruct the jury that each element of each offense must be proven beyond a reasonable doubt.

Petitioner also objects to Judge Sabo's later instruction in which he defined murder in the first degree:

A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing. Thus, in order to find the defendant guilty of murder in the first degree, you must find that the defendant caused the death of another person or that an accomplice caused the death of another person. That is, you must find that the defendant and an accomplice's acts is the legal cause of the death of Richard Caldwell, and thereafter, you must determine if the killing was intentional.

(N.T. 5/21/86 131–132).

Petitioner maintains that these instructions were erroneous because they permitted the jury to convict the Petitioner if it believed that Petitioner's guilt had been proven, even if it still had reasonable doubt about one of the elements of the crime. Petitioner concludes that allowing the jury to convict on a lesser standard deprived him of his due process right.

The Pennsylvania Supreme Court, reviewing the claim on PCRA appeal, examined the underlying claim for merit, because if it had no merit, counsel could not have been ineffective for failing to raise it. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. The court found that Petitioner's argument on the underlying claim was without merit. The court found that Judge Sabo had in fact instructed the jury that the Commonwealth had an obligation to prove each element of the crime charged beyond a reasonable doubt.[108] *Holloway II*, 739 A.2d. at 1047–1048. We may only overturn this decision if it was contrary to, or an improper application of federal law. The Pennsylvania Supreme Court's decision did not violate these standards established by the AEDPA, and we therefore deny relief on this claim.

The Pennsylvania Supreme Court's holding is predicated on the fact that Judge Sabo had earlier instructed the jury that every element must be proven beyond a reasonable doubt. This is persuasive and not unreasonable under the AEDPA, and this claim for relief could be denied on this ground alone. However, Petitioner seeks to persuade us to overturn this decision by arguing that the judge's later statements counteract that early instruction. In particular, Petitioner's argument seems to center around Judge Sabo's statement, "you must first find that the Commonwealth has established by the evidence introduced, or has proven each and

---

**108.** Judge Sabo instructed the jury:
It is not the defendant's burden to prove that he is not guilty. Instead, it is the Commonwealth that always has the burden of proving each and every element of the

crime charged, and that the defendant is guilty of that crime beyond a reasonable doubt.
(N.T. 5/21/86 106).

every essential element of that class of criminal homicide beyond a reasonable doubt." (N.T. 5/21/86 at 126). Petitioner argues that this instruction provided the jury two possible standards for finding guilt, establishment by the evidence introduced or proof beyond a reasonable doubt. This is an implausible reading of the instruction. A more likely reading of this instruction is that the Commonwealth may either "establish[ ] by the evidence introduced," or "prove[ ]," "each and every essential element of that class of criminal homicide beyond a reasonable doubt." We cannot say that the level of proof required to "establish, by the evidence introduced, guilt beyond a reasonable doubt," is sufficiently different from the level of proof required to "prove guilt beyond a reasonable doubt," to raise due process concerns. Indeed, it seems that Judge Sabo was not giving the jury more than one option but simply supplying them with a supporting definition of "prove."

We conclude that Petitioner's claim is without merit. The Pennsylvania Supreme Court's decision, based on Judge Sabo's explicit instruction to the jury, did not violate the strict standard of the AEDPA.[109] Additionally, a close reading of the instruction reveals that Petitioner's interpretation is tenuous at best. It is clear both from reading the entire instruction to the jury and reading the disputed portion closely, that no "reasonable juror could have interpreted the instruction to allow a finding of guilty based on a degree of proof below that required by the Due Process Clause." *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). Therefore, we deny relief for this claim.

### 9. Claim IX–Statutes of Limitations Claims

Petitioner raises two main claims. First, Petitioner claims that the crimes of Conspiracy and Possession of an Instrument of Crime (PIC) were time barred by the statute of limitations and that his convictions of these crimes violated the Due Process and Ex Post Facto Clauses of the U.S. Constitution and prejudicially affected the jury's guilt and capital sentencing deliberations. Second, he claims that trial counsel was ineffective for failing to move to quash these charges or otherwise raise the statute of limitations issue as a bar to prosecution on such charges and that appellate counsel was ineffective for failing to raise these claims on direct appeal. (Pet. Mem. L. at 58.) This failure by trial counsel allowed the prosecution to proceed and petitioner was convicted even though the charge was time barred. *Id.* Petitioner claims that at the time the offenses were committed on or about May 16, 1980, the statute of limitations for offenses other than murder, including conspiracy, was two years from the date the offense was committed under 42 Pa. Cons.Stat. § 5552. *Id.* As a result, Petitioner argues that the Commonwealth was required to initiate a criminal prosecution on or before May 17, 1982 for the offenses that occurred on May 16, 1980. (Pet. Reply Mem. at 91.) Accordingly, when the Commonwealth issued Petitioner's arrest warrant on January 9, 1985, and the criminal informations against Petitioner on June 13, 1985, they were barred from doing so under the two-year statute of limitations in effect at the time the offense was committed. *Id.* After the two-year statute of limitations expired in this case, the statute was amended to provide that there is no statute of limitations

---

109. For the reasons stated above, we would also dismiss the claim were we to exercise plenary review after a showing of cause and prejudice or fundamental miscarriage of justice.

with respect to conspiracy to commit murder, if a murder results from the conspiracy. 42 Pa. Cons.Stat. § 5551.[110]

Petitioner offers six subclaims in support of his two main claims. Two of these subclaims address the alleged violations of Petitioner's right to due process under the Fourteenth Amendment. He argues that his due process rights were violated because (1) he had a liberty interest in not being charged and convicted on the time-barred Conspiracy and PIC charges; (2) the conviction on the time-barred charges of Conspiracy and PIC prejudicially affected the Petitioner at the guilt and sentencing phases. Petitioner also argues (3) that his conviction violated the Ex Post Facto Clauses of the Constitution because the § 5552 statute of limitations in effect at the time the offense was committed had expired before § 5551 was amended to eliminate the statute of limitations for conspiracy to commit murder. Furthermore, Petitioner argues (4) that trial counsel was ineffective for failing to move to quash or otherwise raise the statute of limitations issue; and appellate counsel was ineffective (5) for failing to raise the issue of trial counsel's ineffectiveness and (6) for failing to raise the underlying Due Process and Ex Post Facto Clause violations. Respondent argues that Petitioner's ineffectiveness claims are defaulted because Petitioner did not adequately present his current constitutional claims to the state courts and that the Pennsylvania Supreme Court correctly determined under state law that there is no statute of limitation on conspiracy to commit murder. (Comm. Resp. at 118.) Consequently, any motion by trial counsel to quash the conspiracy charge would have failed, and counsel cannot be ineffective for failing to raise a meritless claim. *Id.* at 120.

With respect to the PIC charge, the Respondent concedes that the applicable statute of limitations period was two years from the time of the crime. *Id.* at 120. However, the Respondent claims that the statute was tolled during the time that Petitioner was in New York during the five years between the murder and his arrest. *Id.* at 121. In any event, Petitioner's failure to plead or prove otherwise in the state PCRA proceedings required dismissal of his claim under state law. *Id.* Finally, Respondent argues that Petitioner ignores that the only claim actually presented to and adjudicated by the state courts was one of trial and appellate counsel's ineffectiveness for failure for not seeking to quash the indictments, and he ignores the requirement that he prove actual prejudice from the counsel's alleged ineffectiveness. We conclude that because Petitioner failed to allege that he suffered any prejudice because of the PIC charge, no relief is warranted on any claim arising from the PIC charge.

### a. Exhaustion and Procedural Default

Before considering the claims themselves, we must determine whether they are properly before this court for review under § 2254(c) of AEDPA. All of Petitioner's subclaims were first presented to the PCRA hearing court and then to the Pennsylvania Supreme Court both on the merits and as part of claims of ineffective assistance of counsel. Therefore, we find that the claims were fairly presented to the Pennsylvania courts on their merits;

---

**110.** The provision of 42 Pa. Cons.Stat. § 5551 eliminating any statute of limitations for conspiracy to commit murder became effective December 19, 1984. The 1984 amendments added "Conspiracy to commit murder or solicitation to commit murder if a murder results from the conspiracy or solicitation" to the offenses for which there is no statute of limitations. 42 Pa. Cons.Stat. § 5551(3). P.L. 1089, No. 218 § 5.

as underlying claims of trial counsel's ineffectiveness for failing to move to quash or otherwise raise the issue of the expiration of the statute of limitations; and as underlying claims of direct appeal counsel's ineffectiveness for failing to raise the claims of trial counsel's ineffectiveness. These subclaims are therefore exhausted. *O'Sullivan v. Boerckel,* 526 U.S. 838, 844–845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999).

In its decision on Petitioner's PCRA appeal, the Pennsylvania Supreme Court treated the underlying claims as to the statute of limitations as waived on their merits both for the failure of trial counsel to contemporaneously object to errors occurring at trial and thus preserve these issues for appeal, and for the failure of appellate counsel to raise them on direct appeal as required by 42 Pa. Cons.Stat. §§ 9543(a)(3) and 9544(b). *Commonwealth v. Holloway (Holloway II ),* 559 Pa. 258, 739 A.2d 1039, 1044–45 (Pa.1999). Because Petitioner alleged ineffectiveness of all prior counsel, however, the court adjudicated these subclaims from the standpoint of ineffectiveness claims. *See id.* We have found that both of these bases are independent and adequate state grounds barring our review of the underlying substantive claims, and now find that each was properly applied by the Pennsylvania Supreme Court as to these subclaims. Therefore, we will examine the ineffectiveness claims under the AEDPA standard, but we may only examine the underlying claims on the merits if cause and prejudice or a fundamental miscarriage of justice are shown to excuse Petitioner's procedural default. *See* Part III. B. 2, *supra.*

**b. AEDPA Review**

Petitioner maintains that he is entitled to relief because (1) trial counsel failed to move to quash the conspiracy and PIC charges or otherwise raise the statute of limitations issue as a bar to these charges and (2) appellate counsel failed to raise the underlying claim or a claim of trial counsel's ineffectiveness. (Pet. Mem. L. at 58.). Because Petitioner raised these ineffectiveness claims in state court and the Pennsylvania Supreme Court adjudicated them on their merits, we review them pursuant to § 2254(d)(1) of the AEDPA, which permits federal courts to grant a writ of habeas corpus if a state decision is contrary to, or an unreasonable application of, clearly established federal law.[111] We find that the Pennsylvania Supreme Court's denial of relief to Petitioner on the basis of this claim does not violate this strict standard, and we therefore deny relief as to the ineffectiveness claims.

▮ The Pennsylvania Supreme Court concluded that Petitioner's conviction was not barred by the statute of limitations and, therefore, counsel could not have been ineffective for failing to raise a meritless claim. *See Holloway II,* 739 A.2d at 1047; *Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State courts have the power to determine their own statutes of limitations. The fact that Petitioner disagrees with the resolution of a state law question does not necessarily implicate a federal law or the federal constitution. *See Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092,

---

**111.** Petitioner does not cite any United States Supreme Court cases that could be considered contrary to the state court's denial of his claim and we therefore find that he is unable to satisfy this portion of the AEDPA standard.

111 L.Ed.2d 606 (1990) ("Federal habeas corpus relief does not lie for errors of state law."); *see also Johnson v. Rosemeyer,* 117 F.3d 104 (3d Cir.1997) (only in extraordinary and compelling circumstances should federal district court in habeas corpus case decline to follow opinions of state intermediate court of appeal with respect to state law rendered in earlier proceedings involving petitioner). We acknowledge that Petitioner has made a plausible case that the Pennsylvania Supreme Court erred in its decision that no statute of limitations exists with respect to the conspiracy charge. Nevertheless, Petitioner's showing does not satisfy the criteria justifying a federal court to depart from a state appellate court's decision on a state law issue.

Petitioner argues that because the statute of limitations for conspiracy under § 5552 had expired before § 5551 was amended (which eliminated the statute of limitations for conspiracy to commit murder), the Commonwealth's application of § 5551 violates the Due Process and Ex Post Facto Clauses. (Pet. Reply Mem. at 91.) The Pennsylvania Supreme Court concluded that there is no statute of limitations for conspiracy to commit murder and the statute to be applied to Petitioner's case is the one in effect at the time his arrest warrant was issued. 42 Pa. Cons. Stat. § 5551. Petitioner cites *Carmell v. Texas,* 529 U.S. 513, 120 S.Ct. 1620, 1633, 146 L.Ed.2d 577 (2000), and *Beazell v. Ohio,* 269 U.S. 167, 169–170, 46 S.Ct. 68, 70 L.Ed. 216 (1925), for the proposition that the application of a statute that was not in effect at the time the offense was committed, is prohibited ex post facto. However, these decisions do not specifically hold the application of a statute of limitations not in effect at the time of a defendant's arrest is a violation of the Ex Post Facto Clauses. Petitioner offers no further support for his contention that the Pennsylvania Supreme

Court's decision violates his due process rights and the Ex Post Facto Clauses.

 The Commonwealth responds with a Pennsylvania Supreme Court case which the Commonwealth argues held that the statute of limitations to be applied is that statute in effect "at the time the present action was commenced." *Commonwealth v. Askin,* 502 Pa. 575, 467 A.2d 820 (1983). The commencement of prosecution "occurs either when an indictment is found or an information ... is issued, or when a warrant, summons or citation is issued, if such warrant summons or citation is executed without unreasonable delay." *Commonwealth v. Groff,* 378 Pa.Super. 353, 548 A.2d 1237, 1243 (1988). The provision of § 5551 eliminating any statute of limitations for conspiracy to commit murder became effective December 19, 1984. P.L. 1089 No. 217 § 5. Defendant's arrest warrant is dated January 9, 1985, after the amendment to § 5551 became effective. As a result of these holdings, we cannot conclude that the Pennsylvania Supreme Court's decision in Petitioner's case is an unreasonable application of Supreme Court precedent.

We find that trial counsel did not act unreasonably in failing to move to quash the conspiracy and PIC charges under the theory that the statute of limitations expired. In determining whether counsel acted reasonably, there remains a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because the *Askin* case was decided in 1983 and Petitioner's trial was in 1986, trial and appellate counsel could have reasonably arrived at the same conclusion as did the Pennsylvania Supreme Court in *Askin* that there was no statute of limitations with regard to conspiracy to commit murder, if murder oc-

curs, under 42 Pa. Cons.Stat. § 5551 because that statute was in effect at the time of Petitioner's arrest. Consequently, they cannot be considered ineffective for failing to raise the statute of limitations issue.

 Finally, we do not find that the existence of the conspiracy charge and conviction prejudicially affected the jury's deliberations at the guilt phase of the trial and sentencing phase deliberations. Petitioner argues that his conviction was based in large part on the testimony of Shirley Baker (N.T. 5/19/86 at 77–85) repeating the alleged conversation between Petitioner, Freeman and Johnson. (Pet. Mem. L. at 59.) Petitioner speculates that the existence of the conspiracy charge allowed the prosecution to admit Shirley Baker's otherwise inadmissible hearsay testimony under the co-conspirator exception to the hearsay rule. (Pet. Mem. L. at n. 41.) We do not agree. Petitioner ignores settled Pennsylvania law that "[t]he co-conspirator exception applies even where no party has been formally charged with conspiracy." *Commonwealth v. Dreibelbis*, 493 Pa. 466, 475, 426 A.2d 1111 (1981). Accordingly, "[w]ith respect to the introduction of evidence under the co-conspirator exception, the Commonwealth is only required to prove the existence of a conspiracy by a fair preponderance of the evidence." *Commonwealth v. Mayhue*, 536 ·Pa. 271, 639 A.2d 421, 432 (1994). Baker's testimony would have been admissible under Pennsylvania law even if such a formal criminal charge against Petitioner had been barred by the statute of limitations; thus, Petitioner's claim of prejudice at the guilt phase is meaningless.

We find Petitioner's claim of prejudice at the sentencing phase equally unconvinc-

ing. Petitioner notes that the statutory aggravating circumstance of murder for hire states that the "defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim." 42 Pa. Cons.Stat. § 9711(d)(2); (Pet. Mem. L. at 60). Petitioner appears to argue that the presence of the words "or had conspired" in the statute necessarily means that the jury found the aggravating circumstance as a result of the conspiracy conviction. The jury found that the aggravating circumstance of murder for hire had been proved; it was not necessary that the jury find that the Petitioner "conspired" to be paid. As the Pennsylvania Supreme Court cogently explained, the murder was part of Petitioner's job as a drug dealer. The fact that Petitioner contracted to sell drugs in addition to committing murder does not mean that he did not contract to commit murder.

We in turn conclude that Petitioner's claim does not survive AEDPA's standard of review for state court decisions, and deny it on the merits.[112]

### 10. Claim X–Ineffective Assistance of Counsel at Penalty Phase of Trial

#### a. Failure To Investigate, Develop, and Present Mitigating Evidence as to Mental Health Issues, and Failure to Request that an Expert Be Appointed To Assist in Developing and Presenting Such Evidence

 Petitioner claims that he was deprived of the effective assistance of counsel

---

**112.** Because we agree that counsel did not act unreasonably and Petitioner was not prejudiced by the existence of the conspiracy charge and conviction, Petitioner would be unable to show cause so as to overcome his procedural default, and, therefore, we may not reach the underlying merits of his due process claims.

at the penalty phase of his trial [113] because counsel failed to investigate, develop, and present mitigating evidence that Petitioner suffers from cognitive defects; the effects of emotional, physical and sexual abuse as a child; and had an impaired capacity at the time of the offense as a result of chronic drug and alcohol abuse and acute intoxication. Petitioner claims that trial counsel failed to investigate his background and obtain his medical, school, and mental health records, and failed to request that a mental health expert be appointed to examine Petitioner and assist in presenting mitigating evidence. Petitioner claims that appellate counsel was similarly ineffective for failing to investigate his mental health, request the appointment of a defense mental health expert and raise the claim of trial counsel's ineffectiveness.

### (1) Presentation of Mitigating Evidence

After the jury found Petitioner guilty, Judge Sabo discussed the penalty phase with counsel. (N.T. 5/22/86 at 9–16.) Petitioner's trial counsel, Barry Denker, indicated that he would offer testimony of some of Petitioner's relatives as to the fact that he was supportive of them over the years. They were not present at trial and could not be present until the next morning. Judge Sabo indicated that such a delay would be permitted, but then Petitioner indicated that he wanted to proceed

immediately. Judge Sabo then conducted a colloquy with Petitioner, and he explained repeatedly that he did not want his family members to be present or to testify because he did not want to reveal his history of drug dealing to them. (N.T. 5/22/86 at 16–23.) Petitioner emphasized that he didn't "want to put them on" or "want them in here" because he never brings his family into his life as far as his "wrongdoing, drug selling, and things like that" are concerned. Petitioner continued: "The only thing they can testify is what they know. I was brought up by the church and stuff like that." (N.T. 5/22/86 at 18.)

After Judge Sabo confirmed with counsel that the (e)(1) mitigating circumstance [114] would apply, he asked defense counsel whether he would argue any other mitigating circumstance, to which trial counsel answered: "Only number five." [115] (N.T. 5/22/86 at 18–19.)

Judge Sabo continued the colloquy and explained to the Petitioner that his wife, Delores Kareem, who was present in the courtroom, could testify about their family life and his character.[116] Petitioner, however, indicated that he did not want her to testify, and trial counsel told the court: "We're going to proceed right now, Judge." Judge Sabo responded: "I know that, but he has a right to know what he's facing. He has to make that decision. You have a right to testify, and you have a

---

**113.** Petitioner makes no such assertions as to the guilt phase of his trial, nor does the evidence he proffers reasonably suggest that a mental health defense could have been raised at the guilt phase. We therefore deem all such claims as to the guilt phase to be waived, including any claims under the *M'Naghten* rule or that defendant had diminished capacity.

**114.** "The defendant has no significant history of prior criminal convictions." 42 Pa. Cons. Stat. § 9711(e)(1).

**115.** "The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa. Cons. Stat. § 309 (relating to duress), or acted under the substantial domination of another person." 42 Pa. Cons.Stat. § 9711(e)(5).

**116.** "Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa. Cons.Stat. § 9711(e)(8).

right not to testify, whatever you wish to do." Petitioner responded: "Let's get it over with." Judge Sabo suggested that Petitioner talk it over with his wife before making the decision, and again suggested that she could testify for Petitioner, if Petitioner wished. Petitioner replied, twice: "I put her through enough." The court reiterated that statement and told Petitioner: "That's a decision you have to make. That's a decision you and your wife have to make." Petitioner replied: "One way, I'm going to get the chair. One way I get the chair, the other way I get life. Any way, she loses." Judge Sabo told Petitioner that "it's an important decision" and Petitioner replied that "It's the hardest thing." Judge Sabo again suggested that Petitioner talk to his wife first before making the decision, and trial counsel responded that he was going to call her as a witness anyway. Judge Sabo responded: "You're going to? I thought he wasn't going to call her, because he put her through enough." Trial counsel again said that he was going to call her, and he did so, and she testified as to their family situation and Petitioner's good character. (N.T. 5/22/86 at 29–32.)

Petitioner's counsel offered a stipulation to the effect that he had no prior criminal convictions to establish the (e)(1) mitigating circumstance. (N.T. 5/22/86 at 33.) Counsel offered no other evidence as to mitigating factors, but in his argument to the jury he referred to the Commonwealth's evidence of Petitioner's purported confession that included the statement that Johnson had Petitioner beaten, leaving scars on his face, apparently in an attempt to argue the (e)(5) mitigating circumstance of duress. (N.T. 5/22/86 at 35.) The jury found that (e)(1) and (e)(8) applied, as well

as the aggravating factors (d)(2), contract killing, and (d)(8), torture. The jury weighed the aggravating and mitigating factors and imposed the death penalty. (N.T. 5/22/86 at 65, 70.)

After trial, Judge Sabo ordered that a mental health evaluation be performed on Petitioner as part of a presentence investigation. The evaluation was conducted by psychologist Albert Levitt, M.Ed. on May 29, 1986, one week after the completion of the penalty phase, and the report was submitted to the court on July 3, 1986.[117] During the PCRA proceedings, PCRA counsel raised claims similar to those before this Court, and counsel requested in 1992 that a defense mental health expert be appointed to evaluate the Petitioner and assist in his claims. The court denied funds for such an expert. In 1996, three mental health experts who were present in the Philadelphia area on other business evaluated Petitioner pro bono and sent letters as to their conclusions to counsel. Such letters were presented at the PCRA hearing, but the court denied funds to pay for travel expenses for these experts to testify at a subsequent PCRA hearing. Instead, the Commonwealth stipulated to both the authenticity of the letters and to the findings contained in them. (PCRA Hrg. 2/10/97 at 7, 12–14.)

### (2) Direct Appeal and PCRA Proceedings

On direct appeal, Petitioner raised a claim of trial counsel's ineffectiveness for failing to present evidence that would mitigate against the death penalty. Appellate counsel argued that trial counsel had the opportunity to present evidence as to miti-

---

117. As we discuss *infra,* the report stated that Petitioner had a Personality Disorder–Depen-

dent Personality.

gating circumstances (e)(1), (4),[118] (5) and (8), but the only witness he put on the stand was Petitioner's wife, who testified as to the fact that they owned a house, had a child with a serious heart problem, and that Petitioner had only a sixth grade education and worked as a writ server. (N.T. 5/2/86, 29–32.) Appellate counsel argued that evidence should have been presented as to Petitioner's illiteracy; the poverty, drugs, and violence prevalent in the neighborhood where Petitioner grew up; that his parents separated when he was young; and that he hadn't sold drugs since 1983 and was trying to make a productive citizen of himself.[119] (Dir.App. Br. at 26–27.)

Petitioner's primary argument, however, was that trial counsel failed to mention a variety of possible mitigating circumstances that could be used to show that Petitioner was acting under duress or the substantial domination of Johnson when he committed the crime, i.e. that the (e)(5) mitigating factor, which counsel argued during the penalty phase, should have been more fully presented. (Dir.App. Br. at 27–30.) Such mitigating circumstances included Petitioner's limited education and low I.Q., the quality of Petitioner's upbringing and home life, his emotional and psychological makeup, and other factors. Appellate counsel even pointed to the Commonwealth's own evidence, i.e. the purported statement made by Petitioner confessing to the crime, in which Petitioner allegedly said that Johnson told him "it's either you or him," Johnson had previously threatened to kill him and his family, and that Johnson had previously had Petitioner beaten, leaving scars on his head.

The Pennsylvania Supreme Court ruled that the claim of trial counsel's ineffectiveness in "failing to bring to the jury's attention that he was subject to the domination of Johnson; could not read or write; had not sold drugs since 1983; had grown up in a crime infested neighborhood and was the product of a broken home and suffered from alcohol dependency" were "totally without merit." *Holloway I*, 572 A.2d at 692. The court noted that argument on the (e)(5) mitigating circumstance "would have been inconsistent with his defense" at trial, which was that he was not at the scene of the crime. *Id.* The court also found that there was no evidence offered as to Petitioner's illiteracy, but rather that he had attended school until the sixth grade. The court further found that trial counsel could not have been ineffective for failing to present mitigating evidence because "the appellant did not wish a continuance to secure the presence of other witnesses who would have testified as to his environment and good character" when trial counsel stated that some relatives could testify but were not present. *Id.* The court noted that the only witness Petitioner allowed to testify was his wife, and "primarily on the basis of her testimony the jury found the mitigating circumstance of character." *Id.* The court concluded that "because the decision to limit testimonial evidence in aid of mitigation was at the request of appellant, trial counsel

---

118. "The age of the defendant at the time of the crime." 42 Pa. Cons.Stat. § 9711(e)(4).

119. Appellate counsel also briefly argued that there was evidence that Petitioner was under the influence of drugs during the commission of the offense, which apparently would go to either the (e)(2) or (e)(3) mitigating factor, or both: "(2) The defendant was under the influence of extreme mental or emotional disturbance; (3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." 42 Pa. Cons.Stat. § 9711 (1988). The present Petition also raises this argument, but only as to factor (e)(3).

should not be deemed ineffective for respecting his client's wishes." *Id.*

In his filings to the PCRA hearing court[120] and on PCRA appeal, Petitioner argued that trial counsel was ineffective both for failing to investigate, develop, and present evidence in mitigation and rebut alleged aggravating factors and for failing to arrange for any mental health mitigation evaluation of Petitioner or investigate his childhood, upbringing, mental health and life history. Petitioner argued that trial counsel's failure to investigate reasonably was prejudicial, for he failed to uncover significant and powerful mitigating evidence that could and should have been presented to the jury. (PCRA Br.Pa.S.Ct. at 60–61.) Petitioner argued that trial counsel's failure to investigate was unreasonable because counsel knew or should have known from talking to his client, defense witnesses, or even from the purported statement of his client that he was a chronic drug abuser who allegedly was heavily abusing drugs on the night of the offense.[121] As a result, counsel had a duty to investigate his history of drug abuse, causes thereof, his mental state on the night of the offense, and other available mitigating evidence. Had trial counsel conducted such an investigation, he could have arranged for a mental health evaluation for assistance in preparing and presenting the defense or mitigating evidence.[122]

The allegation of prejudice made in the PCRA appeal brief focused on Petitioner's mental health, discussing not only the effect on the (e)(5) factor, but also the effect on (e)(2), (3) and (8). Appellate counsel argued that the findings of the court-appointed psychologist Mr. Levitt, made within weeks after Petitioner's trial and stipulated to by the Commonwealth (PCRA Hrg. 2/10/97 at 4), clearly indicated that the provision of mental health expert services for Petitioner was necessary for trial counsel to identify, plead, and present mental health related claims for relief, because findings like those made by Mr. Levitt could have been introduced as mitigating evidence. Mr. Levitt concluded that Petitioner "best meets the diagnostic criteria of Personality Disorder–Dependent Personality[123] characterized by a his-

---

**120.** These issues were raised in the Amended Petition under Post Conviction Relief Act and in the Supplemental Memorandum of Law in Support of Petitions under Post Conviction Relief Act.

**121.** Although the latter evidence goes to Petitioner's alibi defense that he was passed out from drug use on the night of the offense, it could also be used to show that his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. 42 Pa. Cons. Stat. § 9711(e)(3).

**122.** As evidence of trial counsel's failure to investigate, PCRA counsel mentions only counsel's purported failure to conduct an independent investigation of guilt-phase evidence. Habeas counsel has also made this argument. (Pet. Mem. Law at 61.) Such an argument is unavailing because the statements cited, when taken in context, do not prove that counsel failed to conduct a guilt-phase investigation.

**123.** Petitioner explained in his PCRA appeal brief that a personality disorder is a "personality trait that is 'inflexible and maladaptive and causes either significant impairment in social or occupational functioning or subjective distress.'" (PCRA Br.Pa.S.Ct. at 65 (quoting *Diagnostic and Statistical Manual of Mental Disorders* 305 (3d ed. 1980) (hereinafter "DSM–III").)) Another leading treatise often cited by the courts, *see, e.g., Mills v. Rogers,* 457 U.S. 291, 293 n. 1, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982), describes a personality disorder as a "serious mental health impairment that adversely affects and undermines 'cognition (i.e., ways of perceiving and interpreting self, other people and events)'; 'affectivity (i.e., the range, intensity, lability, and appropriateness of emotional responses)'; 'interpersonal functioning', and 'impulse con-

tory of drug abuse coupled with a dyssocial lifestyle." (Pet. App. 11 at 3.) This psychologist further found that "there also appears to be a depressive element involved in his personality" and that Petitioner "does not suffer from a major mental illness." *Id.* Mr. Levitt also noted that Petitioner reported being a heavy

drinker and used cocaine on a daily basis from 1978 to 1983; had a history of a disturbed home life; and because of his age, it was unlikely that he would have trouble with the law in the future. *Id.* The brief also discusses the findings of the other three mental health experts, licensed psychologists Harry Krop, Ph.D.[124] and James D. Larson,[125] Ph.D., and Robert A.

---

trol.'" (PCRA Br.Pa.S.Ct. at 64 (quoting Kaplan & Sadock, *Comprehensive Textbook of Psychiatry* 1425 (6th ed.)).) Dependent personality is characterized by passivity; lack of self-confidence and an inability to make demands on or stand up to others on whom the individual is dependent; and a belittling of the individual's own assets or abilities. Anxiety and depression are common associated features. (PCRA Br.Pa.S.Ct. at 64 (citing DSM–III at 324–25).)

**124.** Dr. Krop's report, dated February 5, 1997, was based on a clinical interview and a battery of psychological tests administered on October 5, 1996, as well as materials provided by counsel. (Pet. App. 12.) He found that Petitioner "presents with a history of alcohol and drug abuse and also derives from a dysfunctional family unit." He also opined that it was also likely that Petitioner was intoxicated on the day of the alleged offense. He reported that Petitioner was "both emotionally and physically abused within the family and he was the victim of an extra-familial sexual assault when he was ten or eleven years old." He found that his evaluation of Petitioner is "inconsistent with any major mental illness" and "inconsistent with an Antisocial Personality Disorder." He also opined that given his history, Petitioner is capable of functioning in an open prison population and that the alleged offense appeared to be out of character for Petitioner. Finally, Dr. Krop noted that "there are several mitigating factors that should have been explored and presented at the time of Mr. Holloway's trial." He also offered to elaborate on his findings in a more detailed report in the future, but there is no such report in the record before us.

**125.** Dr. Larson's report, dated February 4, 1997, was based on a five-hour psychological evaluation conducted on October 12, 1996. (Pet. App. 13.) According to Dr. Larson, Peti-

tioner has a "limited but significant psychiatric history." Petitioner's emotional instability

resulted in an approximately three-week psychiatric hospitalization in 1959. He reported outpatient psychiatric evaluation and apparently treatment in approximately 1970 when he began to manifest symptoms of a hysterical pregnancy in response to his wife's pregnancy. His emotional instability is also reflected in an intermittent depression throughout life. At an early stage (approximately 17) he made a significant suicide attempt by laceration. Apparently he was not afforded the opportunity for psychiatric or mental health intervention at that time.

Dr. Larson also described Petitioner's childhood and family life. In Petitioner's elementary school years, "he was identified as in need of special education because of learning difficulties." Further, his childhood grew increasingly chaotic with multiple moves and caretakers, and he only attended school regularly until the sixth grade. He had no father figure in his important developmental years. At one point in his early years he was placed with an aunt in Baltimore because his mother, who was in Alabama, was unable to care for him. This aunt emotionally and physically abused Petitioner. At another time his mother beat him, breaking his arm, which went untreated for two days. The break was so severe that he required surgery and was hospitalized for six weeks. Dr. Larson noted that Petitioner became tearful when discussing his abusive and rejecting childhood treatment, even though he was fifty-five years old at the time of the evaluation. Because of his treatment, Petitioner ran away from home many times and was placed in numerous other homes. On one occasion when he ran away after a beating at about age ten, he was raped by an adult male.

Dr. Larson also described Petitioner's drug and alcohol abuse and the effects of that

Fox. Jr., M.D.,[126] who evaluated Petitioner in 1996 and made findings relating to mitigation. (PCRA Br.Pa.S.Ct. at 65.) Such findings related to his drug and alcohol abuse; physical, emotional and sexual abuse as a child; cognitive difficulties; mental and emotional impairments; hospitalization for mental health reasons; and a suicide attempt. (Pet. App. 12–14.) PCRA counsel argued that if trial counsel had conducted a reasonable investigation, trial counsel would have discovered enough information to indicate that he should have sought the services of a mental health expert to develop mental health mitigation. PCRA counsel also argued that appellate counsel was ineffective for failing to raise this issue previously.

The Pennsylvania Supreme Court's decision on PCRA appeal refused to address the claim of ineffective assistance of counsel for failure to investigate, develop, and present mental health mitigating evidence raised by Petitioner in the PCRA appeal brief, ruling that the claim had already been decided on direct appeal.[127] The

---

abuse. He described Petitioner as having a lengthy history of polysubstance abuse that "progressed to dependence and then addiction. In its final stages, his substance abuse escalated to the point that his behavior deteriorated. Personal functions were severely altered, and he experienced changes in his functioning at a level consistent with probable cocaine psychosis during the time frame of the murder for which he is currently convicted."

126. Dr. Fox's report, dated February 1, 1997, was based on a three-hour evaluation conducted November 23, 1996, and focused primarily on Petitioner's cognitive deficits, drug abuse and the effects of the drug abuse on his mental state. (Pet. App. 14.) Dr. Fox found that Petitioner was "superficially well-engaged, intelligent, showed good memory and intact cognitive function" but then as the evaluation progressed it became apparent that he suffers from a significant cognitive deficit manifested in difficulty in word-finding, memory lapses, and logical inconsistencies. He noted that at the time of his arrest, Petitioner was functionally illiterate and only minimally performed in school, which he attended only to the sixth grade. During his incarceration Petitioner learned how to read and write, even preparing a number of pro se briefs, but a close reading of such briefs reveals "certain language dysfunctions primarily grammatical in nature and nearly as extensive as the language dysfunctions noted in the interview." Dr. Fox noted that Petitioner reported "what must be considered flashbacks secondary to his years of drug use which are primarily perceptual in nature. It is likely that at the time of the offense and his arrest

these deficits were significantly more severe because of his prior history, nearly twenty years, of drug and alcohol abuse." Dr. Fox concluded that his ten years of sobriety while in prison have resulted in "significant improvement in his cognitive ability."

Dr. Fox then described in more detail Petitioner's drug abuse and the effects of the drug abuse on his mental state. At the time of the offense, Petitioner was a heavy and long-term drug and alcohol user. He began using alcohol on a regular basis in the late 1960s and used it continuously and in large quantities throughout the mid–1980s. From the mid–1970s to early 1980s he was a regular user of cocaine and Phencyclidine (PCP). Dr. Fox explained that the regular use of alcohol and PCP were of greatest concern regarding his mental state, because both of these drugs causes chronic and lasting cognitive impairment. Petitioner reported that on the day before the alleged murder, he used alcohol, cocaine and PCP, and passed out. Dr. Fox explained that use of PCP on a habitual basis caused chronic cognitive and perceptual disturbances. Finally, he concluded that "by the nature of his description of his lifestyle during that period of time it is my sense that he developed a grandiose and paranoid delusional system which to some degree still exists. There is thus evidence of diminished capacity due to chronic drug abuse."

127. The PCRA trial judge addressed mental health issues only to the extent that he found that trial counsel was not ineffective for not pursuing a defense of diminished capacity in the guilt phase and that the PCRA court did not err in denying funds to secure psychiatric testimony that would support such a defense.

court did not address the issue of appellate counsel's ineffectiveness, which could have only been raised for the first time in PCRA proceedings.

### (3) Analysis

#### (a) Standard of Review

Petitioner's claim of ineffective assistance of trial counsel for failure to investigate, develop, and present mental health mitigating evidence, including his failure to arrange for a mental health mitigation evaluation, that was raised to the PCRA hearing court and on PCRA appeal is substantially equivalent to the instant claim, therefore the claim before us was fairly presented to the Pennsylvania Supreme Court and has been exhausted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996); Part III. C. 10. a. (2), *supra.* In *Holloway II,* the Pennsylvania Supreme Court summarily dismissed this claim as previously litigated. We respectfully believe that the Pennsylvania Supreme Court was only referring to the claims of ineffectiveness of counsel actually presented to it and their logical extensions. We believe it did not

mean that claims based on a different set of operative facts and different legal theory than the claims before it on direct appeal were previously litigated.[128] Therefore, as to the claims raised on direct appeal, we must apply the AEDPA in reviewing the Pennsylvania Supreme Court's decision.[129] However, the instant claim of ineffective assistance of trial counsel for failure to investigate, develop, and present mental health mitigating evidence and failure to request that a mental health expert be appointed cannot be said to have been adjudicated on the merits by the Pennsylvania Supreme Court. *See Hameen v. Delaware,* 212 F.3d 226, 248 (3d Cir.2000). Because the claim has been exhausted but was not adjudicated on the merits, we review the claim de novo. *See id.; see also Appel v. Horn,* 250 F.3d 203, 210 (3d Cir.2001). We find that Petitioner's trial counsel was ineffective for failing to investigate, develop, and present mental health mitigating evidence and for failing to request that a defense expert be appointed by the court to assist in these matters, as is the Petitioner's due process right under *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).[130]

Judge Sabo did not address any issues relating to mitigating evidence.

**128.** The Third Circuit has opined that an "ineffective assistance of attorney claim if advanced on one basis does not mean that such claim has been previously litigated if advanced on another." *Ross v. Petsock,* 868 F.2d 639, 642 (3d Cir.1989).

**129.** On direct appeal, Petitioner argued that evidence should have been presented as to his illiteracy; the poverty, drugs, and violence prevalent in the neighborhood where he grew up; that his parents separated when he was young; that he suffered from alcohol dependency; that he hadn't sold drugs since 1983 and was trying to make a productive citizen of himself; and that he was acting under duress or the substantial domination of Johnson when he committed the crime.

**130.** Even if we were to take the Pennsylvania Supreme Court at its word and apply the AEDPA in analyzing the direct appeal decision as a decision on the instant claim, the outcome would be the same. We would respectfully have to find that the Pennsylvania Supreme Court's application of *Strickland* was unreasonable. Trial counsel's conduct complained of on direct appeal and found to be reasonable in *Holloway I* is wholly different than the conduct of trial and appellate counsel complained of to the PCRA court and to us. A decision based on an analysis of one set of facts and legal theories cannot reasonably be applied to another set of facts and legal theories only tangentially related to the former set. The claims before us relate to mental health evidence, which is completely unrelated to the evidence Petitioner waived: testimony of family members that Petitioner was supportive of them over the years.

### (b) Unreasonableness of Counsel's Actions and Omissions

 Although *Strickland* requires us to afford trial counsel's conduct a heavy presumption of reasonableness, 466 U.S. at 689, 104 S.Ct. 2052, we are aware of the overwhelming importance of mitigation evidence to the just imposition of the death penalty. The presentation of mitigation evidence allows counsel to individualize a defendant by humanizing him and explaining his behavior, background, and character outside the constraints of the normal rules of evidence. In capital cases, where the need for individualized sentencing is greatest, the right to present mitigating evidence to the jury is constitutionally protected. *See Williams v. Taylor,* 529 U.S. 362, 391–98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ("The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases."). We must therefore insure that at the penalty phase the jury made an individualized decision with the "fullest information possible concerning the defendant's life and characteristics," and must scrutinize carefully any decision by counsel that deprived Petitioner of mitigation evidence. *Lockett,* 438 U.S. at 603, 98 S.Ct. 2954.

 Failure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness. *See United States v. Gray,* 878 F.2d 702, 711–12 (3d Cir.1989) (holding that defendant's reluctance to subpoena witnesses to compel their attendance at trial did not absolve counsel of his independent professional responsibility to investigate whatever information these potential witnesses possessed, even if he later decided not to put them on the stand, and that "counsel's behavior was therefore not colorably based on tactical considerations but merely upon a lack of diligence," so counsel's performance fell "below the minimum standard of reasonable professional representation"); *see also Sullivan v. Fairman,* 819 F.2d 1382, 1391–92 (7th Cir.1987) (holding that perfunctory attempts to contact witnesses was not reasonable); *Code v. Montgomery,* 799 F.2d 1481, 1483 (11th Cir. 1986) (counsel's interviewing only one witness was unreasonable); *Nealy v. Cabana,* 764 F.2d 1173, 1177 (5th Cir.1985) ("[A]t a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case."); *Crisp v. Duckworth,* 743 F.2d 580, 583 (7th Cir. 1984), *cert. denied,* 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985) ("Though there may be unusual cases when an attorney can make a rational decision that investigation is unnecessary, as a general rule an attorney must investigate a case in order to provide minimally competent professional representation."). In *Gray,* the Third Circuit explained that a complete failure to investigate is unreasonable because "counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Gray,* 878 F.2d at 711 (citing *Strickland v. Washington,* 466 U.S. at 690–91, 104 S.Ct. 2052). In *Strickland,* the Supreme Court explained:

strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes

particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington,* 466 U.S. 668, 690–91, 104 S.Ct. 2052, 80 L.Ed.2d 674.

Petitioner presents no direct evidence of trial counsel's failure to investigate his mental health issues, including cognitive defects; the effects of emotional, physical and sexual abuse; and the effects of chronic drug and alcohol abuse; or any possible reasons for counsel's failure to conduct such an investigation.[131] Petitioner does not even allege that he ever mentioned such issues to counsel so as to alert counsel to a need to investigate; however, we recognize that even when a defendant is uncooperative, counsel still has a duty to interview friends and relatives and otherwise investigate to discover whether mitigating evidence exists. *See Gray,* 878 F.2d at 712. Petitioner alleges that such an investigation was not conducted and that counsel should have known from the evidence in the case to investigate, at the very least, possible effects of Petitioner's chronic drug and alcohol abuse.[132]

The extensive findings in the evaluations conducted immediately post-trial and during PCRA proceedings indicate that such information existed before trial and could have been discovered had counsel searched for it. The existence of this information leads to several possible inferences about counsel's investigation: (1) trial counsel failed to investigate completely; (2) trial counsel investigated partially, but no information as to mental health issues was uncovered; or (3) trial counsel investigated and information as to mental health issues was revealed. Because the post-trial evaluations show that mental health evidence

---

**131.** We recognize that it is often impossible to prove an omission.

**132.** Petitioner has requested an evidentiary hearing to show that trial counsel was ineffective. Presumably, Petitioner would testify as to his conversations with trial counsel, and perhaps close relatives would testify as to their contact with counsel or his investigator. We note, however, that no such persons have been identified in the briefs, and thus no affidavits have been included as appendices or even offered to be submitted as evidence. The propriety of our taking such testimony would be unaffected by Petitioner's waiver of testimony of relatives at his penalty phase trial, because we would not be considering the effect of their testimony on the jury's ultimate decision on mitigating factors and penalty. Rather, we would only be examining their testimony to determine whether trial counsel conducted an investigation, and, if so, whether the investigation was reasonable. Depending on the content of such testimony, we could also use it to determine whether counsel's failure to request that a defense mental health expert be appointed was reasonable.

Such testimony would only be subject to the testing of cross-examination. It could not be rebutted by examining trial counsel, nor can Petitioner examine trial counsel to support his allegations of ineffectiveness, because Mr. Denker is deceased. He died on March 1, 1996, nearly a year before Petitioner's PCRA hearing was held. (PCRA Hrg. 2/10/97 at 4.) Mr. Denker's failure to investigate mental health issues and seek appointment of a mental health expert was discussed at this hearing, but no evidence was offered. Because the claims as to the failure of trial to investigate mental health issues and present mental health expert testimony were first raised on PCRA, no court was able or ever will be able to inquire directly into trial counsel's alleged omissions and the reasons therefor. Petitioner therefore does not have available the usual method of showing counsel's ineffectiveness, but he should not be disadvantaged because of trial counsel's untimely death before the PCRA hearing was held. Therefore our analysis contains more alternatives than might otherwise be the case.

existed prior to trial, both a complete failure to investigate and a partial investigation that failed to uncover such evidence must be considered unreasonable because counsel probably would have discovered such evidence had his investigation been reasonable. *See Williams v. Taylor,* 529 U.S. 362, 395–96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (where counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing [defendant's] nightmarish childhood" counsel's omissions "clearly demonstrate that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. Likewise, because such evidence probably would have been discovered, counsel's decision not to make such an investigation, if indeed he made such a decision, must be considered unreasonable. Further, whether or not an investigation was conducted and whether or not evidence as to mental health issues was uncovered, such evidence must have existed, and therefore counsel acted unreasonably in failing to request that a defense mental health expert be appointed.

 Trial counsel demonstrated a lack of either preparation[133] or knowledge, or both, in failing to request that the trial court appoint a defense expert to assist in the preparation of Petitioner's mitigation defense at the penalty phase. Petitioner's inability to take advantage of such an expert, were he entitled to one, would result in a violation of his Fifth Amendment due process right to access to the adversarial process. *See Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)

(holding that the Fifth Amendment grants indigent defendants the right to have independent experts appointed by the court for assistance in establishing mental incapacity defenses and mental health mitigating evidence); *see also Holland v. Horn,* 150 F.Supp.2d at 751–56 (E.D.Pa. 2001) (finding violation of *Ake* even though defendant had requested that a defense expert be appointed to assist only at the penalty phase). Petitioner's trial was held after *Ake* was decided, so he was clearly entitled to such an expert if he could demonstrate to the trial judge that his mental condition was seriously at issue. *See Ake,* 470 U.S. at 82, 105 S.Ct. 1087; *see also Starr v. Lockhart,* 23 F.3d 1280, 1288 (8th Cir.1994) (requiring that defendant show "a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial"). Trial counsel presented no such information to the trial court, but the later evaluations, even the one conducted by the court-appointed psychologist, show that mental health issues would have been a significant factor at the penalty phase. Upon such a showing, the trial court would have been required to appoint a mental health expert to assist the defense. There can be no strategic or tactical reason for counsel to fail to request that a mental health expert be appointed to assist the defense when mental health issues could be a significant factor at either the guilt or penalty phase, because such an expert is necessary to effectively develop and present such evidence, as well as to assist counsel and his client in deciding whether such evidence should be presented at trial.

---

**133.** On at least one occasion defense counsel implied a lack of preparation in the case, noting that he "had been on trial for a month. And then I had to go right into another homicide." (N.T. 5/13/86 at 93–94.) He also seemed unaware that the Commonwealth planned to seek the death penalty, indicating that he was not "even sure there was a death penalty" in 1980 at the time of the homicide. Further discussion on this issue was then held off-the-record. (N.T. 5/12/86 at 121.)

Petitioner's decision to go ahead with the sentencing proceeding without a continuance so that several family members could testify on his behalf, which the Pennsylvania Supreme Court held, in essence, acted as a waiver of a claim of ineffectiveness for counsel's failure to put on more mitigation witnesses, does not affect our decision as to counsel's ineffectiveness for failure to investigate mental health issues or seek appointment of a mental health expert or our decision, *infra*, as to the prejudice caused by these failures.[134] First, counsel's duty to investigate reasonably and inform and advise his client must be fulfilled before either the lawyer or his client can decide what evidence to present; if counsel failed to investigate and advise,

then Petitioner's waiver was not knowing and intelligent and thus without legal effect. *See, e.g., United States v. Gray,* 878 F.2d 702, 712 (3d Cir.1989) (defendant's reluctance to subpoena witnesses to compel their attendance at trial did not absolve counsel of his independent professional responsibility to investigate to determine what information these potential witnesses possessed, even if he later decided not to put them on the stand; nor did reluctance act as a waiver because it was based on inaccurate information: counsel did not know and therefore failed to inform defendant that subpoenaed witnesses were entitled to compensation for their trouble); *Blanco v. Singletary,* 943 F.2d 1477, 1500–

**134.** On direct appeal, the Pennsylvania Supreme Court noted that Petitioner had waived the right to present witnesses who would have testified as to his environment and good character. The court also pointed to this finding on PCRA appeal in reviewing the claim of PCRA trial court error for failure to provide funds for expert mental health services at that stage. The courts are split as to whether such waivers should be considered issues of fact or mixed questions of fact and law. *See Battenfield v. Gibson,* 236 F.3d 1215, 1231 n. 8 (10th Cir.2001) (reviewing cases). While we believe that the issue is one of fact, we would reach the same outcome regardless of which way the issue is characterized: the finding of the Pennsylvania Supreme Court that Petitioner had waived his right to present mitigation witnesses, and therefore that counsel could not have been ineffective for failing to present them, was correct, as far as it went, i.e. it was a waiver of character evidence to which his relatives might have testified. If the issue were a mixed question of fact and law, we would find unreasonable the court's implicit finding that the waiver as to a mental health expert was knowing and intelligent. 28 U.S.C. § 2254(d)(1). If the issue were one of fact, we would find the Pennsylvania Supreme Court's decision unreasonable in light of the clear and convincing evidence in the record. 28 U.S.C. § 2254(d)(2), (e)(1).

A close reading of the record shows that Petitioner gave specific reasons for waiving the testimony at the penalty phase by his wife and other relatives, who were the only mitigation witnesses, other than himself, that he knew about. His decision to "get it over with" was made in the context of family concerns. He expressly waived the testimony of the relatives other than his wife, explaining quite clearly that he did not want them to be present or to testify because he did not want them to know that he had been dealing drugs. Petitioner made the "Let's get it over with" statement, clearly indicating that he wanted to proceed forthwith, during his conversation with Judge Sabo about his right to have his wife testify on his behalf, in which he stated that he had already "put her through enough." There is no reason to believe, and it would be illogical to do so, that these concerns about putting his wife through another difficult experience or his family learning that he was dealing drugs would extend to a professional who would have testified on his behalf as to mental health issues. Based on the evidence of the circumstances of the waiver and the reasons given by Petitioner for waiving testimony from his family, there is a reasonable probability that Petitioner would not have waived his right to present mental health mitigation evidence from a mental health expert, had counsel made him aware of the possibility. We therefore find that Petitioner's waiver was not knowing and intelligent with respect to his right to present a mental health expert at the penalty phase, and therefore was without legal effect.

05 (11th Cir.1991) (counsel's failure to talk to potential mitigation witnesses and to investigate defendant's mental health status were unreasonable, because without knowing what evidence defendant was foregoing, counsel "could not have advised [him] fully as to the consequences of his choice not to put on any mitigation evidence," and therefore the waiver had no effect); *Battenfield v. Gibson*, 236 F.3d 1215, 1227–35 (10th Cir.2001) (counsel failed to conduct a reasonable investigation for possible mitigating evidence and was therefore unaware of various mitigation strategies and evidence that could have been presented in the penalty phase, and thus counsel could not competently advise defendant as to meaning, nature, and availability of mitigating evidence; defendant's waiver was thus not knowing and intelligent). Second, the relatives who would have testified as to Petitioner's environment and good character were proffered only for the fact that Petitioner was supportive of them over the years, and perhaps also his upbringing in the church. There is no evidence that they knew about, or could have testified to, anything related to Petitioner's physical and sexual abuse as a child; drug and alcohol use; and mental, emotional, and cognitive difficulties that existed either independently or as a result of his childhood abuse or drug and alcohol use. Therefore a waiver of the presentation of their proffered testimony would be irrelevant to testimony on other subjects. Third, even if they had knowledge of and would have testified as to these issues, it is likely their testimony would have raised an inference of the need for the appointment of a defense mental health expert, which would show that trial counsel was unreasonable in failing to make such a request. Fourth, if their testimony was indeed unrelated to Petitioner's history of physical and sexual abuse as a child; drug and alcohol use;

and mental, emotional, and cognitive difficulties, then this fact would indicate that trial counsel's investigation as to mitigating evidence was unreasonable. The court's presentence investigation raised an inference of mental health issues; surely if counsel had conducted a reasonable investigation of all possible mitigating factors, he would have asked these relatives about mental health issues, and such information would have been discovered to justify asking the court that a defense mental health expert be appointed under the right guaranteed by *Ake v. Oklahoma*.

To summarize, trial counsel had a duty to investigate whether each of the mitigating circumstances might apply. On the one hand, he may have either completely failed to conduct such an investigation as to mental health issues, or conducted such an unreasonably cursory investigation that he obtained no such information. Subsequent evaluations of Petitioner show that such information must have existed, and counsel's constitutional duty to adequately represent his client would have required that he request the court to appoint an expert to assist in the investigation and presentation of mitigating evidence. On the other hand, if trial counsel indeed had some knowledge of Petitioner's alleged mental infirmities, his decision not to request that an expert be appointed cannot be said to be a strategic or tactical decision. Petitioner had a constitutional right to such assistance in developing evidence of his mental and emotional state even if Petitioner and counsel ultimately decided not to present such evidence. *See Christy v. Horn*, 28 F.Supp.2d 307, 321 (W.D.Pa. 1998) (finding that *Ake* required psychiatric assistance " 'to help determine whether the insanity defense is viable.' Thus, implicit within *Ake*, such assistance is required when a defendant's mental state is at issue, even if the defendant ultimately

abandons an insanity defense.") (quoting *Ake*, 470 U.S. at 82, 105 S.Ct. 1087); *see also Holland v. Horn*, 150 F.Supp.2d at 752–53 (citing *Christy* and *Ake* approvingly). Trial counsel's representation of Petitioner was therefore unreasonable and also resulted in the denial of Petitioner's Fifth Amendment right to expert assistance in developing mental-health related mitigating factors.

### (c) Prejudice Caused by Counsel's Unreasonable Representation

Trial counsel either conducted an unreasonable investigation that resulted in his failure to ask for a mental health expert, or merely failed to ask for an expert after conducting a reasonable investigation that revealed evidence alerting him to the need for such an expert. Under either scenario, trial counsel acted unreasonably in failing to ask for such an expert. In light of the evaluations before us, there is a reasonable probability that a mental health expert would have aided Petitioner in his investigation, development, and presentation of mitigating evidence, and that denial of such expert assistance resulted in an unfair penalty phase trial, because there is a reasonable probability that a juror would have weighed the aggravating and mitigating factors differently. Therefore trial counsel's failure to ask for a mental health expert resulted in prejudice to Petitioner, and we hold that trial counsel thus rendered unconstitutionally ineffective assistance.

The jury found that mitigating factors (e)(1), no significant history of prior convictions, and (e)(8), character and record of defendant and the circumstances of his offense, as well as the aggravating factors (d)(2), contract killing,[135] and (d)(8), torture,[136] applied. The jury weighed the aggravating and mitigating factors and imposed the death penalty.

The standard for showing prejudice in challenging a death sentence is "whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland v. Washington*, 466 U.S. at 695, 104 S.Ct. 2052. In making this determination, we "must consider the totality of the evidence" before the jury. *Id.* In Pennsylvania, the jury is not required to find mitigating circumstances unanimously. *See* 42 Pa. Cons. Stat. § 9711(c)(1)(iv); *Commonwealth v. Wayne*, 553 Pa. 614, 720 A.2d 456, 468–69 (1998). Therefore if there is a reasonable probability that, but for counsel's error, one or more jurors would have given more weight to the (e)(8) mitigating circumstance or found one or more additional mitigating circumstances, then there is a reasonable probability that the jury would have weighed the aggravating and mitigating circumstances differently and concluded that they did not warrant death. *See Strickland*, 466 U.S. at 695, 104 S.Ct. 2052.

One of the experts who examined Petitioner in 1996, licensed psychologist Harry Krop, Ph.D., concluded in his evaluation of Petitioner that "there are several mitigating factors that should have been explored and presented at the time of Mr. Holloway's trial." (Pet. App. 12.) Because the Commonwealth stipulated to the findings of Dr. Krop and the other experts, and this is such a finding based on his reasoned

---

**135.** "The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim." 42 Pa. Cons.Stat. § 9711(d)(2).

**136.** "The offense was committed by means of torture." 42 Pa. Cons.Stat. § 9711(d)(8).

professional judgment, and because the Commonwealth has not presented psychological evidence to the contrary, we accept his statement as true. In doing so, we are forced to conclude that if these mitigating factors had been explored and presented as Dr. Krop suggests, there is a reasonable probability that Petitioner may have had a stronger argument for mitigation and thus a different sentence. On this basis alone we could find that trial counsel's deficient performance prejudiced Petitioner's case. *See Holland v. Horn*, 150 F.Supp.2d at 750–51 (E.D.Pa. Apr. 25, 2001) (finding prejudice based on an mental health expert's conclusion that "counsel's failure to challenge the denial of a defense mental health expert created a reasonable probability that, but for this omission, Petitioner may have been afforded a stronger argument for mitigation and, therefore, a different sentence"). We also find, however, upon our own examination of the reports of the mental health experts in the record, that if their contents had been presented to the jury, there is a reasonable probability that the outcome of the sentencing would have been different.

Petitioner argues that his Dependent Personality disorder supports both the (e)(2) mitigating factor[137] and the (e)(5) mitigating factor[138] that Petitioner acted under the substantial domination of another person. He also argues that his chronic drug and alcohol abuse and his acute intoxication on the night of the murder support a finding of the (e)(3) mitigating factor.[139] He argues in addition that the (e)(4) mitigating factor[140] should apply because Mr. Levitt found that because of Petitioner's age, he was unlikely to commit violent acts in the future.[141] Finally, Petitioner argues that his mental health is a factor that should have been considered under (e)(8).

A mental health expert could have offered assistance as to the investigation and development of the (e)(2), (3) and (5) mitigating factors and assisted counsel in deciding penalty phase strategy. Trial counsel's failure to present evidence on and argue (e)(2), (3) or (5) cannot be said to be unreasonable, however, even if he had had such evidence and an expert available to him. These mitigating circumstances contradict Petitioner's guilt-phase defenses of factual innocence and alibi, and counsel may, under the objectively reasonable standard we are required to apply, choose

---

**137.** "The defendant was under the influence of extreme mental or emotional disturbance." 42 Pa. Cons.Stat. § 9711(e)(2).

**138.** "The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa. Cons. Stat. § 309 (relating to duress), or acted under the substantial domination of another person." 42 Pa. Cons.Stat. § 9711(e)(5).

**139.** "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." 42 Pa. Cons. Stat. § 9711(e)(3).

**140.** "The age of the defendant at the time of the crime." 42 Pa. Cons.Stat. § 9711(e)(4).

**141.** Petitioner finds no support for any claim based on his age as a mitigating factor from Mr. Levitt's report. The "age" mitigating factor applies to youth or advanced age. *See Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, 706 (1984) (finding that defendant's age of forty-two years "when he committed the crime of murder can in no way be offered as a factor in mitigation of the seriousness of that crime"); *see also Commonwealth v. Rivers*, 537 Pa. 394, 644 A.2d 710, 720 (1994) (same for defendant who was thirty-four years old at the time of the murder). Petitioner was thirty-nine years old at the time of the Caldwell homicide and thus would not have been entitled to the benefit of the (e)(4) mitigating circumstance; therefore counsel could not be ineffective for failing to present evidence on it, argue it, or request that jury be instructed on it.

not to present such evidence because it may detract from other, uncontradicted, mitigating evidence. *See Flamer v. Delaware,* 68 F.3d 710, 734 (3d Cir.1995) (defendant's claim of innocence may restrict penalty phase arguments counsel may make in mitigation); *accord Burger v. Kemp,* 483 U.S. 776, 793–94, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). The Pennsylvania Supreme Court decided the failure of counsel to present evidence on (e)(5) in just this way, and we therefore find it reasonable under AEDPA.

A defendant's poor mental health may be presented as "evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." § 9711(e)(8). The United States Supreme Court has found that penalty phase juries must be afforded every opportunity to exercise their discretion in granting a sentence of life imprisonment, and thus mitigating factors such as (e)(8) are read broadly and considered to be catch-all categories. *See Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Therefore the jury was entitled to consider evidence as to Petitioner's mental health under this factor and give this factor more weight than it previously did if it so chose. *See, e.g., Williams v. Taylor,* 529 U.S. 362, 393–99, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (counsel ineffective at capital sentencing for failing to investigate, develop, and present mitigating evidence of defendant's traumatic childhood, mental retardation, and possible mental illness); *Eddings,* 455 U.S. at 115, 102 S.Ct. 869 ("Evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation."); *Skipper v. South Carolina,* 476 U.S. 1, 13–

14, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (Powell, J., concurring) ("Evidence concerning ... the defendant's ... emotional history ... bear[s] directly on the fundamental justice of imposing capital punishment.")

Counsel's deficient performance prejudiced Petitioner by depriving him of any informed presentation of mental infirmities. We are satisfied that the evidence presented by Petitioner, i.e. the reports of four mental health experts, is relevant to the (e)(8) mitigating factor, and that his lack of a court-appointed mental health expert actually prejudiced him at the penalty phase. There is a reasonable probability that, but for counsel's error, one or more jurors would have given more weight to the (e)(8) mitigating circumstance and therefore weighed the aggravating and mitigating factors differently, and concluded "that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland,* 466 U.S. at 695, 104 S.Ct. 2052. In short, our confidence in the outcome is undermined by counsel's deficiency.

### (4) Conclusion

 We find that trial counsel's representation of Petitioner was constitutionally ineffective, violating the Sixth Amendment, because he failed to reasonably investigate Petitioner's background for mental health related issues and because he failed to request that a mental health expert be appointed to assist the defense, and Petitioner was prejudiced, in that there is a reasonable probability that, absent the unreasonable representation, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.[142] We

---

**142.** Although our decision as to the substantive Sixth Amendment claim is sufficient to

grant the writ, were we able to examine the Fifth Amendment claim that underlies our

will therefore grant the Petition for a Writ of Habeas Corpus on this basis, and order that the Commonwealth conduct a new resentencing proceeding.

### b. Failure To Rebut Evidence and Argument of Torture Aggravating Circumstance

In his second subclaim, Petitioner argues that he is entitled to habeas relief because his trial counsel was ineffective for failing to rebut the prosecution's argument that Petitioner tortured Caldwell. On direct appeal, Petitioner raised a substantially similar claim of ineffectiveness of counsel,[143] and within that claim proceeded to allege that the Commonwealth failed to prove beyond a reasonable doubt that Petitioner had engaged in torture. In its opinion, the Pennsylvania Supreme Court separately addressed these two claims. *Holloway I*, 572 A.2d at 694. The court first held that it was not unreasonable for the jury to find that Petitioner had en-

gaged in torture, given the evidence of strangulation presented by the prosecution. The court also held that it was not unreasonable for the jury to infer from the evidence that it was the intent of Petitioner to inflict torture. The court then addressed the claim of ineffective assistance of counsel, and found that counsel was not ineffective, relying on its previous determination that trial counsel had not acted ineffectively because the brevity of evidence offered in aid of mitigation was at the behest of Petitioner. It therefore dismissed the ineffectiveness claim as being without merit.

Having determined that this claim was fairly presented to the Pennsylvania Supreme Court and exhausted, *O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999), and that the court adjudicated the claim of trial counsel's ineffective assistance on its merits, we must review that decision under the AEDPA, 28 U.S.C. § 2254(d). Doing so, we hold that

---

finding that trial counsel was ineffective for failing to request that a mental health expert be appointed, we would find that the claim has merit and grant the writ on that basis as well. That is, we would also find that as a result of trial counsel's ineffective assistance, Petitioner was denied his Fifth Amendment Due Process right to a court-appointed mental health expert to assist in his defense at the penalty phase. Petitioner did not clearly or explicitly raise the Fifth Amendment issue as a separate claim in PCRA proceedings or before this Court, however. The issue was discussed primarily in terms of ineffectiveness of trial and direct appeal counsel, although PCRA counsel also asserted that Petitioner was entitled to an expert under *Ake* during collateral proceedings. Although Petitioner has alleged facts sufficient for us to recognize that he has a colorable Fifth Amendment claim, we must find that it was not fairly presented to the Pennsylvania Supreme Court, and is exhausted because it could not be raised there now, and is thus procedurally defaulted. If we could address this claim sua sponte, we would be required to find cause and prejudice for this default before we could

review the Fifth Amendment claim on the merits. We have already determined in analyzing the substantive Sixth Amendment claim that trial counsel was ineffective for failing to request that a mental health expert be appointed; and therefore cause and prejudice would exist as to trial counsel. We believe that appellate counsel was not ineffective for failing to raise the Fifth Amendment claim. Because Pennsylvania never relaxed the waiver rule as to the need for trial counsel to contemporaneously object to trial errors, and the Fifth Amendment claim fits within that framework, appellate counsel could have only raised the claim as one of trial counsel's ineffectiveness. Therefore, he cannot be considered ineffective for failing to raise the Fifth Amendment claim, because it could not have been examined by the Pennsylvania Supreme Court directly anyway.

**143.** We therefore find this subclaim to have been exhausted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996).

the Pennsylvania Supreme Court's decisions were not an unreasonable application of, or contrary to, clearly established federal law and consequently deny relief.

As this is a ineffectiveness claim, the controlling federal law, as determined by the Supreme Court of the United States, is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order for the Pennsylvania Supreme Court to find counsel ineffective, Petitioner had to show that counsel made a serious error, and that the error caused actual prejudice. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. In making the same claim of ineffectiveness in this petition for habeas relief, Petitioner must now show that the Pennsylvania Supreme Court misapplied *Strickland* when it denied relief. While we respectfully believe that the Petitioner's waiver as to certain types of mitigating evidence and witnesses may not have extended to evidence and arguments that he did not torture Caldwell, we find that the Pennsylvania Supreme Court's decision was a reasonable application of *Strickland*, because counsel's actions were not unreasonable and did not prejudice Petitioner.

■ There are numerous reasonable bases for counsel's actions at trial. Counsel may have wished to refrain from an in-depth argument regarding the allegation of torture because he felt it would call extra attention to several issues he could not rebut. For example, counsel may have not been able to account for, and did not wish to call attention to, the half-hour to one-hour period in which Shirley Baker did not see Petitioner, when the prosecution alleged he was torturing Ricky Caldwell seven blocks away. Similarly, counsel may have had no explanation for or simply did not wish to draw additional attention to the abundant evidence of strangulation on the neck of the victim. In any case, it is not necessary for us to supply possible reasons for counsel's trial strategy, but rather Petitioner must show why that strategy was ineffective, and he has failed to do so.[144] Thus, we find that counsel did not act unreasonably when he failed to rebut the prosecution's torture argument.[145]

We also note that Petitioner has failed to show actual prejudice. The Supreme Court has held that prejudice can be found only when counsel's errors were so serious that they deprived the defendant of a fair trial. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. Petitioner has not demonstrated a reasonable probability that the outcome of the penalty phase deliberation would have been different had defense counsel attempted to rebut the prosecutor's argument.

144. We are required to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that under the circumstances the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Petitioner fails to overcome this strong presumption.

145. We also note that Petitioner currently alleges record evidence that could have been pointed out by trial counsel to rebut the allegation of torture. Such evidence is completely unpersuasive in light of other evidence in the record. Further, even if we believed that an evidentiary hearing were warranted to develop this claim, we could not hold one. Such development of the facts should have been done at the PCRA hearing. Petitioner makes no attempt to show that he did not "fail" to develop such facts within the meaning of 28 U.S.C. § 2254(e)(2). Because he does not appear to have developed the facts of this claim for habeas relief, and there is no adequate excuse for such failure, we may not hold such a hearing. *28 U.S.C.* § 2254(e)(2).

We conclude that the Pennsylvania Supreme Court's ruling was neither contrary to nor an unreasonable application of, clearly established federal law. Accordingly, under AEDPA review, we deny Petitioner relief on this subclaim.[146]

### c. Affirmatively Harmful Argument Made by Trial Counsel

In his third subclaim, Petitioner argues that he is entitled to habeas corpus relief because his trial counsel was ineffective for making an affirmatively harmful argument. Petitioner argues that trial counsel's statement that Petitioner would be eligible for parole in twenty years provided the jury with erroneous information that prejudiced Petitioner and may have led the jury to opt for a death sentence.

Petitioner's claim of ineffective assistance of counsel for making an affirmatively harmful argument was raised to the PCRA hearing court and on PCRA appeal in a form substantially similar to the instant claim, and having thus been fairly presented to the Pennsylvania Supreme Court, it is exhausted and properly before us. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996). As it did with the first subclaim, the Pennsylvania Supreme Court dismissed this claim as previously litigated in *Holloway II,* but we respectfully believe that this claim was not presented to the Pennsylvania Supreme Court on direct appeal. Because this subclaim was not presented on direct appeal and is not a logical extension of any claim raised on direct appeal, it cannot be said to have been adjudicated on its merits by the Pennsylvania Supreme Court. *See Hameen v. Delaware,* 212 F.3d 226, 248 (3d Cir.2000);

Part III B. 3., *supra.* Because the claim has been exhausted but was not adjudicated on the merits, we review the claim de novo. *See Id.; see also Appel v. Horn,* 250 F.3d 203, 210 (3d Cir.2001). We find that counsel was not ineffective under *Strickland,* and consequently deny relief on this claim.

During penalty phase arguments, defense counsel stated that Petitioner would be eligible for parole in 25 to 30 years:

> The sentence choices you have are between life and death, the life sentence carries approximately twenty something years, maybe a little longer, before someone would even be eligible. My client's age, he's forty-four years old, so you're talking taking away twenty something years, twenty-five, thirty years.

(N.T. 5/22–5/23/86 at 34.) Petitioner argues that the potential release of a defendant weighs heavily on the minds of jurors choosing between life imprisonment and death. He argues that juries are more likely to sentence a defendant found guilty of capital murder to death when there is a possibility of parole. Petitioner concludes that trial counsel's error constituted ineffective assistance because it gave erroneous and prejudicial information to the jury.

▮▮▮ In order to find ineffective assistance of counsel, there must be both error and actual prejudice at trial. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. We see nothing unreasonable about counsel addressing head on possible concerns about parole that the jury might have, by pointing out that Petitioner was forty-four years old and would, at a minimum, be in his sixties before he was even eligible to

---

**146.** As our foregoing analysis indicates, we would also deny relief were we to review the claim de novo.

*apply* for release.[147] Thus, we find that counsel's argument was not error.

Furthermore, we find that there was no actual prejudice caused by counsel's argument. The jury was directed to accept the law as the judge gave it to them (N.T. 5/21/86 at 105), and the trial judge instructed the jury that the choices for punishment were only between life imprisonment and death (N.T. 5/22–5/23/86 at 58). Together, these instructions corrected any mistaken impressions a juror might have had. Petitioner fails to show, in light of these instructions, a reasonable probability that, but for counsel's argument, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Finding neither error nor actual prejudice, as required under *Strickland,* we deny relief on this subclaim.

### d. Failure To Object to Improper Argument by the Prosecutor

In his fourth subclaim, Petitioner argues that he is entitled to habcas corpus relief because his trial counsel was ineffective for failing to object to the prosecutor's improper argument during the penalty phase. Specifically, Petitioner claims that the prosecutor's statements referring to Petitioner as a drug dealer served as a de facto aggravating factor, which in turn led the jury to apply the death penalty, and that trial counsel's failure to object to this statement was ineffective.

Petitioner's claim of ineffective assistance of counsel for failing to object to the prosecutor's improper argument was raised to the PCRA hearing court and on PCRA appeal in a form substantially similar to the instant claim, and having thus been fairly presented to the Pennsylvania Supreme Court, it is exhausted and prop-

erly before us. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996). As it did with the first and third subclaims, the Pennsylvania Supreme Court in *Holloway II* dismissed this claim as previously litigated on direct appeal, but we respectfully believe that the Pennsylvania Supreme Court did not adjudicate the claim then, because it was not raised and was not a logical extension of any claim raised then. Therefore, this subclaim cannot be said to have been adjudicated on its merits by the Pennsylvania Supreme Court. *See Hameen v. Delaware,* 212 F.3d 226, 248 (3d Cir.2000); Part III. B. 3., *supra.* Because the claim has been exhausted but was not adjudicated on the merits, we review the claim de novo. *See id.; see also Appel v. Horn,* 250 F.3d 203, 210 (3d Cir.2001). We deny relief for this claim because Petitioner demonstrates neither the error nor prejudice required of a claim of ineffective counsel under *Strickland.*

Petitioner specifically objects to the prosecutor's statement during penalty phase arguments that referred to the effect Petitioner's drug trade had on his community:

> Defense sees fit to talk about the father figure. Defense sees fit to state how he has touched lives. Think about all the lives he has touched. Think about all the people that he sold drugs to. Think about how many potential destroyed lives are walking around the city and county of Philadelphia because of the business, and make no mistake about it, the business this defendant was in.

(N.T. 5/22–5/23/86 at 42–43). Petitioner maintains that the prosecutor's argument

---

**147.** While it is true that prisoners do not have an automatic right to parole, they can apply for commutation of sentence and in the past, it is well known that depending upon the administration in office in Harrisburg, such commutations have been granted.

amounted to the creation of an aggravating factor not authorized by statute, and thus illegal under Pennsylvania law. Petitioner concludes that it was ineffective for his trial counsel to fail to object to this argument. The Commonwealth argues that the prosecutor was merely rebutting defense counsel's assertion that Petitioner was a man of good moral character, thus there was no cause for defense counsel to object.

Under *Strickland,* we must first determine if counsel's failure to object was error. In order to determine if an objection was required, we must first consider if the prosecutor's conduct was objectionable. The record discloses that in the penalty phase arguments, defense counsel argued that the good character of Petitioner was a mitigating factor, portraying Petitioner as a family man, both by calling his wife to the stand and referencing his family in closing arguments. (N.T. 5/22–5/23/86 at 29–32, 34, 36). We find that the statements of the prosecutor were made to refute defense counsel's argument that Petitioner had good character. The idea of "fair response," which allows a party to respond to statements made by opposing counsel, is well-established federal law. *United States v. Robinson,* 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988). Under this standard, it is clear that the prosecutor's statement did not warrant an objection from defense counsel, thus there was no error as required by *Strickland.*[148]

Even if we were to conclude that defense counsel's failure to object was error, we would find that no prejudice resulted. The Supreme Court has held that prejudice can be found only when counsel's errors were so serious that they deprived the defendant of a fair trial. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Petitioner has not demonstrated a reasonable probability that the outcome of the penalty phase deliberation would have been different had defense counsel objected to the prosecutor's argument. Indeed, the prosecutor's statements revealed nothing new about Petitioner or Petitioner's character. Petitioner himself had already candidly admitted that he was a drug dealer. (N.T. 5/20/86 at 116–117). We find that no prejudice resulted from defense counsel's failure to object. Consequently, we deny relief on this subclaim.

### 11. Claim XI–Faulty Jury Instructions Implying Need for Unanimity in Finding Mitigating Circumstances

Petitioner challenges the jury instructions given on finding and weighing mitigating and aggravating circumstances as erroneous in that they led the jury to believe that it had to be unanimous in finding any mitigating circumstance before that mitigating circumstance could be given effect, thus creating a barrier to the jury's consideration of all mitigating evidence in violation of the Eighth and Fourteenth Amendments. He also claims that the trial court erred by failing to instruct the jury that any individual who individually found a mitigating circumstance could weigh that circumstance against the aggravating factors unanimously found, even if there was not unanimity as to the existence of that mitigating circumstance. He claims that trial counsel was ineffective for failing to object and seek a proper instruction, and that direct appeal counsel was ineffective for failing to raise and litigate this issue on the merits or as one of trial counsel's ineffectiveness.

---

**148.** In addition to complying with the invited response doctrine of *Robinson,* the prosecutor's statement does not amount to prosecuto-

rial misconduct as defined in *Greer v. Miller,* 483 U.S. 756, 765, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987).

In one of his many filings to the PCRA hearing court and on PCRA appeal, Petitioner raised the due process claim on the merits. He also raised claims of trial counsel's ineffectiveness for failing to request the jury instructions and of direct appeal counsel's ineffectiveness for failing to raise the claim of trial counsel's ineffectiveness or raise the claim on the merits. We therefore find that the claims before us were fairly presented to the Pennsylvania courts and are thus exhausted. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters,* 96 F.3d 675, 678 (3d Cir.1996). Because trial counsel failed to object to the instruction given or request an instruction like the one Petitioner alleges should have been requested, the Pennsylvania Supreme Court deemed the due process claim to have been waived. *Commonwealth v. Holloway* (*Holloway II* ), 559 Pa. 258, 739 A.2d 1039, 1044 (Pa.1999) (citing *Commonwealth v. Williams,* 541 Pa. 85, 660 A.2d 1316 (1995)). Further, because neither the due process claim nor the claim of trial counsel's ineffectiveness were raised previously, the Supreme Court of Pennsylvania deemed them to be waived pursuant to PCRA's procedural rules.[149] Because Petitioner alleged ineffectiveness of all prior counsel, however, the court adjudicated the claim from the standpoint of a ineffectiveness claim. *See Id.* We must therefore do so as well, applying the AEDPA standard, deciding whether the Pennsylvania Supreme Court's adjudication of the ineffectiveness claims resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme

Court, i.e. of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See* 28 U.S.C. § 2254(d)(1).

On PCRA appeal, and before us, Petitioner claimed that the instructions given, and the failure to give an appropriate instruction, precluded the jury from considering and giving full effect to mitigating circumstances, in violation of *Mills v. Maryland,* 486 U.S. 367, 374–75, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Under *Mills,* one of the ways that the jury may be precluded from considering and giving full effect to mitigating evidence is through jury instructions that may lead "members of the jury to believe that a particular mitigating circumstance could not be considered unless there was unanimous agreement regarding proof of that circumstance." *Frey v. Fulcomer,* 132 F.3d 916, 919 (3d Cir.1997). Such instructions create a "barrier to the sentencer's consideration of all mitigating evidence" in violation of the Eighth Amendment. *Mills,* 486 U.S. at 375, 108 S.Ct. 1860.

In deciding the ineffectiveness claims before it, the Pennsylvania Supreme Court considered whether counsel could have been ineffective for failing to object to instructions that violated *Mills,* or request instructions that complied with *Mills.* The court found that *Mills* was decided two years after Petitioner's trial, and therefore trial counsel could not be ineffective, because counsel is not required to anticipate changes in the law. *Holloway II,* 739 A.2d at 1046.

We agree with the decision of the Pennsylvania Supreme Court, and therefore

---

**149.** We have previously found that both of these bases for the waiver are independent and adequate state grounds barring our review of the underlying substantive claim, and we now find that they were properly applied to this claim. Therefore, to review the due

process claim on the merits, we would be required to find cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default. *See* Part III. B. 2, *supra.*

find that it was neither contrary to, nor an unreasonable application of, *Strickland.* Counsel is not required to be prescient.[150] *See, e.g., Sistrunk v. Vaughn,* 96 F.3d 666, 671 (3d Cir.1996) (holding that direct appeal counsel could not have been ineffective for failing to raise a *Batson*-type claim before *Batson* had been decided by the Supreme Court); *Government of the Virgin Islands v. Forte,* 865 F.2d 59, 62 (3d Cir.1989) ("There is no general duty on the part of defense counsel to anticipate changes in the law.") Further, because we agree that counsel could not have been ineffective for failing to object or request an instruction that complied with *Mills,* we would not be able to find cause to excuse the procedural default that bars us from examining the merits of the due process claim. We therefore find that Petitioner is not entitled to relief on any claim based on the jury instructions as to finding mitigating circumstances unanimously or individually.

---

**150.** We agree that direct appeal counsel had the benefit of *Mills.* However, because trial counsel failed to preserve the claim, and waiver caused by the failure of trial counsel to contemporaneously object or request instructions was never relaxed in Pennsylvania, even for death penalty cases, *see Commonwealth v. Williams,* 541 Pa. 85, 660 A.2d 1316, 1319–1320 (1995) and cases cited therein, direct appeal counsel could have only raised the claim as one of trial counsel's ineffectiveness. Because that claim has no merit, direct appeal counsel could not be ineffective for failing to raise it. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Even if we were to accept the argument that direct appeal counsel could have brought the *Mills* claim in the first instance, because it was decided before Petitioner's appeal was filed, that claim is still defaulted because the Pennsylvania Supreme Court applied the PCRA bar of 42 Pa. Cons.Stat. §§ 9543(a)(3) and 9544(b). The only "cause" possible to overcome appellate counsel's failure to raise the claim could be appellate counsel's ineffectiveness. To support such an allegation, Petitioner merely alleges "Appellate counsel's

## 12. Claim XII—Improper Application of the Torture Aggravating Circumstance

Petitioner claims that two constitutional violations occurred by an improper application of 42 Pa. Cons.Stat. § 9711(d)(8), the aggravating circumstance that "the offense was committed by means of torture." He claims that the trial court failed to provide a limiting instruction and that there was insufficient evidence to prove § 9711(d)(8).

### a. Failure To Provide a Limiting Instruction

At his PCRA proceedings and in his petition for a writ of habeas corpus, the Petitioner claimed that the trial court's failure to provide the jury with a limiting instruction to guide the jury in its interpretation on the meaning of (d)(8) resulted in a violation of his Sixth, Eighth, and Fourteenth Amendment rights. The Petitioner did not expressly bring this claim on

failure to recognize that Petitioner had a winning *Mills* claim and include it in the appeal was deficient performance." (Reply Br. at 77–78.) Such an allegation is insufficient to overcome the presumption of reasonableness that we must accord to the decisions of counsel, *see Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, or to satisfy the difficult standard required to show that appellate counsel was ineffective for failing to raise a claim, *see, e.g., Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (holding that appellate counsel who files a merits brief is not required to raise every nonfrivolous claim, and indeed should not do so, but rather may select from among them to try to maximize the likelihood of success on appeal); *Smith v. Robbins,* 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) ("[While] it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, ... it is difficult to demonstrate that counsel was incompetent.... [Petitioner must show] that [the] particular nonfrivolous issue was clearly stronger than issues that counsel did present.").

direct appeal. However, in *Holloway I*, the Pennsylvania Supreme Court made clear that the evidence was sufficient to establish that Petitioner intended to and did torture the victim. *Holloway I*, 572 A.2d at 694 ("The jury could find that the strangulation was but a cruel prelude to an intended denouement by [a shot gun] ... it was the intent of both the appellant and co-defendant to first torture the victim."). In its PCRA appeal opinion, the Pennsylvania Supreme Court declined to consider whether (d)(8) required a limiting instruction, stating that it already decided the issue in *Holloway I*. We find that the Petitioner fairly presented this claim to the Pennsylvania courts and that the Pennsylvania Supreme Court issued an adequate decision concerning Petitioner's limiting instruction claim in *Holloway I*. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996). Thus, we must analyze the Pennsylvania Supreme Court's decision concerning Petitioner's claim under the standard of review established in the AEDPA, and in doing so, we find that the decision of the Pennsylvania Supreme Court was neither contrary to, nor an unreasonable application of, clearly established federal law.[151] 28 U.S.C. § 2254(d)(1).

The Petitioner bases this subclaim on a line of U.S. Supreme Court cases that held that if a state wishes to authorize capital punishment, it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty, and thus it must define the crime for which the death may be imposed in a way that obviates standardless sentencing discretion.

*See Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (plurality); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality); *Gregg v. Georgia*, 428 U.S. 153, 196, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam) (sentencing jury's discretion must be "be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.").

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam), the five concurring opinions concluding that the imposition and carrying out of the death penalty in the three cases before the Court would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments were all based at least in part on the fact that the judges or juries had nearly unbridled discretion in imposing the death penalty. The juries in the three cases reviewed in *Furman* were not presented with aggravating or mitigating circumstances to help determine whether the death penalty was an appropriate sentence.

In *Gregg v. Georgia*, a plurality of the Court relied on *Furman* to decide that Georgia's capital sentencing procedures did not violate the Eighth and Fourteenth Amendments because the aggravating and mitigating circumstances provided allowed the jury to focus on the particularized nature of the crime and the particularized characteristics of the individual defendant. 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Additionally, the plurality found that the jury's discretion was channeled because the jury found and identified at

---

**151.** As our analysis *infra* indicates, were we to review the issues in this subclaim de novo,

Petitioner would not be entitled to relief.

least one statutory aggravating factor before the jury was able to impose the death penalty, and the mandatory review by the Georgia Supreme Court provided an additional safeguard to assure that the death penalty would not be imposed on "a capriciously selected group of convicted defendants." *Id.* at 204–206, 96 S.Ct. 2909.

In *Godfrey v. Georgia,* a plurality of the U.S. Supreme Court reversed and remanded the Georgia Supreme Court's decision to uphold a jury's decision to impose the death penalty for a murder that met a Georgia statute's aggravating circumstance that imposed the death penalty if proven beyond a reasonable doubt that the murder "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," because the plain language of the statute did not provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Godfrey,* 446 U.S. at 427, 100 S.Ct. 1759 (quoting *Gregg,* 428 U.S. at 188, 96 S.Ct. 2909 (citations omitted)). The *Godfrey* plurality concluded that this broad use of language resulted in too much discretion for the jury, and lacked a principled basis for the jury to decide the death penalty. *Id.* at 428–433, 100 S.Ct. 1759.

Although we recognize that juries must not be arbitrary and capricious when imposing the death penalty, we do not agree with the Petitioner that the jury's decision to impose death in the instant case was arbitrary and capricious. *See Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam). Petitioner's jury found two aggravating and two mitigating circumstances and weighed them against each other before it imposed the death penalty, therefore their discretion was channeled as *Gregg* requires, 428 U.S. at 206, 96 S.Ct. 2909, and the jury

was adequately guided so as to avoid a "wanton" and "freakish" death penalty decision, *see Furman,* 408 U.S. at 310, 92 S.Ct. 2726 (Stewart, J., concurring). Additionally, the Pennsylvania Supreme Court, in accordance with 42 Pa. Cons.Stat. § 9711(h)(3)(i), had a mandatory obligation to review the jury's sentencing decision, which provided additional assurance that this penalty was appropriate and not disproportionate to the crime. Thus, following the *Gregg* decision, the trial court's death penalty decision and review of that decision by the Pennsylvania Supreme Court did not offend the federal Eighth and Fourteenth Amendments.

Furthermore, we find that allowing the jury to determine whether the evidence presented in the case amounted to torture without a limiting instruction did not give it so much discretion as to violate the Petitioner's Eighth and Fourteenth Amendment rights. At the time of the Petitioner's trial, the Pennsylvania Supreme Court had decided that the general meaning of "torture" was not constitutionally vague and its meaning is a "matter of common knowledge." *See Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183, 196 (1985). Thus, we find that the decision of the Pennsylvania Supreme Court allowing the jury to impose the death penalty based on the plain language of aggravating circumstance (d)(8) was not contrary to any existing federal law.

The Petitioner goes on to argue that the death penalty as applied to him violated his Eighth Amendment rights because the law concerning aggravating circumstance (d)(8) changed in *Commonwealth v. Nelson,* 514 Pa. 262, 523 A.2d 728 (1987), to require a limiting instruction. Petitioner cites *Wade v. Calderon,* 29 F.3d 1312, 1319–20 (9th Cir.1994) to argue that, similar to the decision reached in *Nelson,* the Ninth Circuit of the United States Court

of Appeals also agreed that the torture aggravating circumstance requires a limiting instruction regarding the defendant's intent to cause pain and suffering in addition to the intent to kill.[152] While it is true that the law in Pennsylvania changed to require a limiting instruction to aggravating circumstance (d)(8), Pennsylvania Supreme Court decisions that preceded *Holloway I* were not necessarily binding on that court under the doctrine of *stare decisis. See Holland v. Horn,* 150 F.Supp.2d at 778–80 (E.D.Pa. 2001); *see also Smith v. Horn,* 120 F.3d 400, 414 (3d Cir.1997) ("A state court's misapplication of its own law, in and of itself, cannot be corrected by a federal court. However . . . [a] resulting federal constitutional error can be corrected by a federal habeas court.") (citing *Gilmore v. Taylor,* 508 U.S. 333, 348–49, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993) (O'Connor, J., concurring)). Also, following *Holloway I,* the Pennsylvania Supreme Court held that a limiting instruction is not required for (d)(8) when it is established that there is sufficient evidence to find that the defendant intended to torture the victim. *See Commonwealth v. Fahy,* 537 Pa. 533, 645 A.2d 199, 202–203 (1994); *see also Commonwealth v. Whitney,* 550 Pa. 618, 708 A.2d 471, 480 (1998) (finding that there was sufficient evidence to find torture despite jury instruction being limited to language of statute). The Pennsylvania Supreme Court, in *Commonwealth v. Ennis,* 394 Pa.Super. 1, 574 A.2d 1116 (1990), held that "where the evidence of the case supports the omitted jury instruction, the failure to define the element to the jury is not prejudicial." In *Holloway I,* the Pennsylvania Supreme Court made it clear that there was sufficient evidence to find that the Petitioner intended to torture the vic-

tim. 572 A.2d at 694. Therefore, providing the jury with the instruction established in *Nelson* would have only made it more clear that the Petitioner intended to torture the victim with a ligature before he decided to kill him with a shotgun blast to the head. Thus, we find that the Pennsylvania Supreme Court was reasonable in upholding the trial court's decision to affirm the death penalty based on the plain language of (d)(8) and we deny Petitioner's claim as to this issue.

The Petitioner also makes the subclaim that the failure of both his trial and appellate counsel to request a limiting instruction to aggravating circumstance (d)(8) was a violation of his Sixth and Fourteenth Amendment rights. We disagree. The Pennsylvania Supreme Court's decision in *Nelson* was issued after the Petitioner's trial. We cannot find trial counsel ineffective for failing to predict the change in law in Pennsylvania regarding (d)(8). *See Sistrunk v. Vaughn,* 96 F.3d 666, 670–671 (1996); *Flamer v. Delaware,* 68 F.3d 736, 756–57 (1995); *Senk v. Zimmerman,* 886 F.2d 611, 615–616 (1989). We find that Petitioner's appellate counsel cannot be found ineffective following the standard established in *Strickland,* which requires us to presume that counsel acted reasonably. Here, the established evidence strongly demonstrated that Petitioner intended to torture the victim before he decided to kill him. Therefore, it is not reasonably probable that the outcome of the Petitioner's direct appeal would have been different if the *Nelson* limiting instruction had been provided. Counsel cannot be unreasonable for deciding not to raise a meritless or weak claim. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052; *Smith v. Robbins,* 528 U.S.

---

**152.** Besides not being bound by Ninth Circuit decisions, we find that the California provision at issue in *Wade* differs from § 9711(d)(8). The statutory language of California's aggravating circumstance requires "proof of the infliction of extreme physical pain no matter how long its duration." *Wade,* 29 F.3d at 1319.

259, 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) ("[Petitioner must show] that [the] particular nonfrivolous issue was clearly stronger than issues that counsel did present."). Thus, we find that neither trial counsel's nor appellate counsel's performance was deficient, and we deny Petitioner's ineffective assistance of counsel claim arising from the failures of trial counsel to request a limiting instruction.

### b. Insufficiency of the Evidence

On direct appeal, at his post conviction relief proceedings, and in his petition for habeas corpus, the Petitioner claimed that there was insufficient evidence to establish aggravating circumstance (d)(8), and thus the jury's decision to impose the death penalty violated his Eighth and Fourteenth Amendment rights. We find that Petitioner fairly presented this claim at the state level and has exhausted his opportunity to all remedies available to him regarding this claim. See O'Sullivan v. Boerckel, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir.1996). The Pennsylvania Supreme Court decided that there was sufficient evidence presented to establish that both Petitioner and co-defendant intended to first torture the victim before killing him, see Holloway I, 572 A.2d at 694, and declined to reconsider its decision at Petitioner's PCRA appeal, finding the issue previously litigated, see Holloway II, 739 A.2d at 1043–1044. Therefore, we use the AEDPA standard of review to analyze the Pennsylvania Supreme Court's decision on direct appeal.

In Holloway I, the Pennsylvania Supreme Court used testimonial evidence from Shirley Baker and an unsigned statement made by the Petitioner to conclude that Petitioner and Freeman intended to torture Caldwell. The Holloway I court found that the length of time it took to kill the victim and the use of a ligature to engage in a "tug-of-war" action to strangle the victim were deciding factors in concluding that Caldwell was first tortured before he was killed by shotgun blasts to his head. See Holloway I, 572 A.2d at 694. Under the AEDPA standard, we find the Pennsylvania Supreme Court's decision as to the sufficiency of the evidence to establish (d)(8) was reasonable. Furthermore, we find that Petitioner's argument that (d)(8) could not be established because the victim was unresponsive from the use of sleeping pills is not persuasive. Baker's testimony was that Johnson said that the victim was "high on pills," not that he was unresponsive or unconscious. Further, a medical examiner testified on cross-examination that a toxicology report on the victim did not show drugs in the victim's system. (N.T. 5/19/86, 61–62.) In either case, he would have been aware of the infliction of pain and the intent to inflict pain upon him. The established evidence thus allows a reasonable jury to find that Petitioner intended to inflict pain and suffering on the victim. Therefore, we find that the Pennsylvania Supreme Court's decision as to the sufficiency of the evidence was reasonable and deny Petitioner's claim.[153]

### 13. Claim XIII–Improper Application of the Contract Killing Aggravating Circumstance

The Petitioner claims three constitutional violations occurred by an improper application of 42 Pa. Cons.Stat. § 9711(d)(2), the aggravating circumstance that the "defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of

---

**153.** Were we to examine this claim de novo we would reach the same conclusion.

the victim." These claims are as follows: (1) failure to provide a limiting instruction to the jury, (2) insufficient evidence to prove (d)(2) beyond a reasonable doubt, and (3) retroactive alteration of the proof required for (d)(2), in violation of Due Process and the Ex Post Facto Clauses.

### a. Failure to provide a limiting instruction

At his PCRA proceedings and in his petition for a writ of habeas corpus, the Petitioner claimed that the trial court's failure to provide the jury with a limiting instruction to guide it in its interpretation on the meaning of aggravating circumstance (d)(2) was a violation of his Sixth, Eighth, and Fourteenth Amendment rights. In its PCRA decision, the Pennsylvania Supreme Court appears to have incorrectly stated that it had already addressed this claim during the Petitioner's direct appeal, and decided that Petitioner was not entitled to post conviction relief on this claim. We find that under either a de novo standard or under the AEDPA standard of review,[154] however, this subclaim lacks merit and must be dismissed.

As he did with a similar subclaim in Claim XII, the Petitioner bases this subclaim on a line of U.S. Supreme Court cases that held that if a state wishes to authorize capital punishment, it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty, and thus it must define the crime for which the death penalty may be imposed in a way that avoids standardless sentencing discretion. *See Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759,

64 L.Ed.2d 398 (1980) (plurality); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (plurality); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality); *Gregg v. Georgia*, 428 U.S. 153, 196, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality); *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (per curiam). Additionally, the Petitioner cites *Commonwealth v. Burgos*, 530 Pa. 473, 610 A.2d 11 (1992), to argue that the Pennsylvania Supreme Court ruled that a limiting instruction is required for aggravating circumstance (d)(2). We have analyzed Petitioner's claim based on the Pennsylvania Supreme Court's decision in *Burgos* and on U.S. Supreme Court precedent and we conclude that the Petitioner's claim is meritless.

The Pennsylvania Supreme Court's decision in *Burgos* does not stand for the proposition that juries must be provided with a limiting instruction regarding aggravating circumstance (d)(2). The *Burgos* court merely stated that (d)(2) should not have been submitted to the jury because the prosecution did not prove beyond a reasonable doubt the elements of (d)(2) based on the statute's plain language. Additionally, the *Burgos* court ruled that the plain language of (d)(2) does not apply to collections on a life insurance policy, or to mere "killings for pecuniary gain." The *Burgos* ruling specified that (d)(2) is satisfied when one is paid for the act of committing a murder. In *Burgos*, the insurance company did not pay the defendant for the act of killing the defendant's wife. Instead, the insurance company paid the defendant because of the nature of the insurance policy that the de-

---

**154.** We believe that we should review the claim de novo. We respectfully believe that the Pennsylvania Supreme Court erred finding that the claim was previously litigated, and thus the procedural bar of 42 Pa. Cons.

Stat. § 9544(a) would not be adequate so as to bar our review, and because the claim was never adjudicated on the merits, we would exercise plenary review. *See* Part III. B. 3., *supra*.

fendant took out on his wife's life. Hence, the *Burgos* court made clear that collecting on an insurance policy due to the death of a victim is a realization of mere pecuniary gain. Here, the Petitioner did not realize a mere pecuniary gain as a result of the victim's death. Rather, the Petitioner was paid for carrying out his job duties, which included the act of killing the victim. Furthermore, the Pennsylvania Supreme Court's decision in *Commonwealth v. Fahy* provides further support for our decisions that (d)(2) does not require a limiting instruction and that the trial court did not err by deciding not to provide the jury with such an instruction. 512 Pa. 298, 516 A.2d 689, 698 (1986) ("Appellant's contention that 42 Pa Cons. Stat.A. 9711(d) is vague and overbroad is dismissed as being meritless.").

The failure to provide a limiting instruction does not run afoul of U.S. Supreme Court precedent limiting sentencing discretion, either. In the instant case, the jury was presented with both aggravating and mitigating circumstances, and therefore, the jury was not left with the same unguided discretion as the trial juries in *Furman.* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Here, it can be reasonably found that (d)(2)'s plain language directed the jury on the specific circumstances of the crime. The jury was adequately instructed that killing for pay and torture could provide an adequate basis to meet the statutory aggravating circumstances used to impose the death penalty. (N.T. 5/23/86 at 56–63.) The jury was also instructed on the Petitioner's lack of criminal background and any other evidence concerning the character and record of the defendant and the circumstances of the offense as a basis to meet the statutory mitigating circumstances. *Id.* The jury was then instructed that it should balance these mitigating circumstances against any aggravating circumstances that are found,

and that the death penalty is an appropriate sentence if the aggravating circumstances outweigh the given mitigating circumstances. *Id.* This guided instruction was not present in *Furman,* and was exactly what the Supreme Court had in mind when it stated that decisions lacking this type of guided instruction produce "wanton" and "freakish" impositions of the death penalty. *See Furman,* 408 U.S. at 310, 92 S.Ct. 2726 (Stewart, J., concurring). Here, we find that the trial court adequately instructed the jury in whether or not the death penalty could be imposed on the Petitioner. Thus, we find that the trial court did not violate the lack of guidance concerns expressed in *Furman.*

As discussed previously in Claim XII, in Part III. C. 12. a., *supra,* the jury's discretion was channeled because it imposed the death sentence based on two aggravating circumstances and two mitigating circumstances that it weighed against each other. *See Gregg,* 428 U.S. at 206, 96 S.Ct. 2909 (stating that "[w]hile the jury is permitted to consider any aggravating circumstance . . . it must find and must identify at least one statutory aggravating factor before it may impose a penalty of death"). Thus, following the *Gregg* decision, the trial court's death penalty decision and review of that decision by the Pennsylvania Supreme Court did not offend the federal Eighth and Fourteenth Amendments.

Neither does the plain language of aggravating circumstance (d)(2) present a problem similar to that in *Godfrey.* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Section (d)(2) means what it says, that this aggravating circumstance may be found if "the defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim." This plain language does not create such broad

discretion that would create a cruel or unusual punishment in a violation of a defendant's Eighth Amendment rights, nor does it lack a principled basis from which the jury can decide a death penalty. Here, the plain language of (d)(2) allowed the jury to correctly find that Petitioner was a paid employee of Johnson, and that Petitioner killed the victim as a requirement of his job description. This type of killing meets (d)(2)'s plain language, and allows for the death sentence. Thus, the decision reached in *Godfrey* supports our finding that imposing the death penalty based on the plain language of (d)(2) did not violate the Petitioner's Eighth and Fourteenth Amendment rights.

The Petitioner also claims that the trial court erred by allowing the prosecutor to create the impression that the jury could find (d)(2) "on the basis that Petitioner subjectively thought killing the victim would result in a pecuniary gain for him." (Pet. Mem. L. at 82.) The Petitioner claims that the quote "Do your job" allowed for an inference that by killing the victim the Petitioner would realize a pecuniary gain of more money and drugs. However, "Do your job" can mean just what it says, for the Petitioner to fulfill his duty to kill as Johnson's employee. As stated above, (d)(2) was drafted specifically to impose the death penalty for murders that were paid for by another person. Petitioner did not kill the victim for the expectation of receiving more money, or to collect the proceeds from an insurance policy. The Petitioner killed the victim because his job required him to kill the victim. Also, similar to most employees, or quasi-employees, Petitioner was paid for his work. Therefore, we find that allowing the trial jury to hear Johnson's instruction to Petitioner, "Do your job," did not falsely create an impression that Petitioner killed the victim with the expectation of receiving a mere pecuniary gain. Thus, we dismiss

as meritless Petitioner's claim that the trial court erred by allowing the prosecutor's description of (d)(2) to be read to the trial jury.

Additionally, the Petitioner claims that his Sixth Amendment right to effective assistance of counsel was violated because Petitioner's trial counsel did not object to either the lack of a limiting instruction or to the trial court's decision to allow the prosecution to use the statement "do your job" as a way to describe the killing to meet aggravating circumstance (d)(2). We find that the trial counsel's decision not to object was reasonable under *Strickland*, which states that the proper standard for judging attorney performance is that of reasonably effective assistance in light of the totality of the evidence before the court. 466 U.S. at 687–88, 104 S.Ct. 2052. Here, the totality of the evidence shows that Petitioner's attorney provided reasonably effective assistance. The *Burgos* decision that § 9711(d)(2) did not apply to killings for pecuniary gain was made after *Holloway I*. Thus, this objection was unavailable to Petitioner's trial counsel. However, even if the *Burgos* decision had been available at the time of Petitioner's trial, it is unlikely that the jury would have found that defendant killed the victim for merely pecuniary gain, and as a result, produced a contrary decision. The evidence presented to the jury did not provide a sufficient basis for it to conclude that Petitioner killed the victim with the expectation of receiving additional money from Johnson. Rather, the evidence allowed for the more credible finding that Petitioner killed the victim as part of his job requirements as a drug dealer for Johnson. Furthermore, it is possible to find that the Petitioner's trial counsel did not object to a lack of a limiting instruction because such instruction may have resulted in making more clear that killings made

in employment scenarios fit the types of killings that were intended to receive the death penalty. As stated by the Pennsylvania Supreme Court in *Holloway I*, "to kill for pay does not require a specified amount in the agreement. The consideration may be what suits the purposes for each; money or services." *Holloway I*, 572 A.2d at 693. The Petitioner's trial counsel may have made a strategic decision not to object to the lack of a limiting instruction because it could have made it more clear to the jury that the Petitioner's killing met the circumstances of (d)(2). Thus, the Petitioner's attorney did not provide deficient representation, and, additionally, there is no reasonable probability that the jury's decision would have been different if a limiting instruction had been provided to the jury. Accordingly, we dismiss Petitioner's ineffective counsel claim as being meritless.

### b. Failure To Prove Section 9711(d)(2) Beyond a Reasonable Doubt

On direct appeal, at his post conviction relief proceedings, and in his petition for a writ of habeas corpus, the Petitioner claimed that there was insufficient evidence to prove that he killed the victim or that the killing met the circumstances of (d)(2), and therefore the jury's decision to impose the death penalty violated his Fourteenth Amendment right to Due Process. (Pet. Mem. L. at 83.) We thus find this subclaim to have been fairly presented and exhausted. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999); *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir.1996). In *Holloway I*, the Pennsylvania Supreme Court ruled that the jury was presented with sufficient evidence to find that the circumstances of (d)(2) were fulfilled. The evidence presented to the jury at trial was gathered from testimony given by Shirley Baker

and an unsigned statement made by Petitioner. On direct review of the trial jury's decision, the Pennsylvania Supreme Court concluded that the evidence was sufficient to establish that the Petitioner was "in the employ" of drug supplier "Bubbles" Johnson, and that Johnson instructed the Petitioner to kill the victim because the victim owed Johnson money and had "mess[ed] up a couple of [drug] packages." Therefore, the *Holloway I* court ruled that the evidence presented to the jury could allow for a determination that Petitioner worked for Johnson and that murder was "part of the job description." *Holloway I*, 572 A.2d at 693. This, according to the *Holloway I* court, fits the description of contract murder as set forth in § 9711(d)(2). The Pennsylvania Supreme Court declined to reconsider its decision in *Holloway II*. 739 A.2d at 1043–44. We review the decision of the Pennsylvania Supreme Court on direct appeal in accordance with the standards set forth in the AEDPA.

Petitioner argues that trial jury's conclusion that Petitioner met the circumstances of (d)(2) was arbitrary and capricious because "no reasonable sentencer could have so concluded." *Lewis v. Jeffers*, 497 U.S. 764, 783, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990). Petitioner also argues that the evidence presented at trial could support other, alternative scenarios that would prove the Petitioner did not meet the circumstances of (d)(2), and the existence of alternative explanations means that the prosecution failed to prove (d)(2) beyond a reasonable doubt. *See United States v. Bright*, 550 F.2d 240, 242 (5th Cir.1977); *United States v. Ramos*, 613 F.Supp. 115, 120 (S.D.N.Y.1985); *United States v. Jones*, 605 F.Supp. 513, 516 (S.D.N.Y. 1984).

Reviewing the Pennsylvania Supreme Court's decision under the AEDPA standard, and considering Petitioner's argu-

ments, we find that the Pennsylvania Supreme Court's decision as to the sufficiency of the evidence was not unreasonable. The evidence presented would allow a rational jury to find that an employer-employee relationship existed between Johnson and Petitioner, and that killing was a requirement of Petitioner's job description as Johnson's employee.

Furthermore, we must reject Petitioner's contention that the claim that he was under duress when he complied with Johnson's instruction to kill the victim provides reasonable doubt. Baker's testimony shows that Petitioner, under his own free will, made the statement, "I can take care of that now," meaning to kill the victim when Petitioner learned that the victim was in Johnson's van. This reflects that Petitioner did not object or resist Johnson's instructions. The jury merely found Baker to be more credible than Petitioner, as is its right. Therefore, we dismiss Petitioner's duress defense.

### c. Retroactive Alteration of the Proof Required for (d)(2)

In his PCRA brief and in his Petition, the Petitioner makes the claim ·that the Pennsylvania Supreme Court retroactively applied 42 Pa. Cons.Stat. § 9711(d)(14) to sustain the jury's decision to impose the death penalty, in violation of the Ex Post Facto Clauses, U.S. Const. art. I, § 10, cl. 1; art. I, § 9, cl. 3, and the Petitioner's right to Due Process. Petitioner builds this claim by stating that the Pennsylvania Supreme Court's decision in *Holloway I* failed to explain how the Petitioner's killing could be considered a contract killing according to (d)(2), and that its decision seemed to be based on § 9711(d)(14), which was added by the Pennsylvania Legislature in 1989, three years after Petitioner's trial. Furthermore, the Petitioner claims that this Court must analyze this claim de novo because the Pennsylvania

Supreme Court never answered his Ex Post Facto claim when it was presented at Petitioner's PCRA proceedings. Although the Petitioner is correct in claiming that the *Holloway II* court did not issue a decision regarding the Petitioner's Ex Post Facto claim, this Court finds the Petitioner's Ex Post Facto claim to be meritless. Therefore, under either a de novo standard of review or under the AEDPA standard of review, Petitioner's claim is denied.

As we have already concluded, there is sufficient evidence in the record to allow for a finding that the Petitioner killed the victim, and that the killing met aggravating circumstance (d)(2). Therefore, there is no basis for a finding that the Pennsylvania Supreme Court in *Holloway I* upheld the jury's death penalty decision based on aggravating circumstance (d)(14). The *Holloway I* opinion makes no mention of (d)(14), nor does its decision rely on or imply any reference to (d)(14). We find that the decision of *Holloway I* to uphold the jury's death penalty decision was based entirely on aggravating circumstances (d)(2) and (d)(8). Subsequently, the Ex Post Facto Clauses were not violated, nor was the Petitioner's right to Due Process. Thus, the Petitioner's claim is dismissed.

### 14. Claim XIV–Improper Jury Instructions as to which Mitigating Circumstances Could Be Considered

Petitioner claims that the trial court's jury instructions as to which mitigating circumstances could be considered prohibited the jury from considering and giving full effect to some relevant mitigating evidence, therefore violating his Eighth and Fourteenth Amendment rights. He complains specifically of the instruction that "for the purposes of this case" the only possible mitigating circumstances were "The defendant has no significant history of prior criminal convictions," 42 Pa. Cons. Stat. § 9711(e)(1), and "Any other evi-

dence of mitigation concerning the character and record of the defendant and the circumstances of the offense." *Id.* (e)(8). He argues that there was evidence presented that would have supported a finding of mitigating factors (e)(2),[155] (3),[156] and (5),[157] specifically evidence that Petitioner was under the influence of drugs and alcohol at the time of the offense, and that he acted under duress. He asserts that trial counsel was ineffective for failing to request a proper instruction, and for failing to argue such mitigating factors to the jury, and also argues that direct appeal counsel was ineffective for failing to raise the claim directly and raise the claim of trial counsel's ineffectiveness.

On PCRA appeal, Petitioner raised this claim as one of trial counsel ineffectiveness for failing to request the jury instructions, and direct appeal counsel's ineffectiveness for failing to raise the claim of trial counsel's ineffectiveness. The Pennsylvania Supreme Court found that this claim had been previously litigated on direct appeal, apparently referring to its decision that trial counsel had not performed ineffectively with regard to mitigating circumstances.

▬▬▬ In our decision as to Claim X, in Part III. 10. a., *supra,* we considered trial counsel's ineffectiveness for failing to request the assistance of a mental health expert and failing to investigate, develop, and present mitigating evidence that Petitioner suffers from cognitive defects; the effects of emotional, physical and sexual abuse as a child; and had an impaired capacity at the time of the offense as a result of chronic drug and alcohol abuse and acute intoxication. We found trial counsel's failure to present evidence on and argue (e)(2), (3) or (5) cannot be said to be unreasonable, because these mitigating circumstances contradict Petitioner's guilt-phase defenses of factual innocence and alibi, and counsel may, under the objectively reasonable standard we are required to apply, choose not to present such evidence because it may detract from other, uncontradicted, mitigating evidence. *See Flamer v. Delaware,* 68 F.3d 710, 734 (3d Cir.1995) (defendant's claim of innocence may restrict penalty phase arguments counsel may make in mitigation); *accord Burger v. Kemp,* 483 U.S. 776, 793–94, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). Therefore, we find now that his failure to request jury instructions thereon, or to object to the jury instructions as given, cannot be said to be unreasonable, either. Counsel was not ineffective, and therefore no relief is warranted on this claim.[158]

### 15. Claim XV–Ineffective Assistance of State Court Counsel for Failing To Raise or Properly Litigate Each Claim

In Claim XV, Petitioner makes a blanket assertion that his trial counsel was consti-

---

**155.** "The defendant was under the influence of extreme mental or emotional disturbance." 42 Pa. Cons.Stat. § 9711(e)(2).

**156.** "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." 42 Pa. Cons. Stat. § 9711(e)(3).

**157.** "The defendant acted under extreme duress, although not such duress as to constitute a defense to prosecution under 18 Pa. Cons. Stat. § 309 (relating to duress), or acted un-

der the substantial domination of another person." 42 Pa. Cons.Stat. § 9711(e)(5).

**158.** Even if we were to examine the Eighth and Fourteenth Amendment claim de novo, i.e. that the trial court's instruction prevented the jury from considering relevant mitigating evidence, we would find any error, if there were one, to be harmless because of our previous finding with regard to counsel's reasonable representation, and the need for trial counsel to request instructions and contemporaneously object to proposed instructions with which he disagrees.

tutionally ineffective for failing to either raise or properly litigate those issues presented in his previous twelve claims. Because we addressed Petitioner's ineffective assistance arguments with respect to Claims I–XIV individually, we refrain from repeating our analyses here. Petitioner's Claim XV is therefore denied in accordance with our foregoing conclusions.

### 16. Claim XVI–Cumulative Prejudicial Effect of the Errors in this Case

In Claim XVI, Petitioner argues that he is entitled to habeas relief on the basis of the cumulative effects of the constitutional errors in his case. Because we have already identified a ground on which to grant Petitioner's resentencing, we find that such a collective consideration is unnecessary and would be inconsequential to our ultimate conclusion. Were we to do so we would not, in the absence of the ground upon which we are granting relief, find that the cumulative effect of the other grounds warranted relief.

### IV. CONCLUSION

For the foregoing reasons, we vacate Petitioner's death sentence and remand to the Pennsylvania courts for the purpose of resentencing Petitioner. Petitioner presented sixteen claims for habeas corpus relief, most of which consisted of multiple subclaims and arguments. We find that two related issues both have merit and are properly before us; all other issues are either meritless, or the merits cannot be reached because of procedural defaults. In his Claim X. A., in Part III. C. 10. a. *supra*, Petitioner correctly argues that his trial counsel's representation was constitutionally ineffective, violating the Sixth Amendment, because he failed to reasonably investigate Petitioner's background for mental health related issues and because he failed to request that a mental

health expert be appointed to assist the defense. These unreasonable deficiencies resulted in prejudice to Petitioner, because absent the errors, there is a reasonable probability that the jury would have given more weight to a mitigating circumstance or weighed the aggravating and mitigating circumstances differently and concluded that Petitioner should not receive a death sentence.

Petitioner was particularly concerned, as are we, that such a denial interfered with his ability to present evidence in support of mitigation at sentencing. The severity and permanence of the death penalty cautions us to consider very carefully the effect of any errors in Petitioner's legal process. Society's right to levy the ultimate penalty must be conditioned on a commitment to reliability in assigning that penalty. Therefore, due to the constitutional errors associated with the penalty phase of his state murder trial, we conclude that the death penalty is improperly supported in Petitioner's case, and remand it to the state courts for resentencing at a new penalty phase proceeding.

It is so ordered.

### ORDER

And now, this 27th day of August, 2001, upon consideration of the Petition for Writ of Habeas Corpus, filed on April 3, 2000, all filings in this case, the entire record transmitted by the Clerk of Quarter Sessions Court of Philadelphia County, the expanded record, evidence presented at an evidentiary hearing, and oral arguments, it is hereby ORDERED, consistent with the foregoing opinion, that

1. Petitioner Arnold Holloway's Petition for Writ of Habeas Corpus is GRANTED as to Claim X. A., which relates to ineffectiveness of counsel for failure to investigate mental

health related issues and request a defense mental health expert;

2. The Petition is DENIED in all other respects;

3. Petitioner's death sentence is hereby VACATED and his case REMANDED to the Pennsylvania courts for resentencing in a new penalty phase proceeding;

4. Based on our findings and conclusions in the foregoing Opinion, there are no grounds to issue a certificate of appealability, and such certificate is DENIED;

5. For the reasons stated in the foregoing Opinion, Petitioner's Motion for Summary Judgment on *Batson* Claim filed on August 2, 2001 is DENIED; and

6. As stated at the evidentiary hearing held August 16, 2001, the Commonwealth's Motion for Reconsideration of Grant of Evidentiary Hearing is DENIED.